ENTERGY ARKANSAS, INC., an Arkansas corporation; Entergy Gulf States, Inc., a Texas corporation; Entergy Louisiana, Inc., a Louisiana corporation; Wolf Creek Nuclear Operating Corporation, a Delaware corporation, ["Entergy & Wolf Creek"] Plaintiffs,

Central Interstate Low–Level Radioactive Waste Commission, ["Commission"] Realigned Plaintiff,

US Ecology, Inc., a California corporation, ["USE"] Intervenor–Plaintiff,

v.

State of NEBRASKA; Nebraska Department of Environmental Quality; Nebraska Department of Health and Human Services Regulation & Licensure. ["Nebraska"] Defendants.

No. 4:98CV3411.

United States District Court, D. Nebraska.

Sept. 30, 2002.

Stephen M. Bruckner, Joseph E. Jones, Fraser, Stryker Law Firm, Omaha, NE, for Omaha Public Power Dist.

Rene M. Devlin, Laurence H. Levine, Latham, Watkins Law Firm, Chicago, IL, Steven G. Seglin, Rocky C. Weber, Crosby, Guenzel Law Firm, Lincoln, NE, for US Ecology, Inc.

Lisa Goldblatt, Michael R. McCarthy, Collier, John L. Wittenborn, Shannon Law Firm, Washington, DC, Patrick T. O'Brien, Butler, Galter Law Firm, Lincoln, NE, William B. Reynolds, Howrey, Simon Law Firm, D.C., Washington, DC, for State of Nebraska

' John P. Heil, Patrick J. Ickes, Thomas E. Johnson, Baird, Holm Law Firm, Omaha, NE, for Entergy Arkansas, Entergy Gulf States, Entergy Louisiana, Wolf Creek Nuclear Operating.

Patricia A. Knapp, Univ. of Neb. College of Law, Lincoln, NE, for Boyd County Monitoring Committee.

Annette M. Kovar, Neb. Dept. of Environmental Quality, Lincoln, NE, Patrick T. O'Brien, Butler, Galter Law Firm, Lincoln, NE, John L. Wittenborn, Collier, Shannon Law Firm, Washington, DC, for Dept. of Environmental Quality.

Patrick T. O'Brien, Butler, Galter Law Firm, Lincoln, NE, Alan E. Peterson, Shawn D. Renner, Cline, Williams Law Firm, Lincoln, NE, for Central Interstate Low-Level Radioactive Waste Com'n.

Patrick T. O'Brien, Butler, Galter Law Firm, Lincoln, NE, William B. Reynolds, Howrey, Simon Law Firm, Washington, DC, John L. Wittenborn, Collier, Shannon Law Firm, Washington, DC, for Cheryl Rogers, David P. Schor, Jay Ringenberg, Randolph Wood.

Patrick T. O'Brien, Butler, Galter Law Firm, Lincoln, NE, John L. Wittenborn, Collier, Shannon Law Firm, Washington, DC, for Dept. of Health, Nebraska.

Patrick T. O'Brien, Butler, Galter Law Firm, Lincoln, NE, for Governor.

Patrick T. O'Brien, Butler, Galter Law Firm, Lincoln, NE, John L. Wittenborn, Collier, Shannon Law Firm, Washington, DC, for Director of Neb. Dept. of Health and Human Services, Regulation and Licensure.

## MEMORANDUM AND ORDER

KOPF, Chief Judge.

After a two-month trial, I find and conclude that Nebraska violated its federal obligation to the United States and the States of Arkansas, Kansas, Louisiana, and Oklahoma. To be specific, Nebraska failed to act in good faith as required by an interstate compact when it considered, delayed, and then denied a license to build a low-level radioactive waste disposal facility that was to be used by the citizens of those five states.

In so deciding, I do not determine whether the license should have been granted. As I have said before, Nebraska was vested with a great deal of discretion under the law. *Entergy Ark., Inc. v. Nebraska*, 161 F.Supp.2d 1001, 1005 (D.Neb. 2001) (holding, in part, that because of the great discretion vested in Nebraska under the regulations, the private plaintiff corporations had no due-process-protected property interest in the license application). I have no right to second guess Nebraska on the merits of the license application, and I have not done so. That said, the process was infected with bad faith. While it is impossible to sort out what should or would have happened absent this improper behavior, I state with the utmost conviction that a direct and substantial cause of the license denial was Nebraska's bad faith.

As a remedy, I will order Nebraska to pay and disgorge, with interest, roughly $151 million that was expended during the attempt to license the facility in Nebraska. Except for a declaratory judgment that Nebraska acted in bad faith, I will not award other equitable relief (such as a court-supervised licensing) because Nebraska has now made meaningful active equitable relief unworkable and unwise. Any attempt to impose equitable relief be-

yond a declaratory judgment would make a bad situation far worse.

Pursuant to Federal Rule of Civil Procedure 52, I now set forth the findings of fact and conclusions of law that inform my decision. My findings of fact and conclusions of law are set forth below.

## I. FACTS

The record in this case is massive. Thus, the risk of making this opinion more dense and difficult than it need be is real. I, therefore, resist the urge to describe, debate and then resolve every skirmish and squabble. On the contrary, and despite the truly unfortunate length of this opinion, I strive for relative brevity, and thereby hope for maximum clarity.

After all, shorn of all the trappings, the question is a simple one. Is it more likely than not that Nebraska acted in bad faith?

### A. An Overview

#### 1. Statement of the Case

I assume a certain level of familiarity with this case and its 10–year–plus lineage. For others who desire a more general review, see Thomas O. Kelley, Note, *Nebraska's $160 Million Liability?-Entergy Arkansas, Inc. v. Nebraska, 241 F.3d 979 (8th Cir.2001)*, 80 Neb. L.Rev. 574 (2001).

At its heart, this matter rests upon the Central Interstate Low–Level Radioactive Waste Compact ("Compact"). Put simply, the Commission, a body created by Congress and the Compact to enforce its provisions, sued Nebraska primarily claiming that it violated the Compact's "good faith" provision.

Certain of the big power generators ("Entergy & Wolf Creek") which would have used the disposal site, and U.S. Ecology, Inc. ("USE"), which was to build and operate the site, also sued Nebraska. However, the Court of Appeals for the Eighth Circuit held that these private corporate plaintiffs could not maintain a suit under the Compact against the State of Nebraska. *Entergy Ark., Inc. v. Nebraska,* 241 F.3d 979 (8th Cir.), *cert. denied,* —— U.S. ——, 122 S.Ct. 203, 151 L.Ed.2d 144 (2001) (despite claim for damages, affirming decision that the Eleventh Amendment did not preclude the Commission's suit against Nebraska; reversing decision denying qualified immunity to individual defendants; reversing decision that private corporations' complaints stated a claim under an interstate compact; remanding for reconsideration of motions to dismiss private corporations' due process claims). I later decided that they had no property interest under Nebraska law sufficient to give rise to a Constitutional due process claim. *Entergy,* 161 F.Supp.2d at 1005 (D.Neb.2001) (given that the private corporations could not maintain suit under the Compact, private corporations did not have due-process-protected "property interest" in the license or the money spent in the attempt to obtain it and dismissing those claims).

These corporate plaintiffs also have claims against the Commission which derive from the Commission's claims against Nebraska. I do not discuss those claims in this opinion, but rather deal solely with the Commission's claims. Contemporaneous with the issuance of this opinion, I also issue another opinion denying the basic claims of the private corporate plaintiffs against the Commission.

In the Compact, the member states agreed to develop disposal facilities for low-level nuclear waste generated within their borders, and then the Commission selected Nebraska as the host state for such a facility. The Commission alleges that Nebraska has attempted to evade its obligations under the Compact since 1991 by delaying the decision on a license for the proposed facility and by then wrongfully denying a license. The Commission

seeks injunctive relief, a declaratory judgment that Nebraska has violated its fiduciary[1] and contractual obligations under the Compact, an accounting, compensatory and consequential damages, the removal of Nebraska from further supervision of the licensing process and appointment of a third party to exercise supervision, and attorney fees and costs. The Commission does not assert a claim of personal liability against the State officials.

### 2. The Compact

Under the "Compact Clause" of the Constitution, only Congress has the authority to allow States of the Union to enter into agreements which substantially impact upon federal interests. That is, "No State shall, without the Consent of Congress, ... enter into any Agreement or Compact with another State, or with a foreign Power ...." U.S. Const. art. I, § 10, cl. 3.

Congress passed the Low–Level Radioactive Waste Policy Act of 1980 (the Act), 42 U.S.C. § 2021b et seq. (amended 1986), "to promote the development of regional low-level radioactive waste disposal facilities." *Concerned Citizens of Neb. v. United States Nuclear Regulatory Com'n,* 970 F.2d 421, 422 (8th Cir.1992). *See* 42 U.S.C. § 2021d ("Regional compacts for disposal of low-level radioactive waste"). Under the authority of the Act the member states entered into the Compact, which was passed as original legislation by each of the states and by Congress. Omnibus Low–Level Radioactive Waste Interstate Compact Consent Act, Pub.L. No. 99–240, tit. II, § 222, 99 Stat. 1859, 1863–71 (1986) (reprinting the Compact referred to by article).[2] The Central Interstate Low–Level Radioactive Waste Compact is also found in Nebraska law at Appendix § BB, Neb.Rev.Stat. Vol. 2A (Reissue 1989) (a superceded volume).

The Compact established the Commission to enforce its provisions and provided the framework for licensing a facility for the disposal of low-level radioactive waste generated in the five states. *See* Arts. III & IV. Several provisions address performance of obligations imposed by the Compact. Each of the states has "the right to rely on the good faith performance of each other party state." Art. III(f). The state selected as the host for a disposal site is required "to process all applications for permits and licenses required for the development and operation of any regional facility or facilities within a reasonable period from the time that a completed application is submitted." Art. V(e)(2). By filing suit, among other methods, the Commission is explicitly commanded to "require all party states ... to perform their duties and obligations arising under this compact ...." Art. IV(m)(8).

### 3. The Preliminary Injunction Opinion

I first had occasion to consider the merits of the Commission's claims at a hearing on a motion for preliminary injunction. *Entergy Ark., Inc. v. Nebraska,* 46 F.Supp.2d 977 (D.Neb.1999). At that time, I determined that the Commission would probably prevail and I enjoined Nebraska from pursuing a state administrative hearing that would have reviewed the license denial under conditions which would not protect the Commission and which might impair this court's ability to decide this case. That decision was affirmed on appeal. *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887 (8th Cir.2000). Pursuant to Rule 65(a)(2), the testimony at

---

**1.** At the conclusion of the Commission's case, I granted Nebraska's motion for judgment as a matter of law regarding the Commission's fiduciary duty claim. (Tr. 4548.)

**2.** That Compact, as found at 99 Stat. 1863–71, is reprinted in the Appendix to this opinion and is cited in this opinion by article.

that preliminary injunction hearing has become part of the evidence at this trial.

In the preliminary injunction opinion, I found that it was likely that Nebraska engaged in bad faith when it denied the license. I found that bad faith was shown by the following evidence: (1) Governor Nelson's campaign promise to kill the "nuclear dump" and questionable behavior by his subordinates in an apparent effort to assure that his political promise would be carried out; (2) despite the recommendations of their own auditor, the refusal of Nelson's regulators to adopt a budget and timetable potentially resulting in the waste of eight years of work and more than $74 million; (3) a 1993 decision to deny the application in the face of a legal opinion, from Nebraska's outside counsel in this case, that denial was not required by the regulations; (4) a work slow-down over a monetary dispute despite the fact that Nebraska had received millions of dollars from the Commission; (5) the 1998 decision to deny that appears inconsistent with previous positions articulated by the regulators; (6) inclusion of the Department of Health in the decision-making process in violation of state law as declared by a state district judge; (7) the failure to meet a deadline adopted by the Commission and upheld by my colleague, Judge Urbom; (8) repeated meritless litigation in this court; and (9) efforts by Nebraska, represented by former Governor Nelson's law firm, to preclude the Commission from raising the issue of bad faith during the administrative hearing which would have reviewed the license denial but for the injunction. *Entergy*, 46 F.Supp.2d at 994–95.

### B. Players, Terms, and Time Line

Because of the many names, terms, and abbreviations, it is helpful to set forth a partial glossary. Such a listing appears below:

### 1. Names

**AE**

American Ecology, a publicly traded company and the parent of U.S. Ecology.

**Rod Armstrong**

He served as the supervisor of the Governor's policy research office.

**Kate Allen**

A lawyer who worked at the Governor's policy research office. Later, she served on the staff of a state senator while doing legal work for a group of site opponents. When working for the Governor, she was assigned to work on low-level nuclear waste matters.

**Bechtel**

A large international engineering firm hired by U.S. Ecology to assist it in selecting the site and prosecuting the license application.

**Rick Becker**

A lawyer who worked at the Governor's policy research office. He was assigned to work on low-level nuclear waste matters. He had previously been a law clerk to Pat Knapp while Knapp represented the local monitoring committee.

**Tim Becker**

At one time, the Governor's chief of staff. He previously held other positions on the Governor's staff.

**Boyd County**

The Nebraska county where the disposal site was to be situated.

**Butte**

A village near where the disposal site was to be situated.

**John Breslow**

The Auditor of Public Accounts who authored a report critical of the Department of Environmental Quality.

**Marvin Carlson**

A University of Nebraska geology professor. He served as a consultant to Nebraska, and was the review manager for site characteristics.

**Collier, Shannon**

A Washington, D.C., law firm that served as a consultant to Nebraska during the licensing process. With others, that firm also served as trial counsel in this case. A lawyer for Collier, Shannon authored a legal opinion that was not followed.

**John Conley, and Conley, Smith**

John Conley worked for Conley, Smith. He was specially hired to do a financial analysis of U.S. Ecology.

**DEQ**

The Nebraska Department of Environmental Quality.

**DOH**

The Nebraska Department of Health.

**GAO**

The General Accounting Office, an arm of the Congress. It prepared a report on the site selection process.

**HDR**

A large engineering firm that was primarily responsible for providing most of the consulting services to Nebraska.

**Dr. Mark Horton**

A pediatrician, who served as the Director of the Department of Health. He was the decision-maker for that agency until he left Nebraska in early 1997.

**JHC**

An environmental engineering firm that together with HDR was responsible for providing and managing most of the consulting services to Nebraska.

**Dale Jacobson**

An environmental engineer employed by JHC who was responsible for managing all the consultants. He also served as the review manager for qualifications of the applicant.

**Kennedy, Holland**

The law firm where Governor Nelson worked before he was Governor. Kennedy, Holland lawyers, especially Bill Lamson, did a lot of legal work for Nebraska on low-level nuclear waste matters including prosecuting several of the lawsuits filed against the Commission.

**Pat Knapp**

A lawyer who represented the local monitoring committee. The local monitoring committee opposed the application.

**Bill Lamson**

A highly regarded trial lawyer with Nelson's former law firm who was hired in 1993 to coordinate Nebraska's legal positions on the license.

**Lamson, Dugan & Murray**

The successor law firm to Kennedy, Holland that Nelson rejoined after leaving the Governor's office. Tim Becker also joined that firm.

**Steve Moeller**

A lawyer who worked at the Governor's policy research office. He replaced Allen. He was assigned to low-level nuclear waste matters.

### Ben Nelson

E. Benjamin Nelson, the Governor of Nebraska during most of the licencing process and now United States Senator. He is a lawyer.

### W. Don Nelson

A political confidant and friend of Governor Nelson's. Also a friend of Randy Wood's. He later went to work on Ben Nelson's U.S. Senate staff.

### NRC

The Nuclear Regulatory Commission.

### Jay Ringenberg

He worked at the Department of Environmental Quality, and was the staff person who was primarily responsible for supervising the licensing efforts of that department.

### Kim Robak

A lawyer. She served as legal counsel to Governor Nelson, then chief of staff to Governor Nelson, and after that as Lt. Governor.

### Cheryl Rogers

She worked at the Department of Health, and was the staff person who was primarily responsible for supervising the licensing efforts of that department.

### Dr. David Schor

A pediatrician who became the decision-maker at the Department of Health in January of 1997, replacing Dr. Horton.

### Sandy Scofield

Former state senator who was Governor Nelson's first chief of staff. Kate Allen previously worked for Scofield when she was a state senator.

### Don Stenberg

Attorney General for the State of Nebraska.

### Stewart Taylor

A hydrologist, employed by Bechtel, who advised U.S. Ecology. At the request of Nebraska's consultants, he prepared a computer model that purported to determine whether groundwater discharged to the surface.

### Linda Willard

Assistant Attorney General for Nebraska who did much of the legal work for Nebraska. She authored a legal opinion that was never issued.

### Randy Wood

Director of the Department of Environmental Quality, and the primary decision-maker regarding the application.

### 2. Terms

### Contested Case

A Nebraska administrative procedure that allows an unsuccessful applicant for a license to contest the agency decision. It is conducted by a hearing officer, who makes a non-binding recommendation. The decision-makers who made the initial decision also decide the merits of the contested case.

### DSER

Draft Safety Evaluation Report. The DSER was prepared by Nebraska's consultants and reviewed by the decision-makers. Its purpose was to determine if the facility meets applicable state laws and regulations.

**Hydrograph**

A graph showing water level measurements taken from a well over time.

**IPA**

Independent Performance Assessment. A study prepared by a Nebraska consultant to determine whether the facility as it degraded over 10,000 years would threaten the health or safety of the public.

**LLRW**

Low-level radioactive waste.

**LLRW Program**

A group comprised of employees at the Department of Health and the Department of Environmental Quality who, together with the consultants, were responsible for the licensing effort.

**LMC**

Local Monitoring Committee. A creature of statute created to foster communications between local residents, the state, and the developer.

**PRO**

Governor's policy research office.

**SAR**

Safety Analysis Report. The SAR is the application for a license. It is amended by submitting revisions.

**Technical Review**

The process of reviewing the application by Nebraska's consultants and agency staff. There were "technical reviewers" who were experts in particular disciplines. The technical reviewers were supervised by "review managers" who were responsible for several technical reviewers involving a variety of disciplines. For example, a technical reviewer for hydrology might be overseen by a review manager who was a geologist and who was responsible for all site characteristic issues.

**404 Permit**

A federal license issued by the Army Corps of Engineers to U.S. Ecology which allowed U.S. Ecology to remove a small wetland.

### 3. Time Line

The facts relevant to this case span a period of more than 10 years. Because of that long history, a time line is necessary. Although tedious to read, a complete understanding of this case is impossible without a full appreciation of the chronology.

#### 1980

Congress enacts the Low–Level Radioactive Waste Policy Act (amended in 1986) to promote the development of regional low-level radioactive waste disposal facilities.

#### 1983

Nebraska passes LB 200 which authorizes Nebraska to enter into Compact.

#### 1986

Congress consents to the Compact. Nebraska passes the Low–Level Radioactive Waste Disposal Act, thereby implementing the Compact.

#### December, 1987

Nebraska chosen as host state. According to Governor Kay Orr, "the State of Nebraska recognizes its responsibility as a member of the Compact and accepts such designation as host state." (Ex. 45 at G.)

#### January, 1988

USE enters into formal contract with Commission. (Ex. 13.) Commission also enters into first of many agreements with big generators to provide funding for the project. (Ex. 14.) About $88.5 million ultimately expended by Commission, which

amount is mostly funded by Generators and USE. (Ex. 1083, at last page.)

### 1989

HDR and JHC are hired as chief consultants for Nebraska to provide most of the consulting services to Nebraska regarding any license application. (Tr. 1333, 1651.) HDR is a large engineering firm, and JHC is a speciality environmental engineering firm. Later, University of Nebraska also retained to provide consulting services. HDR and JHC supervise all the consultants.

### 1989

13.02 inches of precipitation at Butte, NE, for this year versus mean annual precipitation of 23.67 inches at this site. (Ex. 3384, at 2.4–53.)

### February, 1990

Nebraska legislature informed that Boyd County site near Butte, NE, has been selected.

### February 21, 1990

Robert V. Eye, a Kansas lawyer, acting as lead counsel, files *Concerned Citizens of Nebraska, Ronald Schumann, Lowell Fisher, Diane Burton and David Follrichs v. United States Nuclear Regulatory Commission, Nebraska Department of Environmental Control, Central Interstate Low–Level Radioactive Waste Compact Commission, and U.S. Ecology, Inc.*, 90–L–70. (Ex. 1535 (docket sheet and selected filings).) The suit sought to prevent the establishment of a low-level radioactive waste disposal site in Nebraska. The case is dismissed by Judge Urbom on October 19, 1990 as against USE and the Commission and on April 22, 1991 as against the NRC, with the judge holding that the NRC's low-level radioactive waste regulations were valid and that the remainder of the plaintiffs' claims also lacked merit. On July 6, 1992, the court of appeals affirmed Judge Urbom's two orders in part and reversed in part. It held that Judge Ur-

bom did not have jurisdiction to consider the challenge to the NRC regulations, but otherwise affirmed the remainder of his decision. (*Id.*)

### July 27, 1990

USE files 4,000–page application with Nebraska for Boyd County site. (Ex. 1411, App. A at 14.) The application consists in part of a Safety Analysis Report (SAR) which was amended throughout the process to include additional information. As changes were made by USE, Nebraska substituted the new pages for the old ones in the SAR. The last revision of the SAR was Revision 8A.

### Fall, 1990

Candidate E. Benjamin Nelson attacks Governor Orr for doing "far too little to protect the interests and respond to the concerns of" local residents. (Ex. 28, Attach. A (AP story).) To a cheering crowd of Boyd County residents, Nelson promises that "[i]f I am elected governor, it is not likely that there will be a nuclear dump in Boyd County or in Nebraska." (Ex. 28 at ¶ 3 (affidavit of AP reporter) & Attach. A; Filing 99, at Tr. 75, 77–79 (testimony of AP reporter in preliminary injunction transcript).) Statement confirmed by Nelson to AP reporter. (Filing 99, at Tr. 76–77.) AP puts story on the wire. (Ex. 28, Attach. A; Filing 99, at Tr. 72–73.)

### November, 1990

Nebraska commences technical review of license. (Ex. 1411, App. A at 18.)

### December 13, 1990

Kate Allen, a lawyer and a site opponent, and Greg Hayden, a University of Nebraska professor and another site opponent who is later appointed by Nelson to serve as Nebraska's Commissioner on the Compact Commission, have meeting with lawyers at Kennedy, Holland, the law firm with which Nelson is then affiliated, about

low-level radioactive waste and what Governor-elect Nelson should be doing. (Ex. 342.) Allen's notes indicate that they discuss the need for Governor-elect Nelson to state his goals. "For example: withdraw from Compact," "prevent a facility from being built in Nebraska," "site and license a facility with community consent as a condition of licensure," "grant a license only if shared liability language is amended into the Compact," "delay the granting of a license until all of the other states/compacts have either submitted a license or until a majority have granted licenses (to try to insure that Nebraska will not be the first or second to license a facility in case the feds decide we only need a few facilities nationwide)." (Ex. 342, at GOM42356). (These notes, and many others, were hidden in Allen's basement until 2001.)

### Date Unknown, but probably late 1990 or early 1991

Allen's files include a handwritten note stating that "ultimately to get leverage will have to threaten to W/D (fiduciary duty)" from the Compact. (Ex. 1441, at GOM46975.) This same note further indicates: "Redo-memos," "remove names," and "ID as atty/client work product." (Ex 1441, at GOM46976.)

### 1990

21.89 inches of precipitation at Butte, NE, for this year versus mean annual precipitation of 23.67 inches. (Ex. 3384, at 2.4–53.)

### January, 1991

Nelson becomes Governor. After Nelson becomes Governor, Commission pays out more than $70 million and USE makes equity contributions of more than $1 million. (Tr. 3821–22; see also, demonstrative exhibit 1083JO at last page (total amount paid by Commission from January 1, 1991 to present is $70,362.068.26; total equity contributions by USE from January 1, 1991 to the present are $1,068,239.22).)

Aside from USE equity contributions, and small annual dues from the five states, the money is provided by the generators. (Id.; Tr. 3826.)

### December, 1990–January, 1991

Kate Allen joins Nelson's staff, known as the Policy Research Office (PRO). Allen had been a legislative aide to Sandy Scofield, a former Nebraska state senator who became Nelson's chief of staff. Scofield was a site opponent. (Tr. 102, 234.) Allen assigned to "staff" the low-level nuclear waste issue. One of her first tasks is to list Nelson's LLRW campaign promises so that Nelson could review them and go to work on fulfilling them. (Tr. 266.) In a December 30, 1990 memorandum captioned "Re: Action Plan on LLRW," Allen submits to Nelson a list of seven LLRW campaign promises. (Ex. 1526, at PRO09225.) Kim Robak testified at trial that within months of working with Allen "I do recall believing that Kate was very biased on the issue." (Tr. 469–70.) Because of her bias, Robak testified that Allen was directed to keep a "low profile." (Tr. 472.)

### January 23, 1991

Allen takes pages of detailed notes involving a meeting with the Governor and site opponents in Boyd County. Among other notations next to the initials "EBN" (standing for E. Benjamin Nelson), she writes "want USEcol to think EBN is deranged; created noise & difficulties think we can win it; expensive." (Ex. 877, at PRO59289.) At another place, besides the initials EBN, Allen wrote "important we get Director w/o agenda who we can trust—so we can critically evaluate the ER & SAR." (Ex. 877, at PRO59293 (capitalization, spelling, and punctuation in this and any other quoted e-mail is as in the original, unless otherwise indicated).) At trial, Allen testified that looking back at it, she thought Nelson wanted to keep the

proponents of the license off balance by adopting a "deranged" posture. (Tr. 283–84.)

### 1991–1992

Allen attends various non-public meetings at DEQ and DOH when discussions with directors and other DEQ and DOH staff take place regarding the license. On at least one occasion (May 7, 1992), Allen is present when technical review managers are present; asks questions of the review managers; and offers opinions, such as "the groundwater rises into the wetlands." (Ex. 553, at JAD000016–18.) Allen's notes regarding technical issues discussed at this May 7, 1992 meeting include: "Showstoppers: wet lands [-] surface expression of GW." (Ex. 399, at GOM49438.) Allen's presence upsets the review managers and, after the meeting, they complain. Jay Ringenberg, the LLRW program manager for DEQ, testifies that it was improper for Allen to attend this type of meeting, and it was improper for her to participate in such a meeting. Ringenberg complains to Wood. Ringenberg testifies that Allen no longer appeared at meetings when the review managers were present. (Tr. 4637–41.)

### February 4, 1991

Allen writes memo to Nelson and Scofield recounting a meeting with Harry Borchert and Cheryl Rogers. Borchert was Rogers' boss at DOH and the head of Radiologic Health. Rogers was the program director for license review for DOH. In the memo, Allen recites the complaints of Borchert and Rogers about DEQ and U.S. Ecology. Allen writes "DOH seems to be the only entity that is asking hard questions." Allen concludes this way: "BOTTOMLINE: Both Harry and Cheryl said that they cannot say to the Governor nor to the citizens that the health and safety of the people is or will be protected if things continue as they are now." (Ex. 362.)

### February, 1991–October, 1991

First round of technical review comments and responses. Technical comments were forwarded by Nebraska in February, 1991, March, 1991 and August, 1991. USE responds in August of 1991 and October of 1991. (Ex. 1411, App. A at 19.)

### March, 1991

Rogers notes a meeting at the Governor's PRO office regarding the scope of work for geologists Byrd and Kaplan. (Tr. 5267–68.) Initially, Byrd and Kaplan had been retained by DEQ under a contract with the University of Nebraska to oversee on-site geological borings extracted by USE and its consultant Bechtel. (Tr. 5263–64.) On October 31, 1990, Byrd had submitted an unsolicited report to Marvin Carlson, a review manager for site characteristics, that groundwater might intrude into the site. (Ex. 7012.)

### March, 1991

George Smith is hired as a technical reviewer for environmental monitoring at the insistence of DOH and Rogers. Smith comes from SEG, a subsidiary of Westinghouse. Westinghouse is a competitor of USE-it was the other bidder for the contract with the Commission. (Exs. 426, 3467; Tr. 1387–88, 3065.) HDR and JHC did not procure the services of Smith. Rather DOH, Rogers, and Borchert first contact SEG and then HDR is instructed to hire Smith. (Tr. 1387–91, 5349.) Later, Smith becomes a policy "advisor" to the DOH director. (Tr. 5376.)

### April 10, 1991

A lawyer at Kennedy, Holland writes a *"Personal and Confidential"* letter to Nelson, as Governor. (Ex. 1556.) Addressed to "Dear Ben," the letter discusses the fact that Nelson has had discussions with the law firm about USE's suggestion that it would cease work if LB 72 passed. LB 72

related to imposing another "community consent" requirement. The letter concludes that passage of the bill would not allow USE to stop work under its contract with the Commission. (Ex. 1556.) The letter further states: "Also, we have not addressed whether passage of LB 72 could arguably be viewed as a breach of Nebraska's good faith performance of the compact. But as we have discussed, LB 72 and some of the other legislation introduced this session which effectively amends the Compact could be viewed by others as a breach of the Compact by Nebraska, unless the other party-states approve those changes." (*Id.*)

### May 14, 1991

Scofield, Nelson's chief of staff, sends an e-mail to Allen stating in pertinent part: "[A]lso, would you like to get on a conference call with me and call randy wood so he knows where the governor is going on llrw and what expectations for him will be. i think the two of us can give him the perspective he needs and also judge if he's up to the task." (Ex. 346.)

### May 16, 1991

Allen sends e-mail to Nelson's chief of staff, legal counsel, head of PRO, and other Nelson staffers concerning the Commission stating, among other things, that "possibly it's time for the Deranged Governortto [sic] come forward." (Ex. 1474.)

### Summer, 1991

Nelson appoints Randy Wood as Director of DEQ. W. Don Nelson (who is not related to Governor Nelson) recommended Wood to Governor Nelson. (Tr. 959.) Wood and W. Don Nelson are friends. (Tr. 2230.) W. Don Nelson knew Wood in Wyoming when W. Don Nelson served that State's Governor as the chief of staff and Wood served as director of Wyoming's equivalent of the DEQ. (Tr. 959.) W. Don Nelson, then residing in Lincoln, Nebraska, is also a close friend and political confidant of Governor Nelson. (Tr. 958.) W.

Don Nelson later became a member of Nelson's U.S. Senate staff, serving as his State Director. (Tr. 958.) Wood's regulatory philosophy is such that he is proud to publicly state that he would "make no effort whatsoever to work with an applicant to work out a way to use a piece of property that would be suitable." (Ex. 1068, at 16 (Wood's testimony before the Import Policy Committee of the Southeast Compact Commission on February 24, 1993).)

### July, 1991

After a request for investigation by U.S. Senator J. James Exon of Nebraska, the General Accounting Office (GAO) approves site selection process. (Ex. 3596, at 1–2.) GAO adds that the Boyd County location is "the only candidate site with good potential to meet the state's licensing requirements." (*Id.* at 10.) Nebraska tells GAO that licensing process will take about 15 months and cost about $6 million. (*Id.* at 3.) Kate Allen makes notes about the GAO report and writes "how do we slow down the process." (Ex. 1460, at GOM37307.)

### August 5, 1991 through August 16, 1991

Lawyers for Kennedy, Holland do legal work and bill Nebraska "re negotiations-Central Waste Comm. & U.S. Ecology," including meetings and phone conferences with Nelson, Scofield, Allen, and Robak. (Ex. 354.) During this time, Nelson served as Nebraska's commissioner on the Commission and had a Kennedy, Holland lawyer appear for him. (*Id.*; Tr. 7221, 7307–8.)

### August 15, 1991

Allen, aware that Wood had received "technical briefings" regarding wetlands and flood plain issues, suggests to Wood that he send a letter to USE expressing his "concern" over these issues. (Ex. 1486; Tr. 254.) Allen also discusses letter, and need for hand delivery, with Nelson. Allen then hand delivers letter to USE in

middle of negotiations between Commission and generators regarding whether generators will contribute more money. This letter disrupts the meeting. (Filing 99, at Tr. 123–27, 155 (preliminary injunction transcript).) Kennedy, Holland lawyer bills Nebraska for "meeting with Kate Allen and attending Waste Compact negotiations; conf. with Ben Nelson re results of meeting. Going over results of previous meeting." (Ex. 354.)

### August 16, 1991

Lawyer for Kennedy, Holland bills Nebraska for "attending Waste Compact negotiations. Nebraska being asked to leave Compact because of uneasiness of waste producers and U.S. Ecology in negotiating before Nebraska representatives because of hostile political atmosphere and attitude of Dept. of Environmental Cont." (Ex. 354.)

### October 1, 1991

Collier, Shannon law firm of Washington, D.C., (also trial counsel here) advises "that Nebraska's site suitability requirements would not be violated if U.S. Ecology's disposal facility were to be located as proposed" despite the fact that part of the site allegedly contained wetlands and flood plains. (Ex. 593, at JHC02421.)

### October 21, 1991

Dr. Mark Horton, a pediatrician with a master's degree in public health, becomes Director of DOH upon the appointment of Governor Nelson. (Tr. 4325, 4337–38.) Horton has no experience in LLRW issues. When he testified at trial, Horton "could not recall" the details of critical events and details regarding the license process or meetings with Governor and others in the Governor's office. (*E.g.*, Tr. 4378–80 (proposal to issue intent to deny without prejudice based on nonreceipt of information from USE), 4417–18 (specifics of how 1993 intent to deny decision was reached or how Governor was informed of that decision).)

### October 22, 1991

Rogers sends Ringenberg at DEQ a memo regarding wetlands and questioning site suitability. (Ex. 3655.)

### October 28, 1991

Rogers sends Allen an e-mail regarding site suitability, indicating that Jay Ringenberg (the DEQ program director) "received the site suitability memo rather well," and recounting a meeting between DOH and DEQ legal counsel. (Ex. 403.) Rogers testifies at trial that she talked to the Governor's office about issues regarding wetlands and how to interpret the regulations. (Tr. 5205–6, 5546.)

### About November 18, 1991

Harry Borchert, with DOH, apparently makes a public statement that the site cannot be licensed because of wetlands and flood plains on the site. This creates a public furor. Wood complains to Horton. (Ex. 1012.) Horton testified that Borchert was counseled about the statement, though Horton could not recall whether he or someone else counseled Borchert, or whether he or someone else investigated whether Borchert made the statement. (Tr. 4439–41.)

### December 24, 1991

Nebraska tells USE that application is complete. (Ex. 1411, App. A at 14; Ex. 7020.)

### 1991

24.78 inches of precipitation at Butte, NE, for this year versus mean annual precipitation of 23.67 inches. (Ex. 3384, at 2.4–53.)

### 1991 and 1992

"Turf battle" between DOH and DEQ festers. (Tr. 526.) Wood and Horton meet with Robak. Wood testifies that Robak instructed him that "the State's position [is] that the Department of Health had jurisdiction" and to "make sure that

the Department of Health was completely involved in this issue as they needed to be." (Tr. 6671.)

### April 8, 1992

Pat Knapp, acting as counsel for the Local Monitoring Committee (LMC), a group of site opponents, files *County of Boyd Local Monitoring Committee v. Central Interstate Low–Level Radioactive Waste Commission,* 4:92CV3137. (Ex. 1536 (docket sheet and selected filings).) The suit contends that the Commission violated the law by not providing information to the LMC. (The LMC is a creature of Nebraska statute and was intended to foster communication between residents of the county where a site was situated, the developer, and the State.) In particular, the LMC wanted information about an amendment to the funding arrangement between the Commission and the Major Generators which provided $16.9 million toward the licensing process. Holding in favor of the Commission, Judge Urbom dismisses the case on June 25, 1992. No appeal is taken.

### April 14, 1992

Allen sends Randy Wood an e-mail regarding the delay in issuing a license to USE in California due to objections to the legislative confirmation of California's chief regulator. In the e-mail, Allen recounts a conversation with a lawyer in the California Department of Environmental Health. Allen states: "This [California delay] has got to be a setback for U.S. Ecology's financial situation. They need a license in hand before they get any credit with a bank. . . . U.S. Ecology is being squeezed pretty hard. We might want to be in a 'heads up' posture." (Ex. 312.) The e-mail also went to Nelson, his chief of staff, and others in the administration.

### May, 1992–November, 1992

Nebraska forwards second-round technical comments to USE in May. USE re-

sponds in November. (Ex. 1411, App. A at 20.)

### Summer 1992

Cheryl Roger's "little lab on the prairie" (LLOP), as the HDR consultants derisively referred to it (Tr. 1373), is established in Butte, NE. (Tr. 5345.) Despite the fact that HDR believed the most economical way to handle environmental monitoring data was to have an independent laboratory do the work (Ex. 3686 at 10), DOH insists that a DOH/DEQ laboratory be set up in Butte. (Ex. 941.)

### June 25, 1992

Allen takes detailed notes regarding a meeting with Nelson and site opponents. Among other things, her notes, next to the initials "EBN," indicate the following: "I can't tell you/promise you that I will stop this" [but] "he wants it elsewhere"; when asked about "good faith," "If we don't proceed fairly, then they will file a suit against the state for bad faith" but "I'm not afraid yet"; "Let's talk about litigation [without] giving our plan to the other side-We want to keep them off balance"; "Our best bet is to be the under dog who has been taken advantage of by the bad power companies"; "we have to be careful not to get public sentiment against us"; regarding potential helpfulness of a revised GAO report, "[a]s a publicity tool, if it is damaging we'll really use it"; "I must be creative, otherwise the press will tire of EBN; little boy that cried wolf"; "Litigation, we will continue to look at every angle." (Ex. 1497, at GOM35466–73.)

### June, 1992—July, 1992

Nebraska's Auditor of Public Accounts recommends that the DEQ adopt a budget and a timetable for the project. (Ex. 19 at 10–20.) The auditor notes that the absence of a departmental budget "is the equivalent of a blank check signed by the ratepayers." (Ex. 19 at 11.) Auditor

notes Nuclear Regulatory Commission had developed a guideline suggesting a license review should be completed within a 15-month time frame. (Ex. 19 at 15.) Wood refuses to adopt a budget or a time table. (Ex. 19, App. B, at 66–69.) Kate Allen helps Wood write the response. (Tr. 301; Ex. 356.) Allen's notes indicate that she tried to convince the auditor to change his audit findings and state that the auditor "is very much aware of how angry the [G]overnor is." (Ex. 379.) Horton essentially goes along with Wood about a time table. (Tr. 4488–89.) Horton cannot explain his thinking about a lack of a budget. (Tr. 4489–90.)

### July 28, 1992

Nelson has meeting lasting 1.5 hours with Robert Eye, the Kansas lawyer who had earlier sued Nebraska over the waste site; Jim Selle, a Nebraska site opponent; Pat Knapp, the LMC lawyer who had earlier sued the Commission over funding of the waste site; and people on the Governor's staff, including Kim Robak and Rod Armstrong, head of PRO. (Tr. 722, 725–29.) At that meeting Knapp argued that Nelson should require DEQ and DOH to make a decision about whether there was a "fatal flaw" on the site because of the wetlands before doing any more work on the license. Nelson responds, "it sounds like common sense to me." (Tr. 727.)

### July 28, 1992

After the earlier meeting that day with Governor Nelson, and in the Governor's absence, Eye, Robak, Knapp, and Rod Armstrong hold further discussions about the legal details of the "fatal flaw." (Tr. 729–32.) According to Pat Knapp, Robak asked her what DEQ's position was on this issue, and Knapp responded that she was uncertain, though she believed that DEQ was "simply acquiescing" in the position of U.S. Ecology. (Tr. 731–32.) Knapp agreed to submit to Robak a memorandum outlining her views. (Tr. 732.)

### On or about July 31, 1992

Knapp submits the promised memo to Robak (Tr. 732–36; Ex. 966) and a partial copy is later found in Kate Allen's files (Tr. 733–34; Ex. 385).

### About 7 days after July 31, 1992

According to Knapp's testimony at trial, Robak calls Knapp and "indicated to me [Knapp] that she had talked to DEQ. She did not say to whom. She just said she had talked to DEQ, that there was, that they had told her that there was documentation to support the position that you could engineer around a fatal flaw, that she would look into it and she would get back to me . . . ." (Tr. 735.)

### August 17, 1992

Allen informs Kim Robak that she had been in touch with Vermont Low–Level Waste Authority concerning "their lawsuit against their contractor for 'missing' a fatal flaw of wetlands on the selected site" and "drafting a job description for an attorney position for Steve Moeller to work on legal issues on LLRW." (Ex. 365.)

### August 19, 1992

Allen proposes a meeting to her superiors. She wants to meet with site opponents and Steve Moeller to do the following: "to take all of the ideas and potential options and put our collective legal minds and substantive information together and come up with options for the Governor with an analysis of risks and possible legal outcomes. (essentially what you asked of the analysts at Monday's meeting)." (Ex. 366.)

### On or about August 20, 1992

Allen's notes reflect discussions with someone on Nelson's staff, perhaps Kim Robak, and the preparation of detailed plans regarding how to change Randy Wood's mind if Wood decided that wetlands on the site were not a fatal flaw.

(Exs. 309, 361, 382, 383 (all bearing a Bates number with a GOM prefix, indicated they were produced from boxes in Allen's basement containing documents from her tenure at PRO (Tr. 376–77)).) The notes contain an extensive discussion about the liability of doing so, including the "good faith" provision of the Compact and the absence of a good faith obligation under State law. At trial, Allen was asked the following question and gave the following answer:

> Q. Would you agree that it [Ex. 309] appears to reflect consideration by two attorneys, yourself and Ms. Robak, about legal options, and possible legal consequences, of trying to change the mind of Director Wood on the fatal flaw issue?
>
> A. Yes.

(Tr. 378.) Allen admits that these documents were hidden in her basement until 2001, that they "might show bad faith against the State of Nebraska" and, in any event, that they were "[a]t least very damaging." (Tr. 387.)

### September 1, 1992

Allen has meeting or discussion with Mike Linder, legal counsel at DEQ. (Ex. 1499.) Her notes indicate that they discuss Linder's thoughts about the regulations. Under the caption "Legal conclusion" she writes, among other things, "no prohib. to h'vng wetland in disposal site." At another point, she writes, placing the thoughts in brackets, "[no prohibition against engineering]." (Ex. 1499, at GOM47458–59.)

### September 2, 1992

Allen speaks with two Local Monitoring Committee (LMC) members. The LMC is a creature of Nebraska statute generally intended to serve as a voice for residents of the area in which the site is situated and is comprised mostly of site opponents. The two LMC members want to talk to Nelson about water on the site and other concerns. Allen sends an e-mail to her supervisor (Armstrong) reminding him that "LMC can still be used by the Governor to do things he cannot do directly." (Ex. 793.)

### September 2, 1992

Allen writes an e-mail to her supervisor at PRO outlining her priorities. In the second paragraph, she types and then writes in her handwriting the following:

> Summarizing and following up my discussion with Mike Linder et al in DEQ concerning their legal analysis that the floodplain and wet lands are not a fatal flaw. I need to brief the folks upstairs and get back to the LMC. Also, deciding whether we ask Don Stenberg [the Nebraska Attorney General and a political foe of Nelson's] for an Attorney General's opinion on the issue. If DEQ says 'no fatal flaw' and Stenberg supports their conclusion, then hello waste dump and send the National Guard to Boyd County.—I am reviewing all the materials given to me by DEQ as supporting guidelines, etc. I'm working on a summary to help present to Kim/EBN. I may need follow-up with DEQ for some clarification.

(Ex. 395, at GOM47568.)

### September 8, 1992

Pat Knapp, the lawyer for the LMC, writes a letter to Kim Robak indicating that Allen has sent her "the documentation which supposedly supports NDEQ's position that one can engineer around flaws in a LLRW site." (Ex. 975.)

### September 14, 1992

On September 14, 1992, Robak responds to Knapp in a terse and formal letter that DEQ has not taken a position. (Ex. 974.)

***Sometime between September 11, 1992 and September 21, 1992***

The notes of Carla Felix, an administrative assistant at DEQ, who is much later promoted to program manager of the LLRW program, describe Wood's account of a telephone conversation he had with a site opponent, Jim Selle. (Tr. 5009; Ex. 271.) The notes indicate Wood stated that he would be asking for an opinion from the Attorney General regarding engineered barriers and wetlands and that the site opponents thought they would have some input into the drafting of the request for an Attorney General's opinion. Wood advises that he was· unaware of such an agreement, but stated he would check with the Governor's office. He called Robak. Robak stated that she too was unaware of that point. Then Felix's notes added: "They [meaning Robak and Wood] said they must have a serious discussion of 'communications' problems-Randy said some action will be taking place-but couldn't say more-I [Felix] teased him saying I'll let my imagination run wild-He laughed said let it go." (Ex. 271.) At trial, Felix thought the "action" that might be taken referred to Kate· Allen. (Tr. 5039.)

***September 17, 1992 and September 21, 1992***

In a memo that is apparently first written on September 17, 1992 and revised on September 21, 1992, Klein, a DOH lawyer, writes Horton stating that: "The agencies have similar regulations on site suitability requirements, but have reached significantly different interpretations of those sections." (Ex. 775, at PRI 34473.)

***September 18, 1992***

Allen is fired. Among other things, her notes reflect that she was told by her supervisor at PRO that the "Governor has determined that I am a legal liability." (Ex. 1078, at MOG00001.) She is also told "The Governor will help you get a job if you agree that you will indicate that it was your decision to leave and that you were burned out. If not (if there is bitterness), there will be no assistance in getting a job." (Ex. 1078, at MOG00001.) At trial, Allen testified that "I requested, in exchange for not saying anything, letters of reference, which they provided to me . . . ." (Tr. 414.) Allen is told that she can stay until her retirement vests in October or early November. (Tr. 158.)

***October 5, 1992***

Allen takes notes of meeting with LMC members; Pat Knapp, their lawyer; and Nelson. (Tr. 402; Ex. 355.) Among other things, Allen's notes indicate, next to the initials "EBN," that "it's a poor site, but it may still be a licensable site" and "he dz not feel he can call a moratorium." (Ex. 355, at GOM46399). The notes next show a discussion about Randy Wood seeking an Attorney General's opinion as to whether or not there is a "fatal flaw." (Ex. 355, at GOM46402.) Allen's notes show that she understood that Knapp, the lawyer for the LMC, believed the LMC was supposed to have input on how it was worded. (*Id.* at GOM46400.) Allen had a draft of Wood's request for the Attorney General's opinion in the files she removed from PRO and hid in her basement. (Ex. 350, at GOM46162–65.)

***October 14, 1992***

Wood requests an opinion from Attorney General Stenberg. (Ex. 143.) Among other things, the opinion request asserted that: (1) "there is no prohibition for the applicant to reasonably modify the site" to meet site suitability requirements and as long as the waste disposal structure (as opposed to the larger 320–acre site) was not in a wetland then the site suitability requirements would not be violated (*id.* at 4), but (2) if groundwater discharged within the disposal units and the buffer zone,

then the regulations were not satisfied (*id.* at 5).

### Mid–October, 1992

Allen leaves PRO job. (Tr. 158.) She takes 19 boxes of documents from the PRO office and puts them in her basement. (Tr. 160, 168.) The boxes are hidden by Allen until her counsel produces them to Nebraska in April of 2001. (Tr. 163–65.) Nebraska then produces them to the plaintiffs in discovery in this case. Although Allen invokes privilege against self-incrimination during her deposition (Tr. 166), Allen testifies at trial about the boxes after being told by Nebraska and the Commission that they will not request prosecution of her (Tr. 178). Allen admits that some of the documents that she took appear damaging to Nebraska, particularly those documents which seem to show a plan to have the Governor influence Wood if Wood decided to grant the license. (Tr. 180–81.) Otherwise, Allen's testimony is replete with statements that she did not know why she did things or that she did not recall. At trial, Nebraska points out that Allen suffers from severe recurring depression and fibromyalgia, both of which adversely affect her ability to recall, and takes several medications, some of which affect her ability to remember. (Tr. 417–21.)

### November, 1992

Moeller begins work as PRO staffer and takes over Kate Allen's LLRW duties. He had been an attorney at DOH and DEQ. (Filing 99, at Tr. 167, 169–72 (preliminary injunction transcript).) Earlier, he had worked with Scofield and Allen on uranium mining issues that involved Scofield's state senatorial district. (Tr. 1678.)

### From November, 1992

Moeller works at PRO. During his time at PRO, and like Allen, he attends various private directors' meetings where license questions are discussed. (Tr. 4832–35.)

### November 9, 1992

Assistant Attorney General Willard's opinion in response to Wood's request is prepared, stating that "your interpretation of these regulations is legally defensible." (Ex. 3932 at 3.)

### November 9, 1992

Moeller calls Linda Willard, and "asked her if she could hold off a couple of days in issuing it." (Ex. 51.) He is told that the opinion was nearly done, and that Ms. Willard must check with her supervisor to see whether the opinion can be held. Moeller asked Willard what the opinion said and was told "there is a legal basis for DEQ's position and that it is a defensable [sic] position." (Ex. 51.) Moeller sends an e-mail to Kim Robak and Rod Armstrong, the PRO director, recounting this information. (Ex. 51.) Moeller testifies that he called Willard at the request of Kim Robak. (Tr. 1694.)

### Sometime after November 9, 1992

Moeller testified that sometime after November 9, 1992, he met with Robak, Wood, and Horton and, pursuant to Robak's instructions, he called Willard to withdraw the request for the opinion. (Tr. 1695.) Moeller testified that both he and Robak knew that Willard's opinion would support DEQ's position, which had been articulated in the earlier opinion request. (Tr. 1695.) Moeller also testified that he had seen a draft of the opinion request. (Tr. 1694.)

### November 16, 1992

Randy Wood sends letter requesting withdrawal of Attorney General opinion. (Ex. 6102.) Willard's opinion is never issued.

### November 19–20, 1992

Moeller talks with DOH lawyer and is told that DOH will play whatever role the Governor wants in the LLRW licensing

process, but DOH and DEQ cannot resolve their differences. Moeller sends e-mail to Robak and Armstrong stating "we should be prepared to send out marching orders . . . ." (Ex. 54.)

### December 2, 1992

A meeting with Wood, Horton, Robak, and Moeller is scheduled for this date. (Ex. 54.)

### December 31, 1992

Moeller called the NRC and spoke at length with an NRC commissioner and an NRC staff member. (Tr. 1703–05; Ex. 60.) Among other things, he discussed whether an LLRW site could be engineered to overcome site suitability problems. (Tr. 1704.) According to an e-mail Moeller sent Robak and Armstrong at 3:16 P.M. on December 31, "I [Moeller] called Mike Linder, DEQ counsel and let him know about the substance of my telephone call with NRC." (Ex. 60.) Moeller's e-mail concluded by stating, "I'll keep you posted if I hear anything on DEQ's interpretation of the regs." (Ex. 60.)

### Afternoon of December 31, 1992

According to Moeller, "Randy Wood called me on, I think New Year's Eve, December 31st, and basically said we've resolved our issues surrounding the Attorney General's opinion, we need a chance to talk to Kim and the governor." (Filing 99, at Tr. 210 (preliminary injunction transcript).) Moeller then sent an e-mail to Robak and Armstrong stating: "I spoke to Randy Wood late thursday, Dec. 31 and he stated that he was ready to sit down and talk with the Governor about whatever differences that DOH and DEQ had concerning their siting regs. is solved." (Ex. 60.) Moeller added: "He [Wood] wants to make sure that if he starts getting into areas a[sic] that the governor does not want to hear concerning licensing issues that he be told to stop his presentation." (Id.)

### 1992

33.34 inches of precipitation at Butte, NE, for this year versus mean annual precipitation at this site of 23.67 inches. (Ex. 3384, at 2.4–53.)

### January 5, 1993

Nelson meets with members of the LMC to discuss litigation regarding the "community consent" issue. (Ex. 675.)

### January 11, 1993

On January 11, 1993, Wood, Horton, Robak, Moeller, and Nelson conferred in person. (Filing 99, at Tr. 211 (preliminary injunction transcript).) According to Wood, he told the Governor "we were going to issue a notice of intent to deny . . . based upon the fact that there were wetlands on the site, and that those wetlands caused the site to fail the site suitability requirement in Title 194 of our DEQ regulations." (Filing 99, at Tr. 372 (preliminary injunction transcript).) According to Moeller, Nelson and Robak asked questions. (Filing 99, at Tr. 212 (preliminary injunction transcript).) As Robak testified, "I believe somebody, whether it was [the] Governor, or myself, or somebody else at the meeting made the determination that Randy needed to be absolutely certain" and Wood "need[ed] to make sure that all the I's are dotted, and T's crossed with regard to the decision before we announced it." (Tr. 652.) The Governor's office then started making plans to ensure that the "I's" were dotted and "T's" crossed.

### January 13, 1993

Moeller put together and sent to Robak a schedule that included: "Assembly and Review by DEQ–DOH Attorneys of appropriate documents and review of historical documents" followed by "review by AG and Governor's Office." (Ex. 62.) Robak responded to Moeller's schedule, which had been sent via an e-mail. In handwrit-

ing on a hard copy of the e-mail, she wrote, "Don't profs-It will be seen by others-hand carry or call." (Ex. 786.) "Profs" was the name for Nebraska's e-mail system. (Tr. 465, 641–42.)

### January 13, 1993

*State of Nebraska, ex rel. E. Benjamin Nelson, Governor v. Central Interstate Low–Level Radioactive Waste Commission and U.S. Ecology, Inc.*, No. 4:93CV3042, is filed in United States District Court for the District of Nebraska. (Ex. 1539 (docket sheet and selected filings).) Linda Willard with the Attorney General's office is lead counsel. Suit contends that no "community consent" was obtained for Boyd County site. With the court holding that the notice of the site selection was given to the Nebraska legislature in February, 1990, the case is dismissed, among other reasons, because Nebraska's suit was more than two years too late and time-barred under Art. IV($l$) of the Compact regarding when an aggrieved party state must sue the Commission. Decision rendered October 8, 1993. (Ex. 1539.) Decision affirmed June 13, 1994. (*Id.*)

### January 22, 1993

Despite contrary advice from Collier, Shannon law firm (Ex. 593), Nebraska issues intent to deny because the site does not meet site suitability requirements, including the presence of wetlands. (Ex. 8; Ex. 1411, App. A at 23.) USE subsequently initiates "a contested case" under Nebraska administrative procedures for appealing agency decisions to challenge the intent to deny. (Ex. 6113.) During that proceeding, USE discovers some but not all of the damaging e-mails from Allen.

### January 22–23, 1993

Jay Ringenberg, the DEQ program manager for the LLRW program, testified at trial that he was not consulted in any way about the intent to deny decision arrived at by Wood and Horton. (Tr. 4880–81.) In fact, he was not informed of the decision until about two days before it was announced. (Tr. 2153, 4702, 4879.) He later learned that Wood had spoken with the Governor's office prior to the decision, and that Wood had consulted only with DEQ and DOH lawyers prior to the decision. (Tr. 4880–81.) This greatly upset Ringenberg as he was the designated DEQ employee who was primarily responsible for the LLRW program. (Tr. 4702.) Like Ringenberg, Rogers, of DOH, testifies that she was "surprised" and "stunned" that she was not consulted prior to the decision. (Tr. 5258.) As the DOH person primarily responsible for the LLRW program, she had no explanation why she was not consulted prior to the decision being made. (Tr. 5568–69.)

### August 12, 1993

Attorney Bill Lamson, a lawyer with Kennedy, Holland, is hired to work on legal issues for DOH with regard to the contested case. (Tr. 7229–33; Ex. 1558.) His notes reflect that he is told that "Kim [Robak] wants me to coordinate everything but that is still in the work[s] in the meantime proceed [with] Dept. of Health representation." (Ex. 1558.)

### August 24, 1993

Lamson meets with Robak, Wood, and Horton. (Ex. 1561, at PRI19493 (entry captioned "8/24/93 WML").) It is decided that he will represent Nebraska, including DOH and DEQ, in the contested case proceeding. After that, Kennedy, Holland lawyers do extensive legal work and research regarding the contested case filed by USE, including "political influence," "jurisdiction of DOH/DEQ," and "attorney/client privilege." (Ex. 1561 at 2, 7, 9.)

### August 27, 1993

USE amends its application, reducing size of tract from 320 acres to 110 acres

and excluding all but one very small wetland. (Ex. 1411, App. A at 24.)

### September 3, 1993

Lamson, in a letter marked *"PERSONAL & CONFIDENTIAL"* and *"ATTORNEY/CLIENT WORK PRODUCT"* advises Horton and Wood that: "[I]t is our opinion that both the Nebraska Departments of Health and Environmental Quality have licensing authority over differing aspects of compact facilities." (Ex. 7067 at 7.)

### October, 1993

Nebraska withdraws notice of intent to deny the license, and USE then dismisses the "contested case." (Ex. 4244; Tr. 1352–53.) Robak becomes Lt. Governor. She no longer has much to do with LLRW issues. (Tr. 681–82.)

### October, 1993–July, 1994

Nebraska submits third round of technical review comments to USE in October of 1993 and February of 1994. USE responds in May and July of 1994. (Ex. 1411, App. A at 21.)

### October 25, 1993

*State of Nebraska, ex rel. E. Benjamin Nelson, Governor v. Central Interstate Low–Level Radioactive Waste Commission and U.S. Ecology, Inc.*, 4:93CV3367, is filed. (Ex. 1540 (docket sheet and selected filings).) Linda Willard with the Attorney General's office is lead counsel. Nelson contends that reduction in the site from 320 acres to 110 acres required "community consent." Case dismissed on res judicata grounds on December 3, 1993 because the same issue against the same parties was presented in 4:93CV3042 and that claim was dismissed less than 3 weeks before the filing of the instant case. Because of the duplicative nature of this suit, a motion for sanctions was filed by the defendants. It is later withdrawn. Order on motion for sanctions states: "Although I find that the motion for sanctions is generally meritorious, at my specific request counsel for both defendants have graciously agreed to withdraw their motion." (1993 WL 738576, at *6.) Decision issued December 3, 1993. No appeal is taken. (*Id.*)

### December 30, 1993

Notice of removal from Boyd County District Court filed in this court under the style *The County of Boyd and The Boyd County Local Monitoring Committee v. U.S. Ecology, Inc.*, 4:93CV3435. (Ex. 1541 (docket sheet and selected filings).) Pat Knapp, counsel for the LMC, is lead counsel. Plaintiffs' fraud claim is based upon the lack of community consent. Because the issue is the same as the two previous "community consent" cases brought by Nebraska and because the plaintiffs here are closely related to Nebraska, case dismissed on res judicata grounds on July 21, 1994. The decision is affirmed on February 24, 1995, with the Court of Appeals holding that Boyd County and the LMC are for preclusion purposes one and the same as Nebraska. (Ex. 1541.)

### December of 1993–Summer of 1995

Kate Allen does legal work for site opponents while also working for State Senator Preister. Senator Preister knows of her "moonlighting" work. (Tr. 127–28.) Allen has numerous billed conversations with Moeller and Rick Becker. (Ex. 1509, at MIG007675–77 (9 conferences with Moeller) (period from July 3 to August 26, 1994); Ex. 1510, at MIG007667–69 (7 meetings or conferences with Moeller, 1 meeting with Moeller and R. Becker, 1 meeting with R. Becker) (December 1, 1994 through January 31, 1995); Ex. 1511, at MIG007663–66 (9 meetings with Moeller, 1 meeting with R. Becker, 1 meeting with Moeller and R. Becker, 2 meetings with Moeller, R. Becker, and Pat Knapp) (February 1–April 15, 1995); Ex. 1512, at MIG007657–62 (17 meetings or confer-

ences with Moeller, 4 conferences with Moeller and R. Becker, 1 conference with R. Becker) (April 17–June 16, 1995).)

### 1993

38.57 inches of precipitation at Butte, NE, for this year versus mean annual precipitation at this site of 23.67 inches. (Ex. 3384, at 2.4–53.)

### January 3, 1994

USE submits "Baseline Environmental Monitoring Program Report" which included data and analysis through June 1993. (Ex. 4311.) USE had started to collect baseline environmental monitoring data in August of 1992. The LLRW program required USE to submit 1 year of data and analysis of the data to serve as a baseline for environmental monitoring should the license be granted. (Ex. 6056, at 6056.0010 (NUREG–1388); Tr. 5282–83.)

### February 22, 1994 to March 4–17, 1994

Attorney General Stenberg is told that Lamson's role includes being "involved in any cases in the LLW area-and by involvement we mean that he actively participates in briefs, arguments and pleadings to the extent that he believes it is in the best interest of his client." (Ex. 868.) Moeller and Tim Becker of PRO advise directors that Lamson will "coordinate a response to concerns regarding jurisdictional and regulatory issues between the departments so that the state is speaking with one voice." (Ex. 867.) Kennedy, Holland then executes a Master Subconsultant Agreement with HDR in which scope of services includes representing DEQ and DOH "as their attorneys to provide . . . [them] with counsel in the licensing process for the Low–Level Radioactive Waste Disposal Facility." (Ex. 1553 at 3.)

### August 12, 1994

Lamson writes Horton and Wood because Kennedy, Holland had "been asked to reexamine [its] opinion regarding the jurisdictions of the Departments of Health and Environmental Quality in light of materials provided by" agency lawyers. (Ex. 7068.) In a confidential letter dated April 22, 1994, to Lamson, a DEQ lawyer outlines the "long, complicated history" of the split of authority between DEQ and DOH. (Ex. 8083 at 1.) A similar letter from a DOH lawyer acknowledges that the "applicant has also raised the authority issue, so its resolution goes beyond practical functioning between the agencies and affects the relationship of the state and the applicant as well." (Ex. 8085 at 4.) After reviewing those materials, Lamson maintains the views expressed in his earlier opinion letter, but acknowledges that "there is some support in the legislative history for the position that the Department of Health's authority is completely preempted in the case of a low-level radioactive waste disposal site." (Ex. 7068 at 3.)

### October, 1994–May, 1995

Nebraska sends fourth and final technical review comments in October. USE responds in May of the following year. (Ex. 1411, App. A at 22.)

### December, 1994

Nelson's PRO office hires Rick Becker, a lawyer. Becker had worked as law clerk to Pat Knapp, counsel to the LMC, and had done work for Knapp regarding LMC and its opposition to the application. Tim Becker (chief of staff) obtains a conflict of interest waiver for Rick Becker from LMC. (Ex. 782; Tr. 770–75.) Rick Becker is assigned to assist Moeller with LLRW issues.

### January 10, 1995

Allen has meeting with Moeller and Rick Becker regarding "lawsuits on CIC appointments and rebate money." (Ex. 1510, at MIG007668.)

*January 20, 1995*

Allen has a meeting with Rick Becker regarding "lawsuits on rebate and CIC appointments." (Ex. 1510, at MIG007669.)

*February 3, 1995*

Allen has a meeting with Moeller regarding "Governor's lawsuits on additional Commissioners and rebate money." (Ex. 1511, at MIG007664.)

*February 3, 1995*

Complaint filed in *State of Nebraska, ex rel. E. Benjamin Nelson, Governor v. Central Interstate Low Level Radioactive Waste Compact Commission,* 4:95CV3052. (Ex. 7050 (docket sheet and selected filings).) Lamson is lead counsel. Nebraska contends that the Commission is wrongly withholding federal rebate funds. These are federal funds disbursed to the Commission by the United States for eventual payment to the host state. They are not LLRW payments due from USE as the licensee. The Commission filed a counterclaim contending that Nebraska has failed to account for the proper use of the rebate funds. The suit is settled, with each party agreeing to dismiss its claims with prejudice. The case, including the claim and counterclaim, was dismissed with prejudice on July 17, 1996. (Ex. 7050.) The Commission agreed to pay Nebraska a portion of the rebate funds and Nebraska agreed to provide an accounting. (Ex. 5184.)

*February 3, 1995*

Complaint filed in *State of Nebraska, ex rel. Benjamin Nelson, Governor v. Central Interstate Low–Level Radioactive Waste Commission,* 4:95CV3053. (Ex. 1542 (docket sheet and selected filings).) Linda Willard is lead counsel. Nebraska contends that it had a right to a second voting commissioner and a right to a third non-voting commissioner. Finding that Nebraska did not have a right to unequal representation on the Commission, the complaint is dismissed on October 23, 1995. No appeal is taken. (Ex. 1542.)

*April 18, 1995*

Allen has conference with Moeller regarding "CIC lawsuits." (Ex. 1512, at MIG007658.)

*April 20, 1995*

Allen has a conference with Moeller regarding, among other things, "CIC lawsuits." (Ex. 1512, at MIG007658.)

*May 1, 1995*

Allen has a conference with Moeller and Rick Becker regarding, among other things, "rebate lawsuit." (Ex. 1512, at MIG007659.)

*May 2, 1995*

Allen has a conference with Moeller and Rick Becker regarding, among other things, "rebate lawsuit." (Ex. 1512, at MIG007659.)

*May 3, 1995*

Allen has a conference with Moeller and Rick Becker regarding, among other things, "CIC lawsuits." (Ex. 1512, at MIG007659.)

*May 8–9, 1995*

Kennedy, Holland lawyers, among others, are shown as recipients of an "analysis of financial assurance requirements" prepared by John Wittenborn and Kathryn McMahon of Collier, Shannon. (Ex. 1567.) Kennedy, Holland lawyer receives draft of letter to USE and an attachment requesting additional information on financial assurance from USE. (Ex. 1568.)

*May 18, 1995*

DEQ, DOH, and "the Governor's Policy Research Office" enter into an "Amendment to Contract of September 27, 1993." (Ex. 1551.) It provides that Kennedy, Holland will do "[a]ny work performed at the request of the Governor's Policy Research Office which specifically relates to

the relationship with the low level radioactive waste compact or other low level radioactive waste issues." (*Id.* at PRI19442.) It also provides that Kennedy, Holland will do "[a]ny work requested by [DEQ or DOH] relative to the low level radioactive waste compact and low level radioactive waste activities in areas which are not reimbursable by the license applicant." (*Id.*)

### June 8, 1995

Allen has a conference with Moeller regarding "rebate lawsuit." (Ex. 1512, at MIG007661.)

### July 11, 1995

USE advises Nebraska that its application is complete. (Ex. 4870.) USE's application is now 30,000 pages long. (Tr. 4645.)

### July 26, 1995

Nebraska advises USE that: "No further application related information will be accepted, unless requested by State reviewers." (Ex. 21.) Nebraska states that: "We believe the final review activities will take approximately one year to complete." (*Id.*)

### March 1, 1996

Moeller sends an e-mail to Tim Becker (chief of staff), Jean Lovell (then head of PRO), Rick Becker, and Trent Nowka, all of the Governor's staff or with PRO, stating that: "I would like Sen. Wesley to run an amendment onto LB 1201 cleaning up the Health statute which exempts Health from being involved in the licensing of a CIC facility . . . ." (Ex. 851.) Moeller adds that "I think the monitoring commite [sic] is ok with it." (Ex. 851.) Lamson testifies that this was never done because "there was a concern that if either Department went into the legislature with a statutory amendment, there would have been a big free-for-all . . . ." (Tr. 7304.)

### March 4, 1996

Moeller sends an e-mail to Tim Becker, Jean Lovell, Robak, and Rick Becker reciting a conversation Moeller had with Dr. Zidko, who is a fervent site opponent. Zidko is disturbed that Nelson attended a fund raiser to which HDR contributed money. Moeller recounts that Zidko "wants some 'sign' or indication that the governor is still on their side." (Ex. 852.) Tim Becker responds: "The Governor just replaced Dick Coyne with Greg Hayden [as a Commissioner], won't support legislation that doesn't have Save Boyd's support, introduced legislation and is receiving criticism from generators, developer, and compact relating to shared liability, Randy W. is following up at the Governor's request regarding Doc's request for an expedited decision." (Ex. 853.) Becker then concludes the e-mail, "What other sign does he want?" (*Id.*)

### September 30, 1996

After giving Nebraska an opportunity to present information on the question, which Nebraska declines, the Commission sets a firm deadline for Nebraska's completion of the license review. That deadline is January 14, 1997. (Ex. 1543, filing 128 at 3.)

### November 27, 1996

Complaint filed in *State of Nebraska, et al. v. Central Interstate Low–Level Radioactive Waste Commission,* 4:96CV3438. (Ex. 1543 (docket sheet and selected filings).) Nebraska contends that the Commission had no right to set a schedule for completion of the license review. Lamson is lead counsel for Nebraska. Judge Urbom holds to the contrary, and judgment is entered for the Commission on October 15, 1998. On August 16, 1999, the Court of Appeals affirms the decision. (Ex. 1543.)

### December 17, 1996

Nebraska requests hydrograph data "from 1/95 to the present time." (Ex. 1273.)

The letter assures USE that: "The data so gathered is to be used in our ongoing environmental surveillance activities, not the formal technical review." (*Id.*)

### January 14, 1997

Nebraska fails to meet deadline established by the Commission.

### Late January, 1997

Horton leaves as DOH Director. (Tr. 6222–23.)

### Early February, 1997

Dr. David Schor starts as DOH decision-maker. Like Horton, Schor is a pediatrician with a master's degree in public health. He is not a political appointee. Rather he is chosen because Deb Thomas, who would have taken over for Horton, declared a conflict of interest because her husband did legal work for a Nebraska power generator. Although Nelson appointed Schor, there is no evidence that he took a personal interest in selecting Schor, who had been with DOH in another position. That selection was made at the suggestion of Thomas. Like Horton, Schor had no experience in low-level radioactive waste issues. (Tr. 6223–26.)

### May 28, 1997

Wood has a meeting with Jacobson, Wittenborn, Schor, and Ringenberg, and Jacobson takes detailed notes of the meeting. (Ex. 5405.) Jacobson's notes reflect that Wood asked, "How can you possibly contemplate issuing a license to a company that is near bankrupt" and "Wood noted that there was an article in the WSJ saying not to buy AEC." Wood directs the hiring of a "Financial Analyst" or "Investment Banker" and "Not an accountant." Jacobson is to do the screening, with the help of John Wittenborn. Ringenberg "will decide who to hire & then Randy will approve." (*Id.*)

### Summer 1997

Wood tells Ringenberg to contact W. Don Nelson (no relation to Governor Nel-son) regarding the hiring of a financial analyst. (Tr. 2227–28.) Wood and W. Don Nelson are friends. (Tr. 2228.) W. Don Nelson knew Wood in Wyoming when W. Don Nelson served that State's Governor as the chief of staff and Wood served as director of Wyoming's equivalent of the DEQ. (Tr. 959.) W. Don Nelson had recommended Wood to Governor Nelson. (Tr. 959.) W. Don Nelson is also a close friend and political confidant of Governor Nelson. (Tr. 958.) W. Don Nelson later became a member of Nelson's senatorial staff, serving as his State Director. (Tr. 958.) Ringenberg contacts W. Don Nelson who in turn suggests the firm of Conley, Smith. (Tr. 2229–30.) W. Don Nelson then worked for a company related to Conley, Smith. (Tr. 1422–23, 2229, 2377–79.) After HDR conducts interviews of various candidates including Conley, Smith, HDR hires Conley, Smith and the contract is issued on a "sole source" basis. (Tr. 2232.)

### June 17, 1997

USE files a declaratory judgment action against DOH, DEQ, and the Directors in state court. (Exs. 1405, 1545, 1545a, 1545b (opinions, docket sheets).) Despite the fact that USE's "404" permit from the Corps of Engineers was about to expire, DEQ and DOH informed USE that if it used the permit to mitigate the insignificant wetland, then its license could be denied because USE would be deemed to have "commenced construction" without a license. On February 26, 1998, Judge Steven Burns of the District Court of Lancaster County, Nebraska, ruled that the Department of Health "does not have statutory authority to review, consider, or rule on the license application that has been filed by U.S. Ecology for a license to construct the disposal facility designated by the Compact." (Ex. 1405 at 16.) He also grants the relief sought by USE. Nebraska appeals, seeks a stay, and the deci-

sion is stayed on May 4, 1998. (Ex. 1545b.) After the final license denial decision by DOH and DEQ, the Nebraska Supreme Court, refusing to address whether DOH had authority, declares that the matter was not ripe when it was decided by Judge Burns and vacates his decision. (Ex. 1545.) The Nebraska Supreme Court's decision is rendered on October 29, 1999. (*Id.*)

### Summer, 1997

Directors are briefed on Final Evaluation Findings submitted by the consultants.

### August 20–25, 1997

State of Nebraska Final Evaluation Findings (Exs. 1346, 1410, and 5475) regarding groundwater, surface water, and financial assurances are prepared by HDR and JHC, the entities heading up Nebraska's independent consultants, and the review managers for each of those areas. These documents, presented to the agency directors, represent the final views of the consultants. Regarding groundwater, surface water, and financial assurance aspects of the license application, they find that the application has complied with the requirements for issuance of a license. Specifically regarding financial assurance, the consultants recommend the use of a conditional license requiring the applicant to provide necessary documentation regarding construction financing within 120 days after the issuance of the license. (Ex. 1346 at 27.)

### August 22, 1997

Complaint in 4:97CV3267, *State of Nebraska v. Central Interstate Low–Level Radioactive Waste Commission,* is filed. (Ex. 1544 (docket sheet and selected filings).) Lamson is lead counsel. Nebraska asserted that it had the right to veto waste exports and waste imports. Holding that Nebraska had no veto power over waste exports, and that the waste import issue was not a live controversy, the case was dismissed and judgment was entered for the Commission on November 23, 1998. (Ex. 1544.) The decision was affirmed by the Court of Appeals on April 4, 2000. (*Id.*)

### September, 1997

First Conley, Smith report delivered. (Ex. 610.) Report states that AE is "in a relatively weak financial position" and "it is difficult to see how the Company could finance the $82 million required to construct the proposed facility in Boyd County without guarantees from the major generators . . . ." (*Id.* at 11.) At trial, Conley stated that his understanding of the scope of Conley, Smith's work excluded consideration of whether the major generators or the Commission could provide financing. (Tr. 2391–96, 2428–29, 2444–45.)

### September 10, 1997

A meeting is held where Wood, Ringenberg, Smith (with SEG), Wehrwein (former fiscal officer for DEQ and then a consultant to JHC), Jacobson, Schor, Conley (with Conley, Smith), and Penner (with Conley, Smith) are in attendance. (Ex. 5559.) Conley "Gave conclusions" and those were: "That without guarantees, AEC cannot finance the project based on its own balance sheet." Penner states: "Problems stemmed from acquisitions in late 1994. Much debt on balance sheet-Highly leveraged." (*Id.*)

### September 11, 1997

Wood and Jacobson discuss Jacobson's final evaluation findings regarding qualifications of the applicant discussed in Section 8.2 of the DSER. (Ex. 5533.) Wood tells Dale Jacobson to change his "acceptable" position regarding financial qualifications of the applicant to "unacceptable." (Ex. 611, at JHC03770.) Jacobson refuses, but states that he could call it "inconclusive." Wood directs Jacobson to call it "inconclusive" in the final evaluation find-

ings, but "then we could call it 'unacceptable' in the DSER." With that disingenuous suggestion, Ringenberg and Jacobson "disagreed." (Ex. 611, at JHC03770.) Jacobson does add cryptic language to the Draft Safety Evaluation Report (DSER), in Section 8, to the effect that "[a] final evaluation of U.S. Ecology's financial qualifications will be conducted at the time that draft and final license decisions are made." (Ex. 1411, at 8–8.) Nonetheless, Section 10, without equivocation, states that USE has provided the necessary financial assurance for construction and suggests the issuance of a conditional license requiring USE to provide construction financing within 120 days after issuance of the license. (Ex. 1411, at 10–3.) Specifically, "US Ecology has demonstrated that it meets the financial criteria established by the State of Nebraska to construct, operate, and maintain an LLRW disposal facility." (Ex. 1411, at 10–3.) Nebraska applies DEQ regulation Title 194, Chapter 6, Section 001 and DOH regulation Title 180, Chapter 1, Section 012.22 and concludes that they have been satisfied. (Ex. 1411, at 10–7.)

### October, 1997

Nebraska's Independent Performance Assessment (IPA) is released. (Ex. 3124.) This report, prepared by an independent Nebraska consultant, advised that even under cautious ("conservative") scenarios the long-term performance of the structures after closure easily satisfied regulatory criteria regarding radioactive exposure for humans. (Ex. 3124, e.g., at 9.) Using a complex mathematical analysis, a Ph.D. in mechanical engineering examined the performance of the structures over a 10,000–year time frame. He found that the dosages humans would likely be exposed to were well under the regulatory limits for radioactive exposure regarding the whole body, the thyroid, and other organs. (Ex. 3124, at vii.) Using a cautious approach, the IPA assumed that soils and sands under the structure and to the site boundary were entirely saturated with water. (Tr.1996–97, 2055–56.)

### October, 1997

Nebraska releases its "Draft Safety Evaluation Report" (DSER) which "presents the results of the LLRW Program's technical review of the license application" and "provides the technical basis to allow the LLRW Program to determine if the facility meets applicable State laws and regulations, and if the facility's design, physical features, and safety systems are technically acceptable." (Ex. 1411, Exec. Summ. at 2.) Regarding the site location, including geologic features, and surface water and groundwater conditions, "the LLRW Program determined that the data, analysis, and information presented in U.S. Ecology's license application are acceptable." (Id., Exec. Summ. at 5.) Regarding financial assurance, "the LLRW Program determined that the data and information presented in U.S. Ecology's license application are substantially accurate, clearly presented, and acceptable." (Id., Exec. Summ. at 8.) Specifically, "US Ecology has provided documentation that reasonably demonstrates that they can obtain the necessary funds to cover the estimated costs of conducting licensed activities over the planned operating life of the facility, including the cost of construction and disposal." (Id. at Section 10, page 10–11.)

### October, 1997

Nebraska releases an "Info Guide" to the public. It tells the public that: "The DSER determines if the facility meets applicable state laws and regulations." (Ex. 3126, at 3126.0011.) It also tells the public that DOH and DEQ will follow a specific procedure before ultimately issuing or denying a license, that is, the DSER will be followed by: notice of public hearing, 90–day public comment period, public hearing on the DSER, issuance of responses to

comments made at the public hearing, issuance of final Safety Evaluation Report (SER), issuance of proposed license decision, 90–day public comment period, public hearing on proposed license decision, issuance of response to comments made at the second public hearing, issuance of final version of SER, and issuance of license decision. (*Id.* at 3126.0006–07.)

### January 21, 1998

Dr. John Osnes, who had previously authored a report for the State of South Dakota in November of 1990 that was critical of the Boyd County site (Ex. 3447; Tr. 5594–95), has been retained by the LMC to critique the DSER. He makes a secret oral status report to the secretary of LMC. The secretary transcribes her notes and faxes them to Pat Knapp, lawyer for LMC. The notes reflect such statements as: (1) "John is not optimistic that he can shoot holes in Section 2 [of the DSER regarding groundwater and surface water]"; (2) "Esp. on SW corner-no reason to believe there will be springs, even in a wet year. In other words. The site will work."; (3) "HONESTLY, there is no solid evidence of violation of REGS."; and (4) "Osnes said that To be frank on any site there will be deficiencies and they will be engineered around for whatever project you are doing." (Ex. 706, LMC0002324–2325 (capitalization and punctuation as in the original).) At the trial of this case, Knapp admits receiving the report, but denies any awareness of it. (Tr. 1326–29.) Osnes subsequently is retained by Nebraska as an expert in the trial of this case. He is vigorously cross examined on these notes by counsel for the Commission during the trial of this case. Although qualifying some of the words and stating that he was misquoted as to others, Osnes does not deny making the substance of the statements attributed to him. (Tr. 5782–5802.) Rather, he states that new information later changed the views expressed in his oral status report.

### February 4, 1998

Public comment period ends.

### February 2–5, 1998

Public hearings in Boyd County. Dr. Osnes, then an expert for the LMC (and later for Nebraska), provides information at the public hearing critical of the DSER (Ex. 3130A) despite contradictory statements in a secret January 21, 1998 oral status report to the LMC. (Ex. 706.) Dr. Arden Davis, another expert for the LMC, also provides expert information critical of the application at this public hearing. (Ex. 5670, at 5670.0102–116 (oral testimony); Ex. 3130C (written report entered into record of hearing).) Like Osnes, Davis is also called as an expert by Nebraska in the trial of this case. At trial, Davis admits that he had a fundamental misunderstanding of Dr. Taylor's local groundwater model (it predicted that there would be no groundwater discharge); that is, Davis wrongly believed that Taylor used a .17–inch per year recharge rate whereas Taylor in fact used a four-times greater (.7–inch per year) recharge rate. (Tr. 6563–64.)

### February through May, 1998

Starting in February, Cheryl Rogers reduces her involvement with the LLRW program. She ceases all activity in May, 1998. (Tr. 5478.)

### March 17, 1998

Ringenberg and Rogers have a meeting with all review managers except Carlson and Wehrwein. (Ex. 576, at JAD000641–42.) Jacobson takes detailed notes. Next to and following the name "Jay R." Jacobson writes the following observations, among others, "Directors say that we must be done by June ? ?. Date unknown." (*Id.* at JAD000641 (emphasis in original).) He also notes that Ringenberg said: "Wood Issues," "Groundwater–All facets," "Quals of Applicant," and "Alternatives" with the

following language circled: "Rest are fixable." (*Id.*) Then Jacobson describes a process where review managers submit " 'bulletized' response" on "Significant Issues" to the Directors. (*Id.* at JAD000642.) Then: "Directors will comment, add, delete, etc. If RM [review manager] & Directors disagree, so be it. Then document will be written by the RMs, the Program, the Directors. No one will 'take ownership.'" (*Id.*)

### April 9, 1998

Wood and Schor have a meeting with Ringenberg, Rogers, Carlson, Jacobson, Butterfield, Smith, and others from DEQ and DOH. (Ex. 576, at JAD000633–36.) Jacobson takes detailed notes. His notes reflect these words: "*3 Documents*," then, with the words for each category circled, "Response to Comments >SER>Decision Document." (*Id.* at 000634 (emphasis in original).) Jacobson writes: "Wood intends to meet with the RMs to 'discuss' the reviewers['] significant issues. May not write this down." (*Id.* at 000634.) Next to Woods' name, Jacobson writes: "3 MAJOR ISSUES" and then "Groundwater[,] Qualifications[,] Alternatives." (*Id.* at 000635.) Next to Woods' name, and the words: "The Pivotal Issue," the following language appears: "Groundwater—Inspite [sic] of our analysis." (*Id.* at 000635.)

### May, 1998

Second Conley, Smith report submitted. (Ex. 5710.) Despite AE raising $1.9 million of equity capital, the report states: "[o]ur opinion has not changed." (*Id.* at 5710.0003.) That is: "We continue to believe the Company does not have the capability to develop the Boyd County Project without assistance from the major generators of waste." (*Id.*)

### June 8, 1998

USE submits "1997 Environmental Monitoring Report" to Nebraska on June 8, 1998. (Ex. 1297.) Among other things, the report includes hydrographs for calendar years 1995, 1996, and 1997.

### June 27, 1998

Marvin Carlson, review manager for the area which dealt with groundwater and surface water, submits his draft of responses to the public comments. (Ex. 141; Tr. 2826.) His responses support USE's position. For example: (1) "The disposal facility is not within a hydrogeologic unit and is above any potential groundwater level" (Ex. 141, at ALG51683), (2) "An underlying buffer zone is described in the application" and "[s]cenarios are analyzed in the application for direct release of contaminants into the groundwater negating reliance on either natural or engineered barriers" (*id.* at ALG51684), (3) "The piezometric surface from a subsurface unit, as measured in a well, could be higher than ground-level without saturation at the surface" (*id.* at ALG51685), (4) "The disposal facility is above any potential groundwater level, is not in a wetland, and no part of the site lies within a 100–year floodplain" (*id.* at ALG51686), and (5) "There are no flowing wells or springs on site" (*id.* at ALG51687).

### July, 1998

Nebraska's specially retained lawyer Lamson has the impression that license will be granted, but with conditions. (Tr. 7282).

### On or about July 14, 1998

Wood and Schor probably make the license denial decision in the presence of Jacobson, Ringenberg, Smith (the SEG consultant), and lawyers from DEQ and DOH. (Ex. 587; Tr. 2318–19, 2358–59.) Carlson, the review manager for site suitability, is not present. Contrary to the sequential process outlined in the Info Guide, Wood and Schor decide to collapse several steps of the process into one. Rather than finishing and publishing the

review managers' response to comments on the DSER, then preparing and publishing the SER, and after that issuing a tentative license decision, Wood and Schor direct that these three documents be prepared all at once and available "by 8–4–98 or shortly thereafter." (Ex. 587, at JAD000884.) Except for Jacobson and Smith, no review managers are present at this meeting. Before discussing the "Decision Document," Ringenberg hands out legal memorandum on "Executive Privilege." (Ex. 587, at JAD000885.) After that, they discuss "issues." Next to the name "Carlson," Jacobson's notes reflect the following: "Engineered Barriers"; "Depth to Groundwater"; "Groundwater Discharge to the Surface"; "Capillary Action"; "The Ditch"; and "Hydrographs." Next to Jacobson's name the notes state: "Qualification Update–Conley Smith" and "Company Viability." (Ex. 587, at JAD000885.) Next to the initials for Randy Wood, Jacobson writes: "The hearing *will not* be held *Before* the election. Wood expects it will take 4 days & will be very vocal." (*Id.* at JAD000884 (emphasis in original).)

### July 18, 1998

Craig Osborn with HDR sends e-mail to other consultants relating a surprise visit of DEQ employees on the previous day (July 17, 1998). (Ex. 211.) The e-mail notes that the DEQ employees "made an unannounced visited [sic]," "[t]he visit consumed the day," and "[t]hey spent their time trying to figure out how to spin responses, evaluations, and the SER/EIA so that they would support Randy's no go decision." (*Id.*) Osborn observed that "[t]heir conclusion was that first they must compose the decision document and then find the technical support or lack there of [sic] for the decisions." (*Id.*) A meeting schedule is then set out. The review managers "may be asked to meet with Randy ... to reconsider their response to comments." (*Id.*) Osborn goes on to state that the "mission impossible aspect of this is

that parallel to the decision document discussions you and I [and others] ... are to prepare the final SER, EIA, and Response to Public Comments so that they are ready for print on the 31st." (*Id.*)

### July 24, 1998

Barry Butterfield, the environmental review manager; Marvin Carlson, the site characteristics review manager; Dale Jacobson, the qualifications review manager; and Jim Wehrwein, the financial assurance review manager; together with most other review managers, meet with Wood and Schor to discuss the "Decision Document." (Ex. 587, at JAD000888; Tr.1944–46.) The review managers learn of the decision. Some are surprised. (Tr.1944–46.) Some voice their disagreement. Butterfield told Wood and Schor that the decision was inconsistent with the independent performance assessment and "that the decision was technically unsupportable." (Tr.1945.) Wood responded by stating: "this decision is not about health and safety, it's about regulatory interpretation." (*Id.*) Wood did not explain what he meant. Other review managers object to the decision. Dale Jacobson explicitly disagreed with the license denial decision regarding financial qualifications and characterization of relocation of the swale as an engineered barrier. (Tr.1946.) Jacobson's notes indicate these topics were discussed: "Depth to Water Table"; "Buffer Zone for Environmental (vertical) Monitoring"; "Engineered structures-substitute for suitable site"; "Groundwater discharge to surface"; "Site Deficiencies–Require active maintenance"; and "Financial viability." (Ex. 587, at JAD000888.) There is no indication that Marvin Carlson expresses an opinion on the Directors' decision at this meeting.

### July 27, 1998

Craig Osborn, of HDR, collects responses to public comments on the DSER. These responses were drafted *be-*

*fore* the announcement to review managers of Randy Wood's "no go" decision. (Ex. 467.) Osborn distributes these initial drafts to the review managers with the following comment: "Please review the responses, note areas of disagreement requiring modification, indicate suggested corrections, and return the responses by 9:00AM. Thursday, July 30th. FYI. [T]he Department's comments and regulatory positions have not been incorporated into this version of the responses." (Ex. 467, at HDR36732.) Despite the inconsistent position he later takes on July 30, 1998, Marvin Carlson, the review manager for the area dealing with groundwater and surface water, makes no suggested changes to the response to comments distributed by Osborn. (Tr. 2712, 2781–87.) These responses to comments are wholly inconsistent with Carlson's and Nebraska's later reasons for the denial of the license. For example: (1) regarding criticisms that groundwater or surface water characteristics of the site serve as pathways for radionuclides, "[t]he LLRW Program conducted an independent performance assessment of groundwater releases and confirmed that releases would be below regulatory limits at the facility boundary"; "[t]he LLRW Program has determined that the site is generally well-drained and free of areas of flooding and frequent ponding"; "[s]urface saturation may exist for periods extending from several minutes to several days" but "[t]here are no flowing wells or springs on site" (Ex. 467 at 34); (2) regarding concerns about the buffer zone, "[t]he buffer zone is of adequate dimension to carry out environmental monitoring activities and mitigation, if needed"; "[a]n underlying buffer zone is described in the application as extending from near zero to about 20 feet [ . . . ] [t]his buffer zone is adequately designed for an aboveground vault facility" (Ex. 467 at 54); and (3) regarding concerns that ground-

water levels are higher than the bottom of the disposal cells, USE "submitted new groundwater hydrographs for the years 1995, 1996 and 1997" and as a result "[t]he LLRW Program reevaluated the disposal unit design considering the new groundwater levels and determined that the bottom of the disposal cells, the basemat, is above the highest observed groundwater level"; "[t]he disposal facility is not within a hydrogeologic unit and is above any potential groundwater level" (Ex. 467 at 143).

### July 30, 1998

Review managers, Osborn, and Ringenberg assemble before the Directors to discuss the "Decision Document." (Ex. 214.) Marvin Carlson, review manager for site characteristics including groundwater and surface water, informs the Directors that he now concludes that groundwater is a problem despite the fact that he had previously believed otherwise. Carlson states that he bases his opinion on the hydrographs submitted by USE on June 8, 1998. (Ex. 140, at ALG51675, ALG51679–80.) Unlike all the earlier reviews of technical information regarding hydrology in which he consulted technical experts, Carlson, a geologist who professes no expertise in hydrology (*e.g.* Tr. 2677, 2744–45), has no substantive consultations with any of the several hydrologists on Nebraska's technical review team regarding the hydrographs. (Tr. 2615 (all technical reviewers were "highly qualified"), 2692 (four hydrologists), 2725 (no "communication or conversation with any other living human being" after receipt of hydrographs and before July 30).) He makes his judgment simply by looking at the peaks in the hydrographs. (Tr. 2691 ("visual inspection"), 2697 (now, plateaus and not spikes), 2743 ("eyeballed" them).) He performs no quantitative or statistical analysis. (Tr. 2692 (no technical review undertaken),

2698–99 (no comparison to precipitation data, no well-by-well comparison of old and new hydrographs), 3006–08 (no numerical comparison of the early and later hydrographs to assess the differences, if any, in the duration of time water was near the surface).) Carlson works for the Conservation and Survey Division of the University of Nebraska. (Tr. 2587, 2941.) The Conservation and Survey Division's LLRW work for DEQ was billed at several hundred thousand dollars. (Tr. 2709.) DEQ has "longstanding relationships" with the Conservation and Survey Division, which does "a lot of work" under "several" contracts to provide services for DEQ in addition to services under the LLRW contract. (Tr. 4861–62.)

### Probably August 3, 1998

Wood meets with Nelson in Milwaukee, Wisconsin, to discuss the intended license denial decision. (Tr. 6880.) Nelson is in Milwaukee attending a meeting of the National Governor's Conference where Nelson is on a natural resources committee. (Tr. 6882.) Wood was also scheduled to attend that meeting because he "staffed" Nelson's participation on the natural resources committee. (Tr. 6882.) Tim Becker, Nelson's chief of staff, and Rick Becker, one of the PRO staffers assigned to LLRW issues, are also present when Wood meets with Nelson on the license issue. (Tr. 6462–64.) According to Rick Becker, Nelson is told that a tentative license denial decision will be announced, and nothing more is said. (Tr. 6464.) That is, according to Becker, Nelson asks no questions and Wood gives no details. (Tr. 6464.) Apparently no notes are kept. According to Becker, the meeting with Nelson was scheduled some days before the day the meeting was actually held. (Tr. 6465.) Schor testifies that several days before the Milwaukee meeting Wood consulted with him about meeting with the Governor. (Tr. 6395.) Schor testified that he told Wood that the Governor should be informed, although Schor was not interested in being present or participating in the discussion. (Tr. 6358, 6394.) Nelson and Wood then have telephone conference with Lamson and notify him of the decision. (Tr. 7195.)

### August 5, 1998

Nebraska issues the proposed license denial decision to the public for comment. (Ex. 5752.) The proposed license denial is based on the following reasoning: (1) because of the high groundwater table, "The Site Lacks Sufficient Depth to the Water Table," citing DEQ regulation Title 194, Chapter 5, Section 001.01G (Ex. 5752 at 4); (2) because of the high water table, "The Site Lacks a Buffer Zone of Adequate Dimension Beneath the Disposed Waste," citing DEQ regulation Title 194, Chapter 5, Section 003.01H and DOH regulation Title 180, Chapter 1, Section 012.28A7 (Ex. 5752 at 5); (3) because USE proposes to relocate the swale, "Engineered Structures and Barriers are Planned Substitutes for a Suitable Site," citing DEQ regulation Title 194, Chapter 5, Section 001.02 (Ex. 5752 at 5); (4) because of the high groundwater table, "Ground Water Discharges to the Surface Within the Disposal Site," citing DEQ regulation Title 194, Chapter 5, Section 001.01H and DOH regulation Title 180, Chapter 1, Section 012.26A6 (Ex. 5752 at 6); (5) because the high groundwater table will intercept the leachate collection system, "There is a Need for Continuing Active Maintenance After Site Closure," citing DEQ regulation Title 194, Chapter 5, Section 002.02A and DOH regulations Title 180, Chapter 1, Sections 012.12G and 012.25 (Ex. 5752 at 7); (6) because the Departments conclude that USE and AE do not have the capacity to finance the proposed project, "US Ecology Has Not Demonstrated that It is Financially Qualified," citing DEQ regulation Title 194, Chapter 6, Section 001 and DOH regula-

tion Title 180, Chapter 1, Section 012.33 (Ex. 5752 at 7); and (7) because USE did not appropriately address likely accidents such as a truck fire inside the entrance to the facility or address the offsite consequences of such an accident, "The Radiation Safety Program Does Not Adequately Address Accidents," citing DEQ regulations Title 194, Chapter 3, Sections 003.11 and 004.03 and DOH regulations Title 180, Chapter 1, Sections 012.08K and 012.09C (Ex. 5752 at 8).

### August 6, 1998

Nebraska does not follow the procedure set out in the "Info Guide" that was distributed to the public in October, 1997. That is, Nebraska does not use the following sequence: (1) the issuance of a response to public comments by the experts, (2) followed by a Safety Evaluation Report (SER), (3) followed by the proposed license decision. (Ex. 3126, at 3126.006.) Instead Nebraska collapses the process into one. By so doing, no one is required to "take credit" for a particular position, and an effort is made to make the scientifically-based documents (the response to comments and the SER) appear consistent with the decision document.

### November 9, 11, and 12, 1998

Public hearings held. (Filing 463 at ¶ B(63) (Order on Final Pretrial Conf.).) At the public hearings, USE presents a vigorous point-by-point rebuttal to the proposed license denial decision. In particular, USE presents the testimony of Dr. Stewart Taylor, a Ph.D. in hydrology from Princeton. (Ex. 1323.) Dr. Taylor had prepared the computer groundwater models and other sophisticated hydrological data that Nebraska relied on in the DSER when finding that there were no water problems. Among other things, Dr. Taylor explains that the 1995–1997 hydrographs are statistically no different than the 1992–1994 (wet year) hydrographs that were available to Nebraska and reviewed in the DSER. (Ex. 1323, at 772–79, 783–84 (testimony)); Ex. 1330, at USE104261–63 (written response) & USE104269 (Figure 1–4, BAO–13 Hydrograph (1992–1997).) USE also provides evidence that its parent, American Ecology, has reduced its long-term debt to under one million dollars, improving its balance sheet by about $40 million. (Ex. 1330, at 1203 (testimony of DeOld); Ex. 1330, at USE104296 (written response).) USE offers to build only 4 class A waste cells and one Class B cell. (Ex. 1330 at 1205–07 (testimony of DeOld).) Among other things, this might obviate the need to relocate the swale and it would likely avoid any possibility of groundwater entering the leachate collection system. (Ex. 1330, at 1206–07 (testimony of DeOld).)

### November 12, 1998

Public comment period ends. (Filing 463 at ¶ B(63) (Order on Final Pretrial Conf.).)

### December, 1998

Third Conley, Smith report. (Ex. 5820.) "In spite of the substantial improvement in American Ecology's balance sheet resulting from the agreement with the Chase Bank, the Company still does not appear to have the ability to finance a major project such as the low-level radioactive waste disposal site to be located near Butte, NE, without major assistance and/or guarantees from the largest members of the Central Interstate Compact." (Ex. 5820, at 5820.0005.) The report stated that outstanding debt was reduced even more than was indicated at the public hearing, from $42,734,000 to $787,000. (Ex. 5820, at 5820.0008.)

### December 18, 1998

License denied. (Ex. 5828.) The grounds for the decision are these: (1) because of the high groundwater table, the "Site Lacks Sufficient Depth to Water Ta-

ble," citing DEQ regulation Title 194, Chapter 5, Section 001.01G (Ex. 5828, at 5828.0002); (2) because of the high groundwater table, the "Site Lacks Adequate Buffer Zone," citing DEQ regulations Title 194, Chapter 5, Section 003.01H; Title 194, Chapter 1, Section 004; and Title 194, Chapter 5, Section 004.04 and DOH regulation Title 180, Chapter 1, Section 012.28A7 (Ex. 5828, at 5828.003–004); (3) because USE intends to move the swale and because USE intends to employ a concrete basemat, sand drainage layer, clay liner, and engineered fill materials to obviate any surface water and groundwater issues, "Engineered Structures and Barriers Are Planned Substitutes For A Suitable Site," citing DEQ regulations Title 194, Chapter 5, Sections 001.02 and 001.01A (Ex. 5828, at 5828.005); (4) because of the high groundwater table, "Groundwater Discharges to the Surface Within the Disposal Site," citing DEQ regulations Title 194, Chapter 5, Sections 001.01H and Title 194, Chapter 1, Section 024 and DOH regulations Title 180, Chapter 1, Sections 012.26A6 and 012.02 (Ex. 5828, at 5828.007); (5) because the high groundwater table may intercept the leachate collection system thus requiring pumping, "There Is A Need For Continuing Active Maintenance After Site Closure," citing DEQ regulations Title 194, Chapter 5, Section 002.02A and Title 194, Chapter 1, Section 002 and DOH regulations Title 180, Chapter 1, Section 012.12G; Title 180, Chapter 1, Sections 012.25 and 012.02 (Ex. 5828, at 5828.0010); and (6) because USE does not have the money on its own to finance construction and because it has not provided sufficient written assurance that it could obtain the funds, "The Applicant Has Not Demonstrated That It Meets The Financial Assurance For the Construction of a Low Level Radioactive Waste Disposal Facility," citing DEQ regulations Title 194, Chapter 6, Section 001 and Title 194, Chapter 6, Section 002.08 (Ex. 5828, at 5828.0012).

### December 18, 1998

Unlike the August, 1998 proposed decision, the December, 1998 final decision is not based upon a failure to satisfy the *DOH* financial assurance regulation. The only regulations cited regarding financial assurance are the *DEQ* regulations. At trial, and despite language in the final decision stating that the "Departments concur with" the Conley, Smith report (Ex. 5828, at 5828.0014 (emphasis added)), Schor testified that he purposely elected not to decide whether the DOH regulation on financial assurance had been satisfied. Respectfully, his explanation for this omission made little sense. (Tr. 6411–20.) Nor does the December, 1998 decision rely upon the "Radiation Safety Program" criticism that was used as one of the grounds for denial in the proposed decision announced in August of 1998. (Ex. 5752, at 5752.0008–0009.) The December decision document neither mentions nor attempts to explain these omissions.

### December 30, 1998

Entergy & Wolf Creek file this case. (Filing 1.) USE intervenes. (Filings 45, 51.) The Commission is realigned as a plaintiff. (Filing 42.)

### January 5, 1999

In a letter dated January 5, 1999, Ringenberg informed USE of a cost estimate for a possible contested case proceeding to challenge the decision, which costs would be charged to USE from funds provided to the Commission by the generators. The estimate was $650,000 for the first quarter of 1999. The letter also indicated that the defense costs of this case would be charged to USE. (Ex. 26.) Later, the DEQ advises Nebraska budget officers that the estimated costs of future license work (which would be paid by USE and funded

by the Major Generators through the Commission) amounted to $7.5 million through June 30, 2000. (Ex. 29.)

### January 9, 1999

Nelson leaves office. (Tr. 850.) Shortly thereafter he becomes "of counsel" to Lamson, Dugan & Murray, a successor firm to Kennedy, Holland. (Tr. 851.) Tim Becker, his former chief of staff, also joins the firm. (Tr. 7202.)

### January 12, 1999

Ringenberg notifies the Commission that there is a "30 day timeframe [sic] for persons to challenge . . . decisions to deny the application." (Ex. 10.) According to Ringenberg, the license denial decision would become final if "not challenged or at the end of the administrative appeals process." (*Id.*)

### January 15, 1999

USE, and later the Commission through a petition in intervention, files a contested case before DEQ and DOH, reserving a jurisdictional challenge to the authority of DOH. (Ex. 25.)

### January 25, 1999

Ringenberg demands $100,000 from USE to pay the LMC. The letter specifically threatens to suspend the "licensing process" (the contested case) if the money is not paid by February 1, 1999. (Ex. 30.)

### February, 1999

Nebraska appoints a hearing officer, C. Thomas White, a retired Chief Justice of the Nebraska Supreme Court, to preside over the contested case. As hearing officer, White will not make a decision. Rather, he will merely make a recommendation that is acted upon by the agencies.

### March 1, 1999

Regarding the contested case, and in response to a letter counsel for the Commission sent to him, Lamson advises counsel that Nelson is "of counsel" with the firm. (Ex. 12.) Lamson also advises that:

(1) "[b]ecause the contested case hearing is a technical analysis of the departments' interpretation of data and their decision to deny the license, any evidence of alleged improper political influence in the denial of the license application which is not in the agency record is irrelevant and therefore should not be admitted"; and (2) "[e]ven if such evidence existed, which we do not believe to be the case, and the alleged 'political influence' became an issue, the testimony by former Governor Nelson elicited by an opposing party should not disqualify Lamson, Dugan & Murray from representation as counsel because his testimony would not be prejudicial to the interests of our client in this case." (Ex. 12 at 7.)

### March 3, 1999

Hearing before Judge White. He tentatively agrees with Nebraska that USE and the Commission may not present evidence of bad faith or call Nelson as a witness. (Ex. 4 at 52–53.)

### March 8, 1999

This court enters temporary restraining order precluding Nebraska from proceeding with the contested case. (Filing 42.)

### April 16, 1999

This court enters a preliminary injunction prohibiting Nebraska from proceeding with the contested case and prohibiting Nebraska from collecting funds from the plaintiffs or spending funds collected from them. (Filing 81.) That decision is affirmed on appeal on April 12, 2000. (Filing 137.) In its opinion, the Court of Appeals described the evidence regarding the Nelson administration. (*Id.*)

### April 8, 1999 through August 9, 2000

Lamson, Dugan & Murray bills for services related to this case; that is, providing litigation services to Collier, Shannon. (Ex. 1582; Tr. 7293–96.)

*June 22, 1999*

Lamson confers "with Governor Nelson, re: State's request to review Governor's personal files on LLRW Compact," and bills Nebraska. (Ex. 1580.)

*August 28, 1999*

Effective date of Nebraska legislation providing that: "The State of Nebraska hereby withdraws from the Central Interstate Low–Level Radioactive Waste Compact." Neb.Rev.Stat. Ann. § 71–3522 (2001). The statute additionally provides that: "The Governor shall notify in writing each of the governors of the other compact states and the chairperson of the [Commission] that the withdrawal of the State of Nebraska from the compact is effective." *Id.* Pursuant to the Compact, no withdrawal is effective until five years after notice by the withdrawing state's governor. Art. VII(d) ("Any party state may withdraw from this compact by enacting a statute repeating [sic] the same. Unless permitted earlier by unanimous approval of the Commission, such withdrawal shall take effect five-years after the Governor of the withdrawing state has given notice in writing of such withdrawal to each Governor of the party states. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.") The effective date of the Nebraska statute is August 28, 1999. Thus, Nebraska's withdrawal is effective in August of 2004.

*September 22, 2000*

Nelson runs for the United States Senate. He is opposed by Don Stenberg, the Attorney General for Nebraska during the Nelson administration. Nelson and Stenberg had been bitter foes when Nelson was Governor. (*See, e.g.,* Tr. 647–48.) In a debate, Stenberg attacks Nelson over the issues raised by this case and statements about Nelson in the Court of Appeals' opinion affirming the grant of the preliminary injunction. (Tr. 966–70.)

Nelson responds: "I kept the waste out of Nebraska and he lost the case." (Tr. 970.)

*November, 2000*

Nelson defeats Stenberg and is elected to the United States Senate.

### C. Facts About the Site

#### 1. Low–Level Waste and the Storage Facility

The radioactive waste involved in this case is comparatively benign when contrasted with other radioactive materials. For example, it is not the type of highly radioactive waste found in spent fuel rods or the like which are now destined for permanent storage in Nevada. Rather, the low-level radioactive waste involved here could be generated at a doctor's office or in a research laboratory or when cleaning a nuclear power plant.

For the proposed facility, the great bulk of the waste would have come from nuclear power plants, although other more minor generators (like hospitals and universities) would have used it also. In general, that waste would have been comprised of such things as filters and plastics (class "A" waste) and semi-solid resin-like materials and tools (class "B or C" waste) used in keeping nuclear power plants clean and operational. Class "A" waste is the least dangerous, and "Class C" waste is the most noxious. (Ex. 3384, at 1.2–1.) Class "B" waste falls in between the other categories. "Class A" waste is stored separately from class "B–C" waste. (Ex. 3384, at 1.2–2.)

Following new storage concepts first used in France, USE proposed to build an above ground facility. Unlike other low-level disposal sites in America that merely buried the waste in the ground, USE proposed to build a massive concrete structure above ground to hold the waste. The structure would have had a concrete base at least 4 feet thick. (Ex. 3384, at 1.2–11

& 1.2–13.) Under the structure would have been a layer of sand. That would have been followed by a layer of sand and clay called a leachate collection system, the purpose of which was to allow monitoring of leachate should there be an inadvertent release of radioactive materials through the above ground concrete basemat. (Ex. 3384, at 1.2–13.) The walls of the structure would have been made of concrete that were at least 3.0 feet thick. (Ex. 3384, at 1.2–11 & 1.2–14.) A concrete roof 3.0 feet thick (or greater for the B–C cell) would have completed the structure. (Ex. 3384, at 1.2–11 & 1.2–14.) In essence, the facility would have been composed of mammoth concrete boxes situated above ground.

The facility would have been comprised of various "A" cells and one "B–C" cell. The modeled life of the "A" cells of the structure was 500 years. (Tr. 3241.) The modeled life of the "B–C" cell was 3,500 years. (*Id.*) Obviously, the facility would not have been operated for such a long period of time. In fact, it would have closed after only 30 years.

At closure, the structure would have been filled with a slurry material that was designed to harden. (Tr. 3671.) At the sides of the structure and on top of the concrete roof there would have been placed layers of sand, clay, concrete, and soil. The leachate collection system would have been plugged, but pipes would be placed in the plugged leachate collection system, protruding through the cap, to provide sampling and drainage ports. (Tr. 3243–44.) In sum, after 30 years, the structure would become a large above ground concrete monolith, filled with a hard slurry, and covered with clay, sand, and soil completely entombing the waste.

### 2. Selecting a Site

Nebraska was selected as the host state. As indicated previously, the Commission, largely funded by nuclear power generators operating in Nebraska, Kansas, Oklahoma, Arkansas, and Louisiana, hired USE to acquire, license, construct, and operate a waste disposal site. USE then set out to find such a site.

USE sent John DeOld to Nebraska to manage the project. DeOld had prior experience in low-level radioactive waste disposal as an assistant project manager at a site operated by USE in Washington.

USE is and was a wholly owned subsidiary of the American Ecology Corporation ("AE"), a publicly traded company. The president of AE at the time of the license denial was the former project manger for the "Chunnel," the acclaimed undersea railroad tunnel linking England and France. (Tr. 2549.) He was an "impressive" individual according to John Conley, a financial analyst specially hired by Nebraska. (*Id.*) Conley viewed AE's management in "generally positive" terms. (Tr. 2550.)

But even with good management, during the later stages of the project (particularly 1995–1997), AE suffered very severe financial problems. (Tr. 2503–13; Exs. 6249 (1995 Form 10–K), 5326 (1996 Form 10–K), 5653 (1997 Form 10–K).) At one point, it hovered on the brink of bankruptcy, and the Commission studied what to do if that happened. (Tr. 3867–68; Ex. 5298.) However, by the time the license was denied in December of 1998, AE had regained much of the financial strength it had earlier lost, reducing its long-term debt from $42.7 million to less than $1 million. (Ex. 1330, at Tr. 1203 (oral statement) & at USE 104296 (written statement); Ex. 5820 at 5820.0008.)

Turning once again to the siting process, USE began the process of trying to locate suitable sites. In so doing, it contracted for site selection and design assistance with Bechtel National, Inc. (Bechtel), a large and highly respected engineering firm, with extensive experience in this type of work. USE and Bechtel narrowed their

focus to three counties in Nebraska where the site might reasonably be placed. (Ex. 3596), Report to the Honorable J. James Exon, U.S. Senate, *Nuclear Waste: Extensive Process to Site Low–Level Waste Disposal Facility in Nebraska,* (General Accounting Office (GAO), July 1991). After an extensive study of potential sites in Boyd, Nemaha, and Nuckolls Counties, the site in Boyd County was selected. (*Id.* at 3596.0003–0004). The Nebraska legislature was notified of the site selection in February of 1990. *See Nebraska v. Central Interstate Low–Level Radioactive Waste Com'n,* 834 F.Supp. 1205, 1211 (D.Neb.1993), *aff'd,* 26 F.3d 77 (8th Cir.), *cert. denied,* 513 U.S. 987, 115 S.Ct. 483, 130 L.Ed.2d 395 (1994).

Unable to take advantage of Nebraska's power of eminent domain, but required by Governor Kay Orr to achieve some type of "community consent" and to fulfill a number of other limiting criteria established by Orr, USE acquired 320 acres of farm and ranch land in one of the most remote areas of Nebraska, Boyd County. Boyd County is in north central Nebraska, on the border between Nebraska and South Dakota. The site is approximately 5 miles from South Dakota and 40 miles from the largest town in the area, O'Neill, Nebraska. O'Neill has a population of less than 4,000.

The tiny community of Butte, Nebraska, which is the closest village to the site, welcomed the choice. The site would have employed a number of people, and would have contributed greatly to the economy of the village and its residents. Many other people in Boyd County were, however, very unhappy with the site selection. For example, when driving to the site for my inspection, I saw a weathered sign adjacent to the road suggesting that "dump pushers" were "dope pushers."

Under Nebraska law, a local monitoring committee ("LMC") was established in Boyd County. (Neb.Rev.Stat. Ann. § 81–15,101.01 (1999).) Each year, USE was obligated under Nebraska law to give the LMC $100,000. (*Id.* at 81–15,104 (1)(h).) The ostensible purpose of the LMC was to facilitate communications between USE, Nebraska, and the residents of Boyd County. In fact, the LMC served as a vigorous site opponent and an aggressive litigator. It hired Pat Knapp (Knapp), a Lincoln, Nebraska, lawyer. She orchestrated many of the LMC's actions.

### 3. The Size of the Disposal Facility

According to the original plan, the disposal facility would have consisted of 20 class "A" waste cells, and 1 class "B–C" cell situated above ground in the concrete structure. (Tr. 3258; 3261.) This facility would have been located on the 320 acres purchased by USE, but the "footprint" of the actual structure was much smaller than 320 acres.

The license application was filed with Nebraska on July 27, 1990. After Nebraska issued an intent to deny the license in 1993, USE was forced to reconfigure and reduce the total size of the site to 110 acres. This was done in order to avoid a license denial predicated upon the existence of "wetlands" on the 320–acre tract even though no wetlands were located within hundreds of feet of where the disposal facility would have been built. Once again, the "footprint" of the actual structure would have been much smaller than the 110–acre reconfigured tract.

In 1995, in revision 8 to the application, USE limited the number of "A" cells to 12 with 4 to be built at inception, and 4 more every 10 years thereafter, for a total of 12 "A" cells. (Tr. 3258–59, 3639–40; Ex. 1411, at 10–5 to 10–6.) The plan for 1 "B–C" cell remained the same.

By the fall of 1998, and after Nebraska had issued yet another intended denial decision, USE offered to limit the facility to 4 class "A" waste cells and 1 class "B–C" cell. (Ex. 1330 at 1205–07.) The class

"B–C" cell had been downsized by one-third from its original size. (Tr. 3265–66.) This proposal may have obviated the desirability of relocating a portion of a shallow depression or swale that would have intercepted a portion of the footprint of the disposal structure.

The offer did not satisfy Nebraska. The license was finally denied shortly thereafter on December 18, 1998. (Ex. 5828.)

### 4. Site Characteristics

I have prepared a "Judge's Rough Sketch" of the site. It is not to scale, and it is intended as a general description only. The sketch is the product of my hearing the testimony, reading the exhibits, and walking over the site (one very hot, windy, and dry day in June, 2002). It appears on the next page.

The 320 acres (1/2 section) purchased by USE for the site consists of land that was once farmed to dryland crops and used to pasture cattle. There is no evidence that the farm ground was ever irrigated from wells or streams. The closest stream is

some 2.5 miles to the north. Except for locally heavy rainfall events, which do occur from time to time, the site, and the area more generally, is arid.

Prior to 1989, the mean annual precipitation for Butte, Nebraska, over the period of record (some 80 years) was 23.67 inches. The years 1989 (13.02 inches) and 1990 (21.89 inches) were dry. Beginning in the latter part of 1991, and extending through 1997, the Butte site experienced abnormally high amounts of precipitation. In 1993, for example, a record was set when the Butte site experienced 38.57 inches of precipitation. However, Butte, Nebraska, like the rest of the State, was experiencing a record drought by 2002. When I toured the site, I was required to walk over it because of the fear that the tail pipe of a pickup might start a grass fire.

The site was selected in part because underneath the entire surface of the 320–acre tract are hundreds of feet of impermeable shale. In fact, one bore hole found that the shale was 500 feet thick. (Ex. 3596, at 3596.0029 (GAO Report)). For all practical purposes, nothing can penetrate the shale.

On top of the shale rests a sort of geologic rubble, consisting of rocks and sand, called the "contact zone" (averaging about 3 feet deep). (Ex. 1411, at 2–19; Tr. 3931.) On top of that zone, one finds various types of more commonly known materials. They consist of a layer of "surficial fines" at the surface of the ground (averaging roughly 4 feet deep) and consisting of silts and clay (Ex. 1411, at 2–19; Tr. 3950), followed by the "upper sands" (averaging about 3 feet deep) and consisting of fine to medium sand (Ex. 1411, at 2–19; Tr. 3944), then followed by "fine-grained sediments" (averaging about 10 feet deep) and consisting of silts and clays. (Ex. 1411, at 2–19; Tr. 3943.) In general, the depth of all these materials from

ground surface to shale varies from between roughly 10 feet to 30 feet across the site. (Ex. 1411, at 2–19; Tr. 3928.)

While there is no large aquifer like the Ogallala between the shale and the ground surface, groundwater is sometimes found at the site. When it is found, this water exists between the shale and the surface of the ground. In other words, the groundwater exists in the material above the shale.

When groundwater exists on the site it is quite shallow when compared to the surface of the earth. This is because the depth from ground surface to the shale is shallow as well. At times, water will rise to near the surface of monitoring wells. When that happens, the unusually high well readings are caused by unusually heavy rains. In order to get some perspective on this point, it is helpful to consider the 1998 testimony of Dr. Stewart Taylor, a Ph.D in hydrology from Princeton, who appeared at a public hearing on the license. Taylor worked for Bechtel.

Keeping in mind that the depth between the ground surface and the shale is itself quite shallow, Taylor explained to Nebraska that when groundwater could be measured on the site: (1) on an average annual basis, 43% of the time the groundwater was at least 8 to 10 feet below the ground surface, and (2) on an average annual basis, 34% of the time the groundwater was 6 to 8 feet below the ground surface. (Exs. 1323 at 778, 1190 at C–95636 (histogram).) Only 6% of the time (or 6 out of 100 years) on an average annual basis did water exist in the 2– to 4-foot range. (Ex. 1190, at C–95636.) While about 8% of the time the average annual depth to groundwater was 10 to 12 feet, there were no average annual depths between 0 and 2 feet. (*Id.* at C–95636.)

The values just described were computed "on an average annual basis." Thus, as

Dr. Taylor noted, on any given day, particular well readings may show higher or lower values. But, in general, when it is present on the site, the undisputed evidence shows that the groundwater normally exists at least 6 to 8 feet below the surface of the ground.

Certain well readings sometimes showed groundwater at or very near the surface. In that connection, competent hydrologists all agree that even if a well reading indicates groundwater at or near the surface of the ground, such a reading does not necessarily mean that the groundwater is actually at that level. (Ex. 467 at 13 ("[w]ater levels measured in the well casing do not always accurately reflect that actual groundwater levels are at or above the surface.").) This is because different parts of the ground generate different hydraulic pressures and under certain circumstances these differences may cause water in the well to be pushed higher than the actual groundwater elevation that the well is intended to measure. During the trial of this case there was much debate about whether the well readings near the surface were accurate indicators of the actual groundwater elevations.

Moreover, it is also important to realize that the existence of high groundwater at a low-level radioactive waste disposal site is not a valid basis upon which to disqualify the location from a health and safety point of view. (Tr. 5768–71 (testimony of one of Nebraska's experts, Dr. John Osnes).) This is because it is important that any potential release of radioactive material into the ground be capable of being monitored and detected. Since groundwater provides a medium that is easily monitored, thereby providing a warning of an unintended release, the existence of groundwater can be a good rather than a bad thing. This is particularly true where, as here, the underlying shale provides an impenetrable vertical barrier to radioactive migration. As a result, where groundwater is relatively shallow and must move laterally toward the site boundary, it is fairly easy to monitor the groundwater and hence detect an unintended release of radioactive material.

On the other hand, if ground water is released to the surface in the form of a discharge of liquid (as opposed to evapotranspiration [3]) such a release might cause a problem if the amount of the discharged water was in sufficient volume and mixed with significant volumes of surface water. In other words, if a substantial quantity of liquid came to the surface such a discharge might create (or intermingle with) a pathway that could convey an inadvertent release of radioactivity to the site boundary via surface water. Since surface water travels much more rapidly than groundwater, the opportunity to detect and mitigate an inadvertent release before it reaches the site boundary is reduced. Thus, the issue of whether there was a groundwater discharge to the surface and the extent of that discharge was a legitimate and important question for the regulators to pursue.

As previously stated, it is not my responsibility to decide technical hydrologic (or other) licensing issues, and I do not. Indeed, this case proves that a fair resolution of the questions presented by the

---

**3.** "Evapotranspiration" is the release of water into the air by evaporation and transpiration from such sources as soils, wetlands, snow cover, and living-plant surfaces. (Ronald L. Hanson, *Evapotranspiration and Droughts*, in Paulson, R.W., Chase, E.B., Roberts, R.S., and Moody, D.W., Compilers, National Water Summary 1988–89—Hydrologic Events and Floods and Droughts: U.S. Geological Survey Water–Supply Paper 2375, pp. 99–104, available at http://geochange.er.usgs.gov/sw/changes/natural/et.) Evapotranspiration depletes groundwater just as pumping, seeps, and springs deplete groundwater.

application required extensive expertise in hydrology and performance testing coupled with a scientist's objectivity and care. In evaluating the question of bad faith in the context of the water issues, one properly focuses upon whether that sort of genuine expertise, objectivity, and care was used to answer the questions. The proper focus is not on whether the answers to the questions were correct.

In other words, to some degree, the bad faith question is more a question of process than it is a question of substance. Therefore, I was particularly unmoved by Nebraska's after-the-fact attempt to justify the decision. For example, while I found the testimony of Mr. Lappala, one of Nebraska's experts retained after the commencement of this case, to be plausible,[4] such a post hoc rationalization only served to illustrate the absence of real expertise, objectivity, and care in Nebraska's decision to deny the license. Since there were plenty of experts that Nebraska could have consulted at the time, the question becomes whether the failure to do so was a function of bad faith.

Returning to the description of the site, the 320–acre tract of ground held "wetlands" encompassing about 43 acres. (Ex. 3596, at 3596.0030.) In the northeastern-most area of the 320–acre tract is the largest wetland, W–1. Wetland W–1 is situated near another wetland labeled W–2. (Ex. 7046 (demonstrative only).)

From my point of view, it is misleading to call these areas "wetlands." Idyllic havens for wildlife they were not. They are muddy water holes of the kind frequently seen being used by cattle in the many pastures that dot the high plains. In very dry years the wetlands hold no water. In very wet years the wetlands hold water sufficient to float a small row boat. These two wetlands are filled in large part because of surface water drainage from a slight ridge that cuts across the northern portion of the north half of the section. In other words, surface water drains into the wetlands from a portion of the site. (However, most of the surface water drainage on the site is away from these areas.) Wetland W–1, and perhaps wetland W–2, also receive some groundwater recharge although it is quite intermittent depending upon the rains.

Aside from a nearly indiscernible "wetland" of less than 1 acre on the 110–acre reconfigured site, there are no wetlands on that tract. This small wetland was not located within the "footprint" of the structure. It was so insignificant that the Army Corps of Engineers gave USE permission to "mitigate" it by plowing the soil and filling any depression. (Oddly, and despite the "404 permit," Nebraska would not allow USE to eradicate the "wetland" during the 8–year licensing process. In fact, and even though the permit was time-sensitive, Nebraska asserted that if USE tried to eradicate the "wetland" before a license was granted, Nebraska would declare that USE unlawfully began "construction" of the disposal facility and deny the license.)

There is a small culvert on the south end of the site. It drains the field south of the site which is across the paved road that

---

4. On the other hand, I found the Commission's expert in hydrology, who was retained for trial, Mr. Siefken, to be more persuasive. Siefken, while serving on the staff of the Nuclear Regulatory Commission, drafted major portions of the federal regulations that Nebraska in large part adopted as its own. He brought to the trial a unique understanding of the regulations, hydrology, and the practical requirements for low-level radioactive waste disposal facilities that none of the other experts enjoyed. But, as indicated in the text, the question in this case is not whether Siefken, retained after-the-fact, was right. Rather, the question is whether Nebraska acted in bad faith.

borders the southern edge of USE's tract. The 110–acre portion of the site is relatively flat. On the entire 320–acre tract, and except for a portion of the land near wetland W–1, the land slopes gently to the north and west. In other words, it tends to drain most surface water away from wetland W–1 and W–2.

A swale exists in the southwest part of the 110–acre site. The swale may fairly be characterized as a very slight depression. Indeed, at points it is nearly impossible to distinguish the swale from the surrounding topography. In fact, parts of the swale were farmed thus making it even more difficult to discern. No one ever surveyed the swale so its precise location is unknown.

The swale carries the precipitation runoff coming through the culvert and the rain and snow that falls on the portion of the site near the swale. The swale conveys any such surface water to the western boundary of the site consistent with the northwesterly slope of the land. (Tr.2019.) The general direction of the groundwater flow is north to northeast. (Tr.2019, 4001; Ex. 467 at 19.) Thus, although there can be regional differences, most groundwater flows away from the swale located in the southwest part of the tract.

During the licensing process, there were no credible visual observations of seeps or springs on the 320–acre site or 110–acre site. In fact, Carol Liewer testified in 1998 before Nebraska (Ex. 1330, at USE104352), (and again before me (Tr. 3713–18, 3761)) that having walked the entire tract nearly every day for many years during the licensing process in order to check more than 50 wells (Tr. 3714–15, 3717), and after being specifically asked to look for and record seeps and springs by

USE and Bechtel (Tr. 3713), she never once observed groundwater coming to the surface (Ex. 1330, at USE104352). As a well technician licensed by Nebraska, and because of other experiences with seeps and springs, she said she knew what a seep or spring looked and felt like. (Tr. 3712–14, 3718.) After hundreds, and perhaps thousands of observations, she never detected a seep or spring on the premises. (Ex. 1330, at USE104352; Tr. 3717–18, 3761.) In particular, she never observed a seep or spring in the swale. (Ex. 1330, at USE104352; Tr. 3717.)

Her field observations tended to be confirmed by Dr. Taylor's "local model," a computer simulation of the site after construction, that was calibrated to the wet years in 1993 and 1994 at Nebraska's specific request. (Tr. 4319–4321; Ex. 3384, at 3384.3150 (Ex. 3384 is the SAR and the cited page is within Appendix G–7 of the SAR, which is the local model).) This information was provided to Nebraska in 1995 and was provided because Nebraska specifically requested it. As Dr. Taylor put it at the trial of this case, explaining what he told Nebraska during the licensing process, the model predicted that "there would be no groundwater discharge to features such as the swale after construction of the site." [5] (Tr. 4320.)

### D. Impartial Opinions

#### 1. The GAO Report Approves of the Site Selection Process

After the Boyd County site was selected, Senator J. James Exon, a United States Senator from Nebraska, asked the General Accounting Office to prepare a report on the site selection process. (Ex. 3596.) The GAO did so and authored its report in

**5.** Once again, I stress that I do not determine whether Dr. Taylor was right or wrong in what he told Nebraska during the licensing process. On the other hand, an important question is whether Nebraska ignored his expertise during the licensing process in a manner that reflects bad faith.

July of 1991. The GAO found that the site selection process was properly conducted. (*Id.* at 1–3, 9–10.)

First, the GAO found that "the site-screening and site-selection process was an extensive effort to comply with state law and policy in selecting a site for a low-level waste facility . . . ." (*Id.* at 9.) Second, "the geologic and hydrologic assessments performed at the three candidate sites appear to have been conducted in a technically correct manner . . . ." (*Id.*) Finally, "the selection of the Boyd County site, as the preferred site, was supported by the information assembled from existing records and gathered during the on-site characterization of the three candidate sites." (*Id.*)

The GAO concluded that the "site in Boyd County was preferable to the other two sites . . . ." (*Id.* at 10.) In fact, the Boyd County site was *"the only candidate site with good potential to meet the state's licensing requirements."* (*Id.* (emphasis added).)

However, the GAO also cautioned "that without additional information, U.S. Ecology may have difficulty in demonstrating the ability of the site to meet the technical requirements" of Nebraska in two ways. (*Id.* at 30.) USE would need to show that "the site be generally well drained and free of areas of flooding or frequent ponding" and USE would need to show "that sufficient depth to the water table exist[s] so that ground water intrusion into the waste will not occur." (*Id.* at 30–31.) "Nevertheless, the [Boyd] site still appears to be technically preferable to the other two candidate sites on the basis of the geologic conditions found at those sites." (*Id.* at 31.)

The GAO contacted Nebraska to determine the expected costs and the time it would take to decide whether to license the proposed facility. "The state estimates that its review will take about 15 months,

concluding in October 1991, at a cost of about $6 million." (*Id.* at 3.)

The GAO also remarked that "[u]pon taking office in January of 1991, the new governor of Nebraska began an inquiry into the community support issue." (*Id.* at 9.) That "new governor" was E. Benjamin Nelson, now a United States Senator.

### 2. Nebraska's Independent Performance Assessment (IPA) Finds Surface Water and Groundwater No Problem

As suggested by the GAO report, a very great effort was devoted to studying the impact of surface water and groundwater on the site. One of those efforts was conducted by Richard Arnold, a Ph.D. in mechanical engineering, and consultant to Nebraska. Because Nebraska wished to test the validity of USE's own performance assessment, Dr. Arnold was tasked by Nebraska to determine over a 10,000-year period whether the proposed facility, as it degraded over time, might endanger the public by exposing people to doses of radiation in excess of regulatory limits. His report was made available to the public in October of 1997.

Based upon training from the Nuclear Regulatory Commission (NRC) and upon very sophisticated computer and mathematical models, which were in turn based upon very cautious assumptions, Dr. Arnold found that the "maximum predicted exposure will occur 564 years following site closure." (Ex. 3124 at 127.) At that time, "the groundwater pathway will produce a dose of 1.6 mrem" and "the surface water pathway has no credible exposure impact . . . ." (*Id.* at 128.) When the ground and surface water pathways are combined with all other pathways (air dispersion and biotic) the "maximally exposed member of the public will be subject to a Total Combined Total Effective Dose Equivalent of 5.0 mrem . . . ." (*Id.*) The regulatory limit is

25 mrem, and thus the site and the proposed structure easily satisfied the performance criteria and the regulatory limits. (*Id.* at vii (Table 1, Summary of Comparable Results).)

Regarding groundwater, it is especially important to point out one of the many cautious assumptions that Dr. Arnold used when he did his work for Nebraska. That is, the materials under the concrete base were "assumed to be completely saturated as a result of a high water table condition." (Ex. 3124 at 53.) This assumption "reflect[s] a situation which would make the most rapid transport to the site boundary that we could imagine. That made [the model results] very conservative." (Tr. 2056.)

Regarding surface water, the "disposed waste containers would be contained within the concrete vaults and covered with a multi-layered closure cap . . . . As such, under normal, undisturbed conditions, it is impossible for surface water to come into contact with the waste." (Ex. 3124 at 84.) Recognizing that the site might be disturbed, "US Ecology provided detailed design of erosion protection to ensure long-term stability of the disposal site during the post-closure period in accordance with state regulations. Therefore, surface water is not considered a credible pathway following closure of the facility." (*Id.* at 84–85.)

Regarding the swale, and the possibility that it might intercept the groundwater thus creating a surface water pathway for radionuclides and groundwater discharging into that swale, Dr. Arnold specifically considered the data from 1993, one of the wettest years on record. (*Id.* at 85.) "Because the groundwater gradient is southwest to northeast in this location, and the waste disposal cells are situated down gradient from the swale, it is anticipated that any intercept of the groundwater would not provide a pathway for release of radionuclides." (*Id.*) Dr. Arnold concluded: "Therefore, the issue does not pose a technical concern." (*Id.*) At trial, Jay Ringenberg, the DEQ manager for the LLRW program, agreed "that the swale is not a credible pathway for release." (Tr.2049.)

In summary, although USE conducted its own performance assessment, Nebraska decided that it needed a completely independent examination. Whether that additional expense and effort was justified is not now the question. The point is that under very cautious assumptions Nebraska's own independent performance assessment confirmed USE's assertion that neither groundwater nor surface water threatened to harm the public by exposing them to dangerous levels of radiation.

### 3. The 1997 "DSER"

USE submitted a massive amount (eventually 30,000 pages) of technical and scientific data as a part of its application. Employing over 100 consultants, including scientists of all kinds, engineers, accountants, and lawyers, Nebraska then evaluated the data. (Ex. 1411, Exec. Summ. at 2,4 & App. A at 6.) "Technical reviewers" would go over the application in areas of their expertise. Those technical reviews were then distributed to "review managers" whose job was to generally oversee and manage the technical reviewers in the review manager's area of responsibility. (Ex. 1411, App. A at 8–9, 17–23.) For example, a review manager for site characteristics might be a geologist who received technical reviews from experts in surface or groundwater hydrology. Those reviews, comments, and requests for additional data were then forwarded to USE in what became known as "comment rounds." Using this process, and over many years and four such "comment rounds," Nebraska asked USE over 2,200 technical questions and requested a great deal of additional information. (Ex. 1411,

App. A at 17–18.) USE then responded in writing and submitted the requested data.

Following the conclusion of these "comment rounds," Nebraska's consultants then prepared final evaluation findings. Those evaluation findings were then reviewed by the decision-makers who, in 1997, were Randy Wood at DEQ and Dr. David Schor at DOH. After that, a draft safety evaluation report (DSER), consisting of two volumes, was prepared. (Ex. 1411.) It was distributed to the public in October of 1997.

The express purpose of the DSER was to present the "technical review of the license application" in order "to determine if the facility meets applicable State laws and regulations, and if the facility's design, physical features, and safety systems are technically acceptable." (Ex. 1411, Exec. Summ. at 2.) The DSER then presented evaluation findings that were either "acceptable" or "not acceptable." (*Id.* at 5.)

Perhaps the best summary of the significance of the DSER is contained in an "Info Guide" published by Nebraska and released to the public in October of 1997 along with the DSER. (Ex. 3126.) *"The DSER determines if the facility meets applicable state laws and regulations."* (Ex. 3126, at 3126.0011 (emphasis added).)

### 4. The DSER Finds That Surface Water and Groundwater Are Not Problems

Any objective reading of the DSER would conclude that surface water and groundwater posed no impediments to issuance of the license. Although scattered throughout the DSER, much of the groundwater and surface water data is reviewed in section 2.0 of the DSER. The executive summary of section 2.0 provides this summary:

Site Characteristics ... presents twenty-two evaluation findings that discuss U.S. Ecology's description of the sites [sic] location, natural and demographic features, geologic features, surface and groundwater conditions, and preoperational environmental monitoring. In those findings, the LLRW Program determined that the data, analysis, and information presented in U.S. Ecology's license application are acceptable.

(Ex. 1411, Exec. Summ. at 5.)

The DSER provided a specific analysis of all the hydrologic grounds upon which Nebraska would rely upon only one year later to deny the license. In each case, the DSER, prepared by the scientists, and reviewed by the Directors, rejected the grounds upon which Nebraska would later trumpet as reasons to deny the license.

In 1998, Nebraska decided that because of high groundwater the site lacked sufficient depth to the water table. However, in the DSER published in 1997, Nebraska agreed that USE had satisfied the regulations which required that the proposed disposal site provide sufficient depth to the water table such that groundwater intrusion into the waste will not occur. (*Id.* at 2–30, 2–32.) Specifically, the DSER stated that: "US Ecology concluded that, because all waste would be placed above grade, even a rising water table would not contact waste. The LLRW Program concurred with this position." (*Id.* at 2–32.) Moreover, the DSER observed that, while "in very wet years (that is, 1992 and 1993), the water table may remain very near the surface," the "water table recedes quickly in response to decreased precipitation." (*Id.*)

In 1998, Nebraska decided that the license should be denied because the site lacked an adequate vertical buffer zone due to the potential for high groundwater. However, in 1997, the DSER concluded that USE had satisfied that buffer zone requirement. (*Id.* at 3–27 to 3–28.) In particular, Nebraska was satisfied that "the buffer zone ... has been defined tak-

ing into account the site's natural surface drainage and groundwater movement" and "would provide adequate dimensions to carry out environmental monitoring activities and take mitigative measures if needed . . . ." (*Id.* at 3–28.)

In 1998, Nebraska determined to deny the license because USE proposed to relocate the swale. Nebraska stated that such a relocation amounted to a prohibited manmade substitute for a suitable site. However, in 1997, the DSER took the opposite position stating (1) that USE had established that the proposed site satisfied the regulations requiring that the site be "well-drained and free of areas of flooding or frequent ponding" (*id.* at 2–28) and (2) that the "revised drainage channel" provided added protection "against any potential acceleration of surface processes due to changes in grade by construction" (*id.* at 2–26).

In fact, the DSER found that the swale posed no groundwater problem whether viewed in its original condition or rerouted. The DSER specifically found that "the natural southwest to northeast groundwater flow does not reverse under local high water table conditions to flow backward into the west drainage swale." (*Id.* at 6–80.) And, after comparing the closure grading contour map to the USE's groundwater results, "even if there were a brief, periodic groundwater gradient to the west, it would be insufficient to cause a release pathway and, therefore, this is not a health and safety issue." (*Id.* at 6–80 to 6–81.)

In 1998, Nebraska decided that because the structure had a cap, concrete vaults, concrete basemat, sand drainage layer, leachate collection system, clay liner, and engineered fill materials that effectively obviated any high groundwater issues, USE improperly proposed to use engineered substitutes for a suitable site. Yet, in 1997, the DSER concluded that the site was suitable from a groundwater perspec-

tive (*id.* at section 2.4.2, pages 2–29 to 2–38) and that the engineered features properly enhanced the suitability of the site insofar as groundwater was concerned (*see, e.g., id.* at section 3.1–1, pages 3–8 to 3–12; *id.* at section 3.2–1, pages 3–34 to 3–37).

In 1998, Nebraska concluded that groundwater discharged to the surface and thus the license should be denied on that basis. But, in 1997, the DSER came to the contrary conclusion; that is, "there is no direct groundwater discharge to the surface within the proposed site." (*Id.* at 2–33.) Although "[d]uring short periods of intense precipitation, surface materials overlying the water table could become saturated," the DSER concluded that "evapotranspiration would quickly dewater these materials." (*Id.* at 2–32.)

Lastly, Nebraska concluded in 1998 that because high groundwater might infiltrate the leachate collection system, there would be a need for active maintenance after site closure. As a result, the license should be denied because the regulations discouraged the need for active maintenance after closure. However, in 1997, the DSER concluded that there would be no need for active long-term maintenance. (*Id.* at 3–50 to 3–53.) This was so even though "for abnormal events" some minimal maintenance might be required for "removal of leachate from collection pipes that results from small amounts of infiltrated water that could occur at the disposal units." (*Id.* at 3–52.)

### 5. The DSER Finds Financial Assurances Acceptable

The DSER found that USE had satisfied all the financial assurance requirements for the operational period, for site closure and stabilization, for the institutional control period, and for insurance. (Ex. 1411, at 10–1 to 10–23.) Regarding

construction financing specifically, the DSER concluded:

> In summary, U.S. Ecology has provided documentation that reasonably demonstrates that they can obtain the necessary funds to cover the estimated cost of conducting licensed activities over the planned operating life of the facility, including the cost of construction and disposal. Proformas contained in SAR, Revision 8, are on a project level and demonstrate that the repayment of the project construction loans and annual operating costs would be met through the projected fees to be collected. US Ecology related that its financing plan and proposed financial assurances would help to insulate the project from any nonproject-related actions. US Ecology stated that the project is designed to be self-sufficient. The project is an exclusive franchise granted to U.S. Ecology by the CIC [the Commission], and the contract between U.S. Ecology and the CIC provides the basis for the franchise and segregates the Nebraska project from other aspects of U.S. Ecology's or their parent company's business.

(*Id.* at 10–11.)

Despite the fact that tens of millions of dollars had been expended in pursuit of the license, despite the fact that USE had invested over $6 million of its own funds in the project, and despite the fact that USE would have had a monopoly income stream, Nebraska concluded one year later that USE had not provided sufficient "written" assurance of obtaining the necessary financing. This finding flew in the face of the DSER's conclusion that USE had provided sufficient "written" assurance of obtaining financing by submitting (1) a written performance guarantee from AE, the parent corporation of USE; (2) a letter from an investment banking firm, skilled in tax-exempt bond deals, expressing interest in financing the project; and (3) the written provisions of USE's con-

tract with the Commission that granted the Commission the right to provide the construction financing, either as a loan or as a contribution on behalf of the Commission. (*Id.* at 10–6 to 10–7.)

### 6. Nebraska's Chief Expert Testifies that the Site Was Licensable

Even though Nebraska, under the tenure of Governor Nelson, had told the GAO in 1991 that the licensing process would take about 15 months and cost approximately $6 million, that was not to be. In fact, the license review was not concluded until December of 1998, shortly before Governor Nelson left office. By then $88.5 million had been spent. (Ex. 1083, at last page; Tr. 1017.) Nearly all of those monies had been paid by the Commission out of funds provided to the Commission by USE and the generators. Much of the money had gone to Nebraska to pay for its licensing effort since Nebraska law prohibited Nebraska from paying for any of the licensing costs.

As indicated, large amounts of money were paid directly to Nebraska. Nebraska in turn spent substantial sums to pay its consultants. In particular, Nebraska hired the engineering firm of HDR Engineering, Inc. (HDR), and the environmental consulting firm of Jacobson Helgoth Consultants (JHC) to jointly head up a team of consultants. Their job was to "[e]ssentially furnish the entire range of services required by the Department of Environmental Quality and [the] Department of Health to provide technical support for the review of the license submitted by U.S. Ecology." (Tr. 1651.) Dale Jacobson (Jacobson) was selected to head the HDR and JHC joint venture as the "project director." (*Id.*) He was "the principal person between the [LLRW] program, the state government agencies and the consultant team . . . ." (*Id.*) The work that HDR and JHC did for

Nebraska would have started as early as 1989. (Tr. 1333.)

Jacobson was very experienced and well educated. Prior to forming JHC, he had been a senior vice president and project manager for HDR. In that capacity, he was responsible for the management of complex environmental projects. (Tr. 1332.) He held three degrees. He earned a Bachelor's Degree in Civil Engineering, a Master's Degree in Environmental Engineering, and a Master's Degree in Business Administration. (Tr. 1331–32.)

Although Jacobson was called as a witness for the plaintiffs, he was reluctant to say anything that would harm his former client, Nebraska. Nevertheless, Jacobson appeared to be a person of great principle. For example, he testified that Randy Wood, the DEQ Director, told him to change his opinion on an important matter favorable to USE, but Jacobson refused. (Tr. 1414, 1427.) More about that later. For now, there is a far more important and overriding point. After about 8 years of study and the expenditure of huge sums of money, Nebraska's head expert reluctantly admitted that "it was my opinion that the site could have been licensed." (Tr. 1652.)

### E. Evidence of Bad Faith

Recognizing (1) that the GAO believed the site was properly selected, (2) that Nebraska's IPA found that the proposed site would preserve the health and safety of people and that surface water and groundwater were not problems, (3) that Nebraska's DSER found that surface water and groundwater were not problems, (4) that Nebraska's DSER found that USE

had provided appropriate written financial assurances that it could finance the project, and (5) that Nebraska's head consultant, after a lengthy investigation and the expenditure of tens of millions of dollars, testified that the site could have been licensed, the question of bad faith is starkly framed. Although the reasons for my finding of bad faith have changed slightly since my preliminary injunction opinion, the evidence of bad faith remains overwhelming.

In fact, the huge discovery effort (over 1.5 million pages of documents) has revealed persuasive evidence supporting many of my initial conclusions. That effort has also provided disturbing new evidence of bad faith including boxes of very damaging documents that were secretly taken from the Governor's policy research office and hidden in a basement for almost ten years.

I next catalogue the evidence of bad faith upon which I particularly rely.[6] In so doing, I state that any one of the following indicators of bad faith is and was enough to convince me of Nebraska's liability.

### 1. Governor Nelson, In His Own Words

As a candidate, Ben Nelson promised that "[i]f I am elected governor, it is not likely that there will be a nuclear dump in Boyd County or in Nebraska." (Ex. 28 at Attach. A.) The Associated Press reporter who heard the campaign speech thought the commitment so unusual that he interviewed Nelson to confirm it. To the extent that Nelson now denies making the statement, that denial is not credible.

---

**6.** The Commission has presented many pieces of evidence tending to prove bad faith. Suffice it to state that the areas mentioned in the text are the most persuasive, but not the only, evidence of bad faith. For example, I do not discuss in the following portions of this opinion Nebraska's efforts to insulate itself from an inquiry into bad faith during the 1999 "contested case" which I ultimately enjoined. Since that issue was the primary focus of my preliminary injunction opinion, and since the evidence and my views have not changed during trial, there is no reason to add to the already unwieldy length of this opinion.

True to his word, but only after eight years had elapsed and huge sums had been spent, the license application was denied. Less than a month later Nelson left office. Subsequently, when running for the United States Senate, Nelson proudly claimed that, "I kept the nuclear waste out of Nebraska." (Tr. 970.)

The inescapable conclusion from these statements, plus two months of supporting trial evidence, is that Nelson made a promise and kept it. In fact, because of the discovery of very damaging documents, we have an unusual insight into Nelson's actions between the time he made his campaign promise and the time he took credit for that promise as he ran for the United States Senate.

During the years when Kate Allen was taking detailed notes, we know that Nelson worked with site opponents and planned how to defeat the license application by using devious methods. Consider Allen's notes which attribute the following statements to Nelson:

"want USEcol to think EBN is deranged[7]" (Ex. 877, at PRO59289);

"create[ ] noise & difficulties[;] think we can win it; expensive" (Ex. 877, at PRO59289);

"If we don't proceed fairly, then they will file a suit against the state for bad faith" but "I'm not afraid yet" (Ex. 1497, at GOM[8]35468);

"Let's talk about litigation [without] giving our plan to the other side-We want to keep them off balance" (Ex. 1497, at GOM35468);

"Our best bet is to be the under dog who has been taken advantage of by the bad power companies" (Ex. 1497, at GOM35469);

"[W]e have to be careful not to get public sentiment against us" (Ex. 1497, at GOM35469);

Regarding a revised GAO report, "[a]s a publicity tool, if it is damaging we'll really use it" (Ex. 1497, at GOM35469);

"I must be creative, otherwise the press will tire of EBN; little boy that cried wolf" (Ex. 1497, at GOM35470);

"Litigation—we will continue to look at every angle." (Ex. 1497, at GOM35471).

Without engaging in strained semantics,[9] there is no plausible way that these statements can be squared with any notion of good faith. If Nelson uttered these words to site opponents, and I find that he did, the entire licensing process was sullied beyond redemption.

If Nebraska denies that Nelson made the statements attributed to him by Allen, I am not persuaded. While Allen may be many things, it is not believable that her contemporaneous notes were fabricated. Indeed, they have a certain inherent authenticity because they implicate Allen in misbehavior, and that is undoubtedly one reason why she hid many of them in her basement.

Although she was fired when she became "a legal liability" (Ex. 1078, at MOG00001), Allen had a reason not to harm Nelson. In exchange for her silence, Allen was promised job assistance, and the record reveals that she got what was promised. Still further, Allen's testimony

---

**7.** As discussed later, after these notes were made in January of 1991, Allen subsequently called for use of the "deranged Governor" when communicating with her superiors. (Ex. 1474, GOM 32751.)

**8.** The "GOM," "MOG," and "MIG" prefixes signify that the document was located in files

which were hidden in Allen's basement. (Tr. 269–70.)

**9.** Nelson admitted that he sometimes used the "deranged Governor" phraseology, but stated that when he used those words he only intended to refer to some future governor. (Tr. 978.)

at the preliminary injunction hearing and at trial evidenced an aversion to harming Nelson and his administration. (For example, she professed "no memory" of many critical details and events.) Thus, there is no reason to think that Allen's notes were part of a scheme to retaliate against Nelson.

Moreover, I reject the suggestion that Allen was mentally unbalanced while working for Nelson. The vivid and coherent detail of Allen's notes reveal a well-organized mind. Therefore, even if she was "depressed," there is no reason to doubt the accuracy of her notes.

In summary, Nelson's words are important. We know what Nelson did because his own words tell us.

### 2. A Regulator "We Can Trust"

Randy Wood, the DEQ Director, had "an attitude." [10] That was no secret.

Consider, as an illustration, Wood's testimony before the Southeast Compact Commission after Nebraska issued its 1993 tentative license denial decision. Because the Southeast Compact allowed Nebraska to use its LLRW facilities on a short-term basis, but had threatened to deny further use if Nebraska did not deal with its waste problems, the Southeast Compact wanted to know whether a license would ever be granted to USE. At a hearing in Atlanta, Georgia, one of the Southeast Compact Commissioners closely questioned Wood about his regulatory approach.

Wood bluntly told the Southeast Compact Commission that his "agency [would] make no effort whatsoever to work with an applicant to work out a way to use a piece of property that would be suitable." (Ex. 1068 at 16.) Wood would not even inform the applicant that an insignificant change in a license application (like moving a

"building one foot") might make the property suitable for a license. (*Id.*)

Thus, Wood, who had been a regulator in Wyoming and Arizona before coming to Nebraska, openly acknowledged that he was not one to assist a license applicant even if it would be reasonable to do so. Wood testified that he fully revealed his regulatory philosophy to Nelson during his 1991 job interview. (Tr. 6937–38, 7050–51.) With Wood's "tough guy" approach evident to anyone who cared to know about it, next consider how Wood came to be hired by Nelson.

Kate Allen took notes when Ben Nelson met with site opponents in Boyd County, Nebraska, on January 23, 1991. During that meeting, Nelson stressed that it was "important we get Director w/o agenda who we can trust" in order to "critically evaluate" the license application. (Ex. 877, at PRO59293.) Subsequently, Nelson received a recommendation to hire Wood from his friend and political confidant W. Don Nelson. (Tr. 959.) W. Don Nelson was so close to Governor Nelson that he later became part of Nelson's United States Senate staff. (Tr. 958.) W. Don Nelson was also Wood's friend. (Tr. 2228.) They knew each other from Wyoming where W. Don Nelson had been the Governor's chief of staff and Wood served as the head of the Wyoming equivalent of the DEQ. (Tr. 959.)

Not long after the January 23, 1991 meeting, Nelson's chief of staff, Sandy Scofield, sent Kate Allen an e-mail regarding a plan to call Wood "so he knows where the governor is going on llrw and what expectations for him will be." (Ex. 346.) The purpose of the phone call was to "give [Wood] the perspective he needs and also judge if he's up to the task." (*Id.*) Wood said he does not remember much about the

---

**10.** He was not a credible witness either. See, for example, the numerous contradictions in his preliminary injunction hearing testimony, his deposition testimony, and his trial testimony. (*E.g.,* Tr. 6903–04, 6993–7000, 7001–05, 7005–09.)

conversation, but we know that Scofield in fact made a call to Wood, that she offered him the job, and he accepted. (Tr. 6645–47.)

That Nelson got what he was looking for in Randy Wood is evident. One example, in particular, illustrates Wood's unreasonable rigidity when dealing with USE.

Wood had a discussion with George Smith during a license meeting that included the DOH decision-maker. Smith served as a "policy advisor" to the DOH Director on USE's application. Smith had earlier worked for the Nuclear Regulatory Commission (NRC). The subject of license conditions came up. Recall that a license condition was proposed in the DSER to deal with construction financing.

Smith made it clear "in some great lengths" that license conditions were used by the NRC. (Ex. 10,002a, at Tr. 272 (Dep. of Smith).) In response, "Randy said he didn't give a big rat's rear end what the [NRC did]." (*Id.*) On the contrary, Wood issued a "directive" that "there would no License conditions." (*Id.* at Tr. 272–73.) Subsequently, and despite the Commission's expenditure of over $88 million in pursuit of the license, the contrary views of all the regular financial assurance reviewers (Ex. 1346 at 22 ("Final Evaluation Findings")), and the practice of the NRC, Wood refused to rationally consider a conditional license for construction financing.[11]

In summary, Nelson told site opponents exactly what type of regulator "we [must] get," and that was one "we can trust." In Randy Wood, Governor Nelson found that person, and Wood's conduct was plainly unreasonable.

### 3. "Waste Woman"

In an 1991 memo to a lawyer with Nelson's former law firm, Kate Allen, herself a lawyer, announced that "[t]he Governor calls me Waste Woman." (Ex. 1485, at GOM47017.) "Waste woman's" conduct while working for the State of Nebraska was the very essence of bad faith, and the Nelson administration knew of it, tolerated it and, alas, encouraged her.

Kim Robak, a high-ranking Nelson administration official, frankly testified that "I do recall believing that Kate was very biased on the issue." (Tr. 469.) This realization occurred within "a couple of months" after Robak started working for Nelson as the Governor's legal counsel, probably in August or September of 1991. (Tr. 469–70.) But, instead of firing her or changing her assignment, Kate Allen was given "a directive to have a lower profile." (Tr. 472.)

In fact, on October 31, 1991, Rod Armstrong, Allen's supervisor at the PRO, sent Allen an e-mail that conveyed the "Governor's unequivocal support." In pertinent part that e-mail stated:

> I had a good chat with the Governor and Sandy about this. First and foremost, you still have the Governor's and Sandy's (and my) unequivocal support. The Governor commented that you are bearing the brunt of the Compact's disgust with him (and with your ability to "blow their skirts up.")

> . . . . .

> Bottom line: Everybody here stills loves ya, kid. We want you to keep on top of the issue without getting caught in the crossfire.

(Ex. 335, at GOM36014.) For about a year after that e-mail, Allen continued to work in the Nelson administration as the person primarily responsible for LLRW policy issues.

---

**11.** Regarding the December 18, 1998 final decision, Schor testified that he did not decide whether the license should have been denied for lack of financial assurance. (Tr. 6411–15.) Thus, as to this ground for denial, Wood was the only decision-maker.

Importantly, Allen and the rest of the Nelson administration clearly knew about Nebraska's responsibility to act in good faith under the Compact. They also knew that Allen's conduct was suspect. On August 13, 1991, in an e-mail to senior Nelson administration staffers, including the chief of staff, the Governor's legal counsel and the head of PRO, Allen advised that she was aware of the possibility of "a 'bad faith' case against Nebraska . . . ." (Ex. 370.) Accordingly, she was "being very careful in what I say." (*Id.*)

During her tenure with the Nelson administration, the Governor's "Waste Woman" consistently acted in accord with her evident bias against the application. Although I could recite others, six examples make the point.

On December 30, 1990, a few days before Nelson took office, Allen prepared an "Action Plan on LLRW" outlining Nelson's campaign promises. (Ex. 1526.) The memo was addressed to "Governor Nelson." The first item on the "action plan" is this: "Upon taking office [the Governor] will order a moratorium on further development of the facility . . . ." (*Id.*) If not officially, then in effect, Nebraska maintained such a "moratorium" during the eight years of the Nelson administration. For all practical purposes, Allen's "action plan" was implemented.

Second, in an e-mail to her supervisors dated May 16, 1991, regarding "compact commission business," Allen advised that "possibly it's time for the Deranged Governortto [sic] come forward." (Ex. 1474, at GOM32751.) About three months after Allen's call for the "deranged Governor to come forward," and aware of "technical briefings" for Wood regarding wetlands and flood plain issues, Allen instructed

Wood that he should send a letter to USE expressing his "concern" over these issues. (Tr. 254; Exs. 1486 & 1487; Filing 99, at Tr. 122–27, 164 (preliminary injunction transcript).) Allen also discussed the letter with Nelson, and the Governor gave his permission for submission of the letter. (Ex. 1487, at GOM46250; Filing 99, at Tr. 122.) At the request of Nelson (Filing 99, at Tr. 123), Allen then hand delivered the letter to USE in the middle of negotiations between the Commission, USE, and the generators regarding whether the generators would contribute millions of dollars more to the licensing process. (Tr. 255; Ex. 1487, at GOM46250.) As might be expected, this letter disrupted the meeting. (*Id.*)

Third, Allen tried to influence DEQ and DOH technical staff who worked on the license application. Allen attended various non-public meetings at DEQ and DOH when discussions with the Directors, and DEQ and DOH technical staff, took place regarding the license. (Tr.2081–85, 4832; Ex. 399, at GOM49432–38; Ex. 406, at GOM5004–5; Ex. 1476, at GOM409441–42.) She made notes, including "Showstoppers: wet lands[,] surface expression of GW." (Ex. 399, at GOM49438.) On at least one occasion (May 7, 1992), Allen was present when the review managers were also present. (Tr. 4635–41, 4833; Ex. 553, at JAD000016–18.) She asked questions of the review managers and offered opinions, such as "the groundwater rises into the wetlands." (Ex. 553, at JAD000018.) Her presence upset the review managers and, after the meeting, they complained. (Tr. 4641.) Jay Ringenberg, the LLRW program manager for DEQ, testified that it was improper for Allen to attend this type of meeting, and it was inappropriate for her to participate in such a meeting. (Tr. 4637, 4641.) [12]

---

**12.** After Allen left the Nelson administration she continued to work against the application by approaching licensing staff. George

Fourth, Allen interviewed staff legal counsel at DEQ, Mike Linder, and then revealed his legal analysis to Pat Knapp, a site opponent's lawyer. On September 1, 1992, Allen had a meeting with Mike Linder. (Tr. 394–95; Ex. 1499, at GOM47458–64.) Her notes indicate that they discussed Linder's thoughts about the regulations. Under the caption "Legal Conclusion" she writes, among other things, "no prohib. to h'vng wetland in disposal site." (Ex. 1499, at GOM47458.) At another point, she writes, placing the thoughts in brackets, "[no prohibition against engineering.]." (*Id.* at GOM47459.)

On September 2, 1992 she wrote an e-mail to her PRO supervisor "following up [on] my discussion with Mike Linder et al in DEQ concerning their legal analysis that the floodplain and wet lands are not a fatal flaw" and stating "I need to brief the folks upstairs [the Governor's office] and get back to the LMC." (Ex. 395, at GOM47568 (second paragraph).) She added that she was "reviewing all the materials given to me by DEQ as supporting guidelines, etc." (*Id.*)

On that same date, Allen sent her supervisors another e-mail, requested that the Governor meet with the LMC, and complained about DEQ possibly taking "the stand that it doesn't matter that 60% of the site is under water . . . ." (Ex. 793.) She reminded her supervisors that "the LMC can still be used by the Governor to do things he cannot do directly." (*Id.*)

On September 8, 1992, Pat Knapp, the lawyer for the LMC, wrote a letter to Kim Robak stating that Allen had sent her "the documentation which supposedly supports NDEQ's position that one can engineer around flaws in a LLRW site." (Ex. 975.) Thus, Allen improperly served as a conduit to the LMC's lawyer regarding the current thinking of DEQ's in-house counsel.

Fifth, in effect, Allen told Wood how to "squeeze" USE regarding construction financing. On April 14, 1992, Allen sent Randy Wood an e-mail about the delay in issuing a LLRW license to USE in California. In the e-mail, Allen recounts a conversation with a lawyer in the California Department of Environmental Health. Allen states: "This has got to be a setback for U.S. Ecology's financial situation. They need a license in hand before they get any credit with a bank . . . . U.S. Ecology is being squeezed pretty hard. We might want to be in a 'heads up' posture." (Ex. 312.) The e-mail also went to Nelson, his chief of staff, and others in the administration. Having been given a "heads up" by Allen about how USE was "squeezed" in California and needed "a license in hand before they get any credit with a bank," it is not coincidental that Wood denied USE a conditional license for construction financing when all the regular financial assurance reviewers proposed that a license be granted with such a condition.

Sixth, Allen prepared a detailed legal analysis about the risks and benefits of Governor Nelson ordering Wood to deny the license because of wetlands. (Tr. 452; Ex. 361, at GOM46993–95; Ex. 382, at GOM47434–36 ("Draft# 3" dated "8–21–92").) The document begins with a description of the "fact situation," and that is presented this way:

> Randy has told the Governor that it is legally defensable [sic] to engineer to overcome minimum site requirements. Randy's position is that the existence of wetlands and a 100 year floodplain on the site together with the discharge of

Smith, the "policy advisor" at DOH, recalled a luncheon encounter where Allen confronted him, acting "pissed off," and "rambling on in some kind of an anti Application tirade." (Ex. 10,002a, at Tr. 80–82 (Dep. of Smith).)

groundwater to the surface are not fatal flaws.

(Ex. 361, at GOM46993.)

The memorandum concludes that the Governor can and should order Wood to deny the license on site suitability grounds even if Wood believes otherwise. (*Id.* at GOM46993–94.) Allen stresses that "[t]he appeal of Randy's decision is strictly an administrative appeal on the record." [13] (*Id.* at GOM46994) Thus, the "[w]orse case scenario if the court finds against the state, is that the Court will order the state to finish the license review." (*Id.*) In so doing, Allen discusses the "good faith clause" under the Compact, "11th Amendment sovereign immunity," and various other legal principles. (*Id.* at GOM46994–95.)

Although Ms. Robak denies it and Allen cannot remember, Allen's notes suggest that she discussed that plan with Robak. (Ex. 383, at GOM47437–42.) Whether "Waste Woman" explicitly discussed the plan with the Nelson administration or not, that analysis and planning leaves nothing to the imagination regarding Nebraska's bad faith.[14] Allen admitted as much. (Tr. 180–86, 378, 387.) In fact, she thought the documents were "very damaging":

Q. And these typewritten versions of the decision analysis are among the documents you thought might show bad faith against the State of Nebraska; correct?

A. Possibly, yes.

Q. At least very damaging?

A. Yes.

Q. And you had them-you had them in your basement over the period from 1992 until 2001, right?

A. Yes.

(Tr. 387.)

To sum up, the failure of Nelson and his administration to remove or control an obviously biased lawyer in an important LLRW policy position for a period of nearly two years is compelling evidence of bad faith. It is no leap to find, as I do, that Nebraska tolerated Allen's bad behavior because the results were pleasing.

### 4. "[I]f there is bitterness, there will be no assistance in getting a job."

While accomplished indirectly, Nebraska "purchased" Kate Allen's silence. In so doing, the truth was hidden until this trial made it visible.

On September 18, 1992, Rod Armstrong, the PRO director, fired Kate Allen. She was allowed to work until her retirement vested, which was a month or so later. Allen took detailed notes of what she was told by Armstrong when he fired her, and about the events that followed. (Ex. 1078, at MOG00001–02.)

Among other things, her notes reflect that at 11:00 a.m., on September 18, 1992, she was told by Armstrong that the "Governor has determined that [she was] a legal liability." (Ex. 1078, at MOG00001.) At 11:45 a.m. on that same day, her notes reflect the following comments: "They have agreed. The Governor will help you get a job if you agree that you will indicate that it was your decision to leave and that you were burned out. If not (if there is bitterness), there will be no assistance in getting a job." (*Id.*)

Between September 18, 1992 and 9:00 a.m. on September 23, 1992, Allen also

---

**13.** This was precisely the position Nebraska took in 1999 when it successfully precluded USE and the Commission from presenting bad faith evidence in the contested case proceeding that followed the final license denial.

**14.** As discussed in a later portion of this opinion, Wood ultimately did what Allen's memorandum sought to accomplish. That is, in January of 1993, he issued an intent to deny the license on the very grounds outlined in Allen's analysis.

spoke with "Martha" (another PRO staffer) and "Sandy" (Scofield). Among other things, "Martha" told her: "The Governor was not displeased with my work." (*Id.*) On the other hand, "Sandy" told her that: "She spoke with the Governor" and "[h]e told her that he felt that [Allen] was not giving him plans and options that he needed on this issue, and therefore he was not pleased with [her] job performance." (*Id.*)

At noon on September 23, 1992, the Governor's press aide called Allen and "[a]sked me how I wanted it handled if/when the press calls." (*Id.*) "I told her that I was not comfortable saying that I resigned or that I'm 'looking for new challenges.'" (*Id.* at MOG00001–02) Allen went on: "I told her that I intended to say that 'this is a difficult time for me; there are a lot of tough decisions to be made, and I have no further comments.'" (*Id.* at MOG00002.) According to Allen, the press aide replied "that her response would be something along the lines of 'this is a very difficult job that she has done well; we thank Kate and wish her good luck.'" (*Id.*) Allen and the press aide then agreed to call each other if the press inquired "so we can let each other know what we plan on saying in case anything has changed." (*Id.*)

At trial, Allen testified that as a quid pro quo for her silence she specifically demanded letters of reference, and she got them. That is, "I requested, in exchange for not saying anything, letters of reference, which they provided to me, which I had." (Tr. 414.)

Shortly after she left her PRO job sometime in late October or early November,

1992, Allen was employed by State Senator Wickersham. (Tr. 123.) About a year later, in November of 1993, Allen went to work for State Senator Preister. (Tr. 123.) Preister was a site opponent, and Allen actively worked against the application while working for the Senator. (Tr. 124.) She also worked half-time for "Save Boyd County" opposing the application. Senator Preister knew of her work and approved of it. (Tr. 128.) Thus, even though Allen lost her PRO job, she soon landed other government work which enabled her to continue to oppose the application while on Nebraska's payroll.

At about the time she left the PRO office, Allen took 19 boxes of documents from that office. (Tr. 157.) Allen did not have permission to take the documents, and she knew that she should not have taken them. (Tr. 170–171.) Ultimately, the boxes ended up in Allen's basement. (Tr. 162.) As previously discussed, these included several boxes of documents relevant to LLRW issues, specifically including documents that were highly damaging to Nebraska.

Allen hid the documents until her counsel produced them to the State of Nebraska in 2001 in response to a letter from trial counsel for Nebraska.[15] At her deposition for the trial of this case, Allen invoked her Fifth Amendment privilege regarding some of the documents. (Tr. 165–67.) At trial, Allen did not invoke her privilege because shortly before trial Nebraska and the Commission indicated that they had no intention of requesting that Allen be prosecuted. (Tr. 178.)[16]

---

**15.** There is no claim or evidence that Nebraska's trial counsel were aware of the documents until Allen's lawyer produced them. Trial counsel for Nebraska promptly disclosed them to counsel for the plaintiffs once they were produced. Apparently, trial counsel sent out a stock letter to potential witnesses requesting production of relevant documents,

and in response Allen hired a lawyer and had him produce the documents to Nebraska. (Tr. 164.)

**16.** With no criticism intended of Nebraska or the Commission, I must add that this Court is not a party to any such agreement.

Prior the trial of this case, Allen testified at the hearing on the preliminary injunction. (Tr. 171.) She was aware that she had "boxes of LLRW evidence," but "didn't mention it to anybody at that time." (*Id.*)

Nebraska presented the testimony of Rod Armstrong to deny some of what is in Allen's notes. Mr. Armstrong's testimony does not persuade me that I should disbelieve Allen's notes. First, Armstrong's testimony was sometimes equivocal and at other times confirmed much of the substance of what Allen's notes recounted. (Tr. 5077–83.) Second, I trust Allen's contemporaneous notes about her firing for many of the same reasons that I trust Allen's other notes. Third, Allen acted in conformity with the notes. Indeed, she kept her silence for nearly ten years, even keeping secret the existence of the hidden files during her sworn preliminary injunction testimony. Fourth, when Allen testified that "I requested, in exchange for not saying anything, letters of reference, which they provided me," I was listening and watching carefully. At this point in her testimony, she was very credible. Even Armstrong agreed that the substance of that type of bargain was communicated to her. (Tr. 5082–84.)

In summary, I find that Allen's notes reveal what in essence the Nelson administration promised her when she was fired. In effect, that promise was: "Keep silent, and we will help you find a job. Speak, and you will have no help." Given the damaging information and documents that Allen then possessed, and the fact that the Nelson administration knew that Allen was very biased, the effort to keep her quiet reflects a guilty knowledge on the part of Nebraska and an improper, but partially successful, attempt to hide evidence of bad faith.

### 5. "Marching Orders" and the 1993 Intent to Deny

In the summer of 1992, Nelson tacitly agreed to a plan for a "preemptive strike." That is, before completing the licensing review, Nebraska would deny the application because of wetlands on the site. When an Attorney General's opinion threatened to disrupt that plan, the Nelson administration ordered Wood to withdraw it and he complied. At the same time, the Nelson administration handed out "marching orders" to DOH and DEQ. Shortly thereafter, Nebraska issued an "intent to deny" based largely upon the existence of wetlands. In so doing, Nebraska ignored the advice it had received from its specially retained Washington, D.C., legal counsel. The details are set forth below.

The 320–acre site selected by USE and the Commission had wetlands and floodplains on it. However, those wetlands and floodplains were not within the "footprint" of the structures which would hold the waste. Nevertheless, the DEQ director raised a question about whether the existence of the wetlands and floodplains required denial of the license. As a result, an opinion was requested of the Collier, Shannon firm. That firm served as outside regulatory counsel to Nebraska under a contract with HDR.

On October 1, 1991, the opinion was issued. (Ex. 593, at JHC02421–31.) Although delivered to Dale Jacobson, he provided it to Jay Ringenberg, the DEQ LLRW program manager. (Tr. 1466, 1468.) The opinion was ultimately examined by Wood. (Tr. 6715–16.)

The opinion started with a review of the facts. Among other things, it recognized that: "US Ecology has proposed to site a low-level radioactive waste disposal site on 320 acres located in Butte, Nebraska. Wastes would be disposed in above-ground disposal vaults. Wetlands and floodplains

exist on the proposed site, however, no buildings, roads, or waste disposal vaults will be constructed in designated wetland or floodplain areas." (Ex. 593, at 1–2.)

After an extensive analysis of Nebraska's regulations, NRC regulations, NRC technical position papers, and other information, Collier, Shannon concluded that the license need not be denied. (*Id.* at 11.) In particular, Collier, Shannon rendered the following opinion:

> Nebraska need not reject U.S. Ecology's proposed Boyd County site under the Title 194 siting criteria simply because of the existence of a floodplain and wetlands. In our opinion, the site could be used so long as the disposal units are not located in floodplain or wetland areas and engineering techniques are used to prevent flooding or frequent ponding.

(*Id.*)

Some ten months later, on July 28, 1992, Governor Nelson had a 1.5 hour meeting with Pat Knapp, the LMC lawyer and site opponent; Robert Eye, a Kansas lawyer [17] and a site opponent; Jim Selle, a Nebraska site opponent; and members of Nelson's staff including Kim Robak and Rod Armstrong. (Tr. 722, 725–29.)

At that meeting Knapp urged Nelson to instruct Wood to deny the license before the review was completed because of the wetlands, a supposed "fatal flaw." (Tr. 726–27.) In particular, Knapp wanted the Governor to order DEQ and DOH to deny the license. (Tr. 729.) After Knapp argued that it was proper to decide site suitability issues before proceeding any further with the licensing process, Nelson responded "it sounds like common sense to me." (Tr. 727.)

Nelson left the meeting, and Knapp, Eye, Robak, and Armstrong continued the meeting. Jim Selle left "because there was going to be a bunch of lawyers talking about legal things." (Tr. 729.) Knapp provided Robak and Armstrong with some of her legal research. (Tr. 730.) Robak asked Knapp "what DEQ's position was on [Knapp's] argument," and Knapp responded "to the best of my knowledge, DEQ doesn't have a position" but is "simply acquiescing" in USE's position. (Tr. 731.) Robak responded that Knapp should put her legal arguments in writing, and Robak "would try to follow up with DEQ to see what their documentation or what their position was . . . ." (Tr. 731.)

On July 31, 1992, Knapp supplied the requested legal memorandum. (Ex. 966.) Among other things, Knapp argued that the site did not meet minimum site suitability requirements because of groundwater, and that the above ground storage design of the site was irrelevant when it came to satisfying minimum site suitability characteristics. (*Id.* at ROK000788–89.) Sometime thereafter Knapp had a telephone conversation with Allen, and she recalled "Kate telling me that Kim was growing impatient with her, and as I recall the conversation, she [Allen] was, basically, trying to understand what I was saying in my memo." (Tr. 745.) Knapp gave Allen a "general outline." (Tr. 746.)

Knapp testified that within about a week after she sent her memo, "I received a telephone call from Kim Robak[,]" "Ms. Robak indicated to me that she had talked to DEQ[,]" and "that they had told her that there was documentation to support the position that you could engineer around a fatal flaw . . . ." (Tr. 735.) Knapp testified that shortly thereafter she received "in the mail an envelope from the Governor's office with some documents in

---

**17.** At this time, it is not clear for whom Eye really worked. Earlier, and apparently representing private clients, he had sued Nebraska over the site. At the meeting with Nelson, Eye may also have been serving as an advisor to the then Governor of Kansas. (Tr. 725.)

it and a note from Kate Allen saying something to the effect of Kim said to send you this. It's the documentation from DEQ." (Tr. 735–36.)

On August 19, 1992, Allen sent Robak an e-mail. In it she spoke of preparing an "action plan" for the Governor that included Allen consulting Jim Selle, Pat Knapp, Bob Eye, Diane Burton, and Steve Moeller. (Ex. 366.) She wanted to consult these people to "put our collective legal minds and substantive information together and come up with options for the Governor with an analysis of risks and possible legal outcomes." (*Id.*) Allen added, "(essentially what you asked of the analysts at Monday's meeting)[.]" (*Id.*) The record does not reflect a response to this e-mail.

On or about August 21, 1992, and as noted earlier, Allen prepared a "Decision Analysis." (Ex. 361, at GOM46993–95; Ex. 382, at GOM47434–36 ("Draft# 3" dated "8–21–92").) That document considered the risk and benefits of Nelson explicitly instructing Wood to deny the license. Although Ms. Robak denies it and Allen cannot remember, Allen's notes suggest that she discussed that plan with Robak. (Ex. 383, at GOM47437–42.)

In any event, on September 8, 1992, Knapp wrote Robak. In the letter Knapp stated that "Kate Allen has provided me with the documentation which supposedly supports NDEQ's position that one can engineer around flaws in a LLRW site." (Ex. 975.) Robak routed a copy to Allen. (*Id.*)

Robak responded on September 14, 1992. (Ex. 974.) The letter was terse and formal. It stated that DEQ had not taken a position "regarding the ability to engineer or build around flaws in a low-level radioactive waste site." (*Id.*) On September 18, 1992, Allen was fired because, according to Allen, the Governor had determined that she was "a legal liability." (Ex. 1078.)

Although she had been fired, Allen was allowed to continue working until her retirement vested. On October 5, 1992, she took notes of a meeting that Nelson had with members of the LMC. (Ex. 355.) Allen's notes document a discussion about Randy Wood seeking an Attorney General's opinion "as to whether or not there is a fatal flaw." (Ex. 355, at GOM46400.) Allen's notes show that she understood that Pat Knapp believed the LMC was supposed to have input on how it was worded. (*Id.*)

On October 14, 1992 Wood submitted a request for an opinion to the Nebraska Attorney General. (Ex. 143.) Remarkably, Kate Allen had a draft of the opinion request in her files. (Ex. 350, at GOM46162–65).

Among other things, the opinion request asserted that: (1) "there is no prohibition for the applicant to reasonably modify the site" to meet site suitability requirements and as long as the waste disposal structure (as opposed to the larger 320–acre site) was not in a wetland then the site suitability requirements would not be violated (Ex. 143 at 4), but (2) "if groundwater discharged within the disposal units and the buffer zone, then the regulations were not satisfied." (Ex. 143 at 5.)

On November 9, 1992, Assistant Attorney General Willard had essentially completed her opinion in response to Wood's request. Her opinion concluded that DEQ's position was defensible. (Tr. 1774–76; Ex. 3932 at 3.) On that same date, Steve Moeller reported to Robak and Armstrong that he had called Willard and "asked her if she could hold off a couple of days in issuing it." (Ex. 51.) In his e-mail, Moeller reported that: "I asked her what the opinion said and she said that it concludes that there is a legal basis for the DEQ's position and that it is a defensable [sic] position." (*Id.*)

On November 10, 1992, Moeller wrote another e-mail to Robak and Armstrong. (Ex. 52.) In that e-mail he reported that: "Randy Wood called me and was wondering why I asked Linda to stop or hold the opinion." (*Id.*) Moeller recounted that he told Wood about a meeting with DOH "and that as a result Kim instructed me to call over and get the opinion held until we could unravel what was going on." (*Id.*) Moeller additionally stated that Wood "then informed me that he had called Linda Willard and that she told him that since he originally asked for the opinion he would have to send them something in writing to cancel it and that he was trying to get ahold of Kim to talk to her about this but she was unavailable." (*Id.*)

Moeller testified that sometime after November 9, 1992, he met with Robak, Wood, and Horton and pursuant to Robak's instructions he called Willard to withdraw the request for the opinion. (Tr. 1695.) Moeller testified that both he and Robak knew that Willard's opinion would support DEQ's position, as articulated in the earlier opinion request. (Tr. 1695.) Moeller also testified that he had seen a draft of the opinion request. (Tr. 1694.)

Robak agreed that she had a meeting with Wood and Horton. (Tr. 648.) According to Robak, "I asked that the request [for Attorney General opinion] be withdrawn, not put on hold. I think I asked them to actually pull it back from the AG's office." (Tr. 648.) Despite the e-mail from Moeller which informed Robak that Willard had concluded "there is a legal basis for the DEQ's position," Robak testified that when she ordered the withdrawal of the opinion she did not know of the contents of Willard's opinion. (Tr. 647.)

Robak also testified that she ordered the opinion request be withdrawn because it was submitted only by DEQ and not DOH and because it had not been vetted by the Governor's office as was required by the policy of the Governor's office for all opinion requests. (Tr. 647–50.) She testified that she told Wood and Horton, "please sit down and work this out." (Tr. 648.) According to Robak, the directors agreed. (Tr. 649.)

On November 16, 1992 Wood formally requested that the opinion be withdrawn. (Ex. 6102.) [18] Using an incomprehensible explanation, Wood wrote: "Subsequent to the transmittal of this request to your office a number of additional related questions have arisen and we believe it appropriate to reconsider the initial questions in the context of these additional authority and interpretation questions." (*Id.*) Willard's opinion was never released.

Despite the fact that Wood and Horton agreed to work out their differences when they talked with Robak, that did not turn out to be the case, at least for awhile. On November 20, 1992, Moeller sent an e-mail to Robak and Armstrong. (Ex. 54.) In that e-mail Moeller recounted a conversation with a DOH lawyer, and that lawyer "stated that whatever role the Gov. wanted Health to play in the licensing process was ok" but, as between DOH and DEQ, a "mutual resolution was unlikely." (*Id.* at SEGLIN00068.) Thus, Moeller concluded that "we should be prepared to send out marching orders as to what role both agencies will have in the license [ ]review." (*Id.*) Thereafter, a meeting was scheduled with Wood, Horton, Robak, and Moeller in early December. (*Id.* at SEGLIN00069.)

On December 31, 1992, Moeller called the NRC and spoke at length with an

---

**18.** Incredibly, at his deposition in December, 2001, Wood did not recall the letter, he did not recall who wrote the letter, and did not recall why the opinion was withdrawn. (Ex. 10,000a, at Tr. 205–09 (Dep. of Wood).)

NRC commissioner and an NRC staff member. (Tr. 1703–05; Ex. 60.) Among other things, he discussed whether an LLRW site could be engineered to overcome site suitability problems. (Tr. 1704.) According to an e-mail Moeller sent Robak and Armstrong at 3:16 p.m. on December 31, "I called Mike Linder, DEQ counsel and let him know about the substance of my telephone call with NRC." (Ex. 60.) Moeller concluded by stating, "I'll keep you posted if I hear anything on DEQ's interpretation of the regs." (Ex. 60.)

By late on December 31, the "marching orders" were apparently heard loud and clear. According to Moeller, "Randy Wood called me on, I think New Year's Eve, December 31st, and basically said that we've resolved our issues surrounding the Attorney General's opinion, we need a chance to talk to Kim and the governor." (Filing 99, at Tr. 210 (preliminary injunction transcript).)

Moeller then sent an e-mail to Robak and Armstrong stating: "I spoke to Randy Wood late thursday, Dec. 31 and he stated that he was ready to sit down and talk with the Governor about whatever differences that DOH and DEQ had concerning their siting regs. is solved." (Ex. 60.) Moeller added: "He [Wood] wants to make sure that if he starts getting into areas a[sic] that the governor does not want to hear concerning licensing issues that he be told to stop his presentation." (Id.)

On January 11, 1993, Wood, Horton, Robak, Moeller, and Nelson conferred in person. (Filing 99, at Tr. 211 (preliminary injunction transcript).) According to Wood, he told the Governor "we were going to issue a notice of intent to deny . . .

based upon the fact that there were wetlands on the site, and that those wetlands caused the site to fail the site suitability requirement in Title 194 of our DEQ regulations." (Id. at Tr. 372.) According to Moeller, Nelson and Robak asked questions. (Id. at Tr. 212.)

The decision having been made, there were frantic efforts at the Governor's office to justify it. As Robak testified, "I believe that somebody, whether it was [the] Governor, or myself, or somebody else at the meeting made the determination that Randy needed to be absolutely certain" and Wood "need[ed] to make sure that all the I's are dotted, and T's crossed with regard to the decision before we announced it." (Tr. 652.)

After that, on January 13, 1993, Moeller put together and sent to Robak a schedule that included: "Assembly and Review by DEQ–DOH Attorneys of appropriate documents and review of historical documents" followed by "review by AG and Governor's Office." (Ex. 62.) The "boot straps" were being pulled, and the Governor's office was pulling them.[19]

On January 22, 1993, the tentative license denial decision was announced. (Ex. 8; Ex. 1411, App. A at 23.) According to the written public announcement, the tentative licence denial decision was issued "because of the evidence of flooding, frequent ponding, and wetlands on the site, which also indicate the site is not generally well drained, all of which is contrary to minimum site characteristics." (Ex. 8 at 2.) This decision conflicts in whole or in part with the opinion Linda Willard was prepared to issue, and the opinion that Collier, Shannon had issued.

---

**19.** Robak responded to Moeller's schedule, which had been sent via an e-mail. In handwriting, she wrote, "Don't profs-It will be seen by others-hand carry or call." (Ex. 786.) "Profs" was the name for Nebraska's e-mail system. (Tr. 465, 641–42.) After the intent to

deny was issued in 1993, USE filed a "contested case" and through discovery unearthed some of the damaging e-mails. After that, the volume of e-mails involving LLRW issues and the Governor's office appears to have diminished.

Jay Ringenberg, the DEQ program manager for the LLRW program, testified that neither he nor his staff were consulted in any way about the "intent to deny" decision arrived at by Wood and Horton. (Tr. 2153–54; 4702.) In fact, he was not informed of the decision until about two days before it was announced. (Tr. 2153, 4702, 4879.) He later learned that Wood had spoken with the Governor's office prior to the decision, and that Wood had consulted only with DEQ and DOH lawyers. (Tr. 4880–81.) Ringenberg also learned that the Collier, Shannon firm had not been consulted. (Tr. 4881.) Ringenberg was upset that he and his staff were not consulted. (Tr. 4702.)

Like Ringenberg, Cheryl Rogers, the head of DOH's program, testified that she was "surprised" and "stunned" that she was not consulted prior to the decision. (Tr. 5258.) As the DOH person primarily responsible for the LLRW program, she had no good explanation why she was not consulted before the decision was made. (Tr. 5568–69.)

In response to questions from defense counsel, Wood tried to explain why he and Horton did not jointly request another attorney general's opinion after Wood had withdrawn the first one and why they did not follow the Collier, Shannon opinion. (Tr. 6696–97; 6715–19.) His answers were vague and unpersuasive. According to Wood, the directors basically decided to proceed on their own because "we're capable of interpreting [the regulations], reading and interpreting, and decided that we would do that internally." (Tr. 6697.) His answers, of course, beg the question of why Wood asked for the opinions in the first place.

Even though the issuance of the denial decision was a very important event, Horton could not shed any light on it. He said: "I don't recall the specifics of how

that [intent to deny] actually came about." (Tr. 4417.)

In summary, numerous inferences should be drawn from the foregoing, and none of them aid Nebraska. Succinctly stated, I find that the 1993 tentative license denial was the product of bad faith. Specifically, I find that (1) the Governor's office directly interfered with the regulatory process by ordering Wood to withdraw the request for an Attorney General's opinion, and (2) Wood and Horton, who were not lawyers, made a license denial decision which conflicted with the Attorney General's opinion Wood had been ordered to have withdrawn and which also conflicted with advice from specially retained outside counsel, and (3) then, with the aid of the Governor's office, Wood and Horton set about to have their in-house lawyers write a justification for the decision they had already made.

Among other things, Nebraska argues that USE eventually conceded that groundwater did at times discharge into wetlands W–1 and possibly W–2. Thus, Nebraska argues that the 1993 denial decision could have been predicated upon that ground alone, and that such a denial would have been consistent with the regulations. Even if that is true, the tentative denial decision that was actually issued largely relied upon the mere existence of wetlands. That decision conflicted with Linda Willard's opinion that the Governor's office caused to be withdrawn and it also conflicted with the opinion of Collier, Shannon that was ignored when the Governor's office saw to it that all the "I's were dotted, and T's crossed." Thus, so far as bad faith is concerned, such an after-the-fact rationalization does not rebut the evidence of wrongful conduct that at least in part caused the 1993 denial decision.

### 6. *Disregarding the State Auditor*

On July 1, 1992, Nebraska's Auditor of Public Accounts "completed our review of

the [LLRW] Program, as requested by the Governor's Office." (Ex. 19, at second page.) As will be seen, the review was critical of the lack of a budget and schedule. This angered Nelson. Nelson, through Allen, communicated his anger to the Auditor, and Wood refused to comply with the Auditor's recommendation.

The Auditor's review of the LLRW program made detailed findings and recommendations. The first and foremost recommendation was the adoption of a budget and a timetable. (Ex. 19 at 10–20.) Here is what the Auditor concluded:

> The LLRW program has not adopted an aggregate budget to control the costs of the licence review work, nor has it developed a timetable with established goals for the license review work. The absence of these two documents allows the program to become unaccountable for the costs it incurs and also hinders an assessment of the progress made on the license review work.

> It is a generally accepted practice of good management to estimate the cost and time required to complete a major task before it is undertaken. This is true in both the public and private sectors. Budgets are established to provide controls over expenses. This financial control is vital if management wishes to restrict the type and amount of expenses incurred. Likewise, timetables are established to monitor progress toward an agreed upon completion date.

> . . . . .

> We recognize th[at] budgets and timetables are only estimates, but they also represent management's expectations, which when formally adopted, relays this information to employees and other in-

terested parties .... At present, no such criteria exists, which is the equivalent of a blank check signed by the ratepayers.

> We are not aware of any good reason for this project to remain open-ended. The LLRW division now has historical data which it can use to develop a budget and timetable. The lack of these controlling documents makes it especially difficult to determine whether the project is properly or poorly managed. The citizens of the State deserve to know whether the review process is on schedule and within budget. Presently this can not be determined.

(*Id.* at 10–12.)

The Auditor also observed that under NRC guidelines "the licensing review and approval process should, to the extent practicable, complete all activities associated with the review and processing of any application for such a license no later than 15 months after the date of receipt of such application." (*Id.* at 15.) While the Auditor noted the existence of these federal standards, he did not require that Nebraska strictly adhere to them. (*Id.* at 18.) Rather, he proposed a timetable developed by DEQ which was tailored to the specific matter before the agency.

The Auditor gave Wood an opportunity to respond to a draft of the report. Wood sent a letter that is attached to the Auditor's report. (Exhibit 19, App. B.) In his letter Wood objected to the requirement of a budget and timetable for several reasons. (*Id.,* App. B at 66–69.) In the end, he refused to adopt a budget or timetable. He concluded: "I cannot emphasize too strongly that to commit to a budget and a schedule would do significant harm to the credibility of our process and decisions." (*Id.,* App. B at 69.) [20]

---

**20.** Horton did not recall why no budget was adopted. (Tr. 4489–90.) Regarding the failure to impose a timetable, and despite the fact that the agencies would have developed their own timetable had they followed the Auditor's

Wood's response is not surprising. Before he sent it to the Auditor, he sent it to Kate Allen for editing. (Tr. 301.) Wood's edited letter was found in Allen's basement. (Ex. 356, at GOM46514–18.)

Wood's response is also not surprising given the fact that Nelson was mad at the Auditor [21] and Allen had contacted the Auditor and tried to convince him to change his position. In an e-mail dated June 26, 1992, Allen, writing on the subject of the "breslow audit meeting," told Rod Armstrong, the head of PRO, the following:

John [Breslow, the Auditor] has agreed to rearrange the order in which he makes his recommendations so that he begins with the caveat that he understands that DEC cannot control the budget or the time it takes to get responses, however, DEC needs a budget and timeline to efficiently and effectively do the job.

Karen is working with Breslows office to 're-arrange' language. Randy will work on his responses this week-end, send them to breslow monday, breslow will put the doc in final form, randy has an opportunity to revise his letter (which is part of the report) and they are looking at a release day of either next thursday or saturday.

it was discussed whether john, et al needs to meet with the governor as originally planned. it was clear that john is very much aware at how angry the governor is and he does not want to have to meet again. our response was that we had to check with the governor, it's his call.

i'll keep you posted.

ww

(Ex. 379, at GOM47408 (except as indicated, the capitalization and punctuation used in the e-mail have not been corrected).)

A slightly humorous, but trenchant, example of the effect of the absence of a budget [22] is found by examining the issue of a laboratory for DOH. Cheryl Rogers, with DOH, wanted a laboratory situated in Butte, Nebraska, to test air and water samples, and the like. Of course, that expense would be paid for by the Commission. (Tr. 5336; Ex. 3508.) The HDR and JHC consultants thought that using a contract laboratory would be sufficient, and they did not believe a facility at Butte was warranted. (Tr. 1373, 1375–76.) Whimsically, they began referring to the proposed site as the "Little Lab on the Prairie" or "LLOP." (Tr. 1373.)

Wood overruled the consultants, and instructed Ringenberg to give DOH what was requested. (Ex. 941.) As a result, Rogers got the laboratory at Butte. (Tr. 5342–47.) It was operated from at least August of 1992 through at least the summer of 1998. (Tr. 5345, 5347.)

When asked at his deposition why Rogers got what she wanted, Jacobson, Nebraska's chief expert and the manager of all the consultants, testified that "I believe she was able to do so because the earlier decision had been made that the Department of Health would be given every op-

report, Horton's "recollection was there was concern about having some external time line imposed upon us that would not allow us potentially to do the complete review that we thought was necessary." (Tr. 4488.)

**21.** Attorney General Don Stenberg and the Auditor, John Breslow, belonged to one political party and Governor Nelson belonged to the other. All three men were political rivals.

As alluded to in the evidence (*e.g.*, Tr. 647–48, 4696, 4856–57) and in fairness to Nelson, I do not doubt that both Stenberg and Breslow had their own political agendas when dealing with Nelson. I have viewed the evidence with that tense background firmly in mind.

**22.** In a later point in this opinion, I discuss the lack of a timetable and the Commission's efforts to impose a reasonable deadline.

portunity to participate in the process and *there were no constraints.*" (Tr. 1377 (emphasis added).) In fact, when a cost-benefit analysis was done by HDR, the lowest cost alternative was the contract laboratory. (Ex. 3686 at 10 (alternative 3).) Of course, the low-cost alternative was not selected. As the Auditor put it, Nebraska had "the equivalent of a blank check signed by the ratepayers," and it was not about to give it up.

In summary, the lack of a budget and timetable had obvious and severe consequences. Despite all the excuses[23] given by Wood and others, if this record reveals anything, it shows the expenditure of huge and unnecessary amounts of money and an unduly prolonged licensing process. Whatever the Auditor's motivations, his recommendations for a budget and timetable made eminent common sense. Nebraska's failure to implement those recommendations amounted to bad faith.

### 7. Litigation As a Weapon

From 1993, and extending through 1997, Nebraska filed six lawsuits against the Commission (and sometimes USE). Nebraska lost five of those cases, and settled the sixth. The evidence reveals that the Nelson administration[24] used litigation to impede the Commission as it pursued a licence.

Allen's notes confirm what was apparent from the ceaseless and meritless nature of the litigation filed by Nebraska. Nelson told site opponents that he was using litigation to distract the Commission. He told them: "Let's talk about litigation [without] giving our plan to the other side-We want to keep them off balance." (Ex. 1497, at GOM35468). He added: "[l]itiga-

tion, will continue to look at every angle . . . ." (*Id.* at GOM35471).

Furthermore, it is clear that Nelson administration political advisors, who were lawyers (Moeller and Rick Becker), conferred more than 50 times with Kate Allen, who was also a lawyer, and at least 15 of those conferences specifically related to LLRW litigation. All of these conferences took place even after she had been fired. (Exs.1509-1512.) It is beyond cavil that Allen's behavior was the essence of bad faith when she worked for Nelson. During the time she was conferring with Moeller and Becker she was serving a part-time lawyer for site opponents. She was also on Nebraska's payroll working for an anti-site state senator. Thus, there is good reason to believe that the Nelson administration worked "hand and glove" with Allen, a site opponent's lawyer with a demonstrated record of bad faith behavior, on at least some of the litigation.

With the foregoing in mind, I turn next to the lawsuits that illustrate bad faith. I review the five suits Nebraska brought and lost together with an unsuccessful "copycat" suit commenced by the LMC.

The first of these harassing lawsuits was *State of Nebraska, ex rel. E. Benjamin Nelson, Governor v. Central Interstate Low-Level Radioactive Waste Commission and U.S. Ecology, Inc.,* filed in the United States District Court for the District of Nebraska, on January 13, 1993. (Ex.1539 (docket sheet and selected filings).) That case is reported at 834 F.Supp. 1205 (D.Neb.1993), *aff'd,* 26 F.3d 77 (8th Cir.), *cert. denied,* 513 U.S. 987, 115 S.Ct. 483, 130 L.Ed.2d 395 (1994). It

---

**23.** The audit report effectively rebuts these lame excuses (Ex. 19 at 10-20) and I will not make this opinion any longer by recounting those responses.

**24.** Governor Nelson personally authorized at least three of the suits. (Tr. 914-19, 938.) He also signed a letter to Attorney General Stenberg requesting that Bill Lamson, a lawyer with his former firm, represent Nebraska in some of the suits. (Tr. 917-18.)

is noteworthy that nine days before the suit was filed, Nelson conferred with members of the LMC to discuss litigation regarding the "community consent" issue. (Ex. 675.) Linda Willard, with the Attorney General's office, was lead counsel in this case.

Nebraska contended that no "community consent" was obtained for the Boyd County site, and, as a consequence, the site could not be licensed. With the court holding that the notice of the site selection was given to the Nebraska legislature in February, 1990, the case was dismissed because, among other reasons, Nebraska's suit was more than two years too late and time-barred under Art. IV($l$) of the Compact regarding when an aggrieved party state must sue the Commission. The district court decision was rendered on October 8, 1993. It was affirmed on June 13, 1994.

The second suit, so closely related to the first that sanctions were sought, was filed on October 25, 1993, less than three weeks after the first one was dismissed. The case is styled: *State of Nebraska, ex rel. E. Benjamin Nelson, Governor, v. Central Interstate Low–Level Radioactive Waste Commission and U.S. Ecology. Inc.,* 4:93CV3367, (Ex. 1540 (docket sheet and selected filings).) The case is reported at 1993 WL 738576 (D.Neb. Dec.3, 1993). Linda Willard was lead counsel.

Nelson argued that the reduction in the waste site from 320 acres to 110 acres required "community consent." This second case was dismissed on res judicata grounds because the same issue against the same parties was presented in 4:93CV3042 and that claim was dismissed less than 3 weeks before the filing of the second case. Because of the duplicative nature of the second suit, a motion for sanctions was filed by the defendants. Sanctions were warranted, but because the court requested the defendants to withdraw their motion and the defendants agreed, no sanctions were awarded. That is: "Although I find that the motion for sanctions is generally meritorious, at my specific request counsel for both defendants have graciously agreed to withdraw their motion." 1993 WL 738576, at * 6. The decision was issued on December 3, 1993. No appeal was taken.

To aggravate matters, the LMC (with Boyd County) sued USE over the same community consent issue. However, in an apparent effort to evade the decisions of this court, the LMC filed suit in state court. On December 30, 1993, a notice of removal from Boyd County District Court was filed in this court under the style *The County of Boyd and The Boyd County Local Monitoring Committee v. U.S. Ecology, Inc.* . (Ex. 1541 (docket sheet and selected filings).) That case is reported at 858 F.Supp. 960 (D.Neb.1994), *aff'd,* 48 F.3d 359 (8th Cir.), *cert. denied,* 516 U.S. 814, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995). Pat Knapp, counsel for the LMC, was lead counsel.

Plaintiffs claimed fraud based upon the lack of community consent. Because the issue was the same as the two previous "community consent" cases brought by Nebraska and because the plaintiffs were closely related to Nebraska, the case was dismissed on res judicata grounds on July 21, 1994. The decision was affirmed on February 24, 1995, with the Court of Appeals holding that Boyd County and the LMC were for preclusion purposes one and the same as Nebraska. *County of Boyd,* 48 F.3d at 362.

When the LMC decision was issued in the summer of 1994, I made it clear that litigation was apparently being used by Nebraska and its political subdivisions to frustrate the Compact. I strongly suggested that such efforts should cease:

Application of the doctrine of res judicata is particularly important in this case because a very important federal interest is at stake. Although perhaps not superficially apparent, what this case is really about is whether the state and its political subdivisions will be compelled to honor their obligations under a Compact which Congress approved pursuant to the Constitution. While the State of Nebraska and its constituent political bodies are entitled to fully and fairly litigate their legitimate claims, they are not entitled to wage what might be characterized as hit-and-run guerilla warfare by filing multiple lawsuits on the same claim in order to frustrate performance of the Compact.

*County of Boyd,* 858 F.Supp. at 974. As will be seen, the warning was not heeded.[25]

On February 3, 1995, the complaint was filed in *State of Nebraska, ex rel. Benjamin Nelson, Governor v. Central Interstate Low–Level Radioactive Waste Commission.* (Ex. 1542 (docket sheet and selected filings).) That case is reported at 902 F.Supp. 1046 (D.Neb.1995). Linda Willard was lead counsel.

Nebraska contended that it had a right to a second voting commissioner and a right to a third non-voting commissioner regarding the Compact Commission. Finding that Nebraska did not have a right to unequal representation on the Commission, the complaint was dismissed on October 23, 1995. No appeal was taken.

On November 27, 1996, the complaint was filed in 4:96CV3438, *State of Nebraska, et al., v. Central Interstate Low–Level*

*Radioactive Waste Commission* (Ex. 1543 (docket sheet and selected filings.)) The district court decision by Judge Urbom is not reported, but the opinion of the court of appeals is reported at 187 F.3d 982 (8th Cir.1999). Bill Lamson, with Nelson's former firm, was lead counsel for Nebraska.

Nebraska contended that the Commission had no right to set a schedule for completion of the license review. Judge Urbom found that the Commission had the power to impose a deadline and that the deadline was reasonable. Regarding the reasonableness of the deadline, the judge remarked that:

> [T]he State certainly did not help itself when the directors of the NDEQ and NDOH denied the Commission's invitation to attend the information gathering meeting on August 27, 1996. The State also did not help its cause by failing to provide answers to the specific questions asked by the Commission with respect to the State's progress on processing U.S. Ecology's license application.

(Ex. 1543, filing 128 at 17 n.11.)

Judgment was entered for the Commission on October 15, 1998. On September 13, 1999, the court of appeals affirmed the decision that the Commission had the power to set a deadline. It did not reach the question of whether the deadline was reasonable since Nebraska had by then denied the license and the reasonableness of the deadline was therefore moot.

On August 22, 1997, the complaint in 4:97CV3267, *State of Nebraska v. Central Interstate Low–Level Radioactive Waste Commission,* was filed. (Ex. 1544 (docket

---

**25.** Although I do not hold Nebraska directly responsible for the LMC lawsuit, that litigation is certainly relevant when trying to understand Nebraska's litigation practices in very similar cases. There is undisputed evidence that Governor Nelson and his administration worked closely with the LMC and Pat

Knapp, the lawyer for that organization, on ways to defeat the license. Indeed, it is helpful to remember Kate Allen's reminder to her superiors: the "LMC can still be used by the Governor to do things he cannot do directly." (Ex. 793.)

sheet and selected filings).) The case is reported at 29 F.Supp.2d 1085 (D.Neb. 1998), *aff'd,* 207 F.3d 1021 (8th Cir.2000). Bill Lamson was lead counsel.

Nebraska asserted that it had the right to veto waste export and waste import authorizations granted by the Commission. Holding that Nebraska had no veto power over waste exports, and that the waste import issue was not a live controversy, the case was dismissed and judgment was entered for the Commission on November 23, 1998. The decision was affirmed by the court of appeals on April 4, 2000.

In defense to this string of litigation and the evident appearance of bad faith, Nebraska argues that its lawyers did not believe the cases they filed lacked merit. Therefore, Nebraska argues that I should not infer bad faith from its losing litigation. That argument misses the mark for at least three reasons. First, even a cursory review of the merits of each of the cases Nebraska lost reveals that they were flimsy. Second, at least one case warranted the imposition of sanctions. Third, what Allen's notes, hidden in her basement, revealed is that Governor Nelson had a "plan" to keep the site proponents "off balance" by using litigation. Thus, even if Nebraska's lawyers proceeded with a pure heart (as I want to believe) in each of the separate cases they filed, the Governor's overarching plan and motivation were improper and the resultant litigation in the aggregate was tainted as a result.

In summary, Nebraska used litigation to harass the Commission. In so doing, it acted in bad faith.

### 8. The Statute "exempts Health from being involved in the licensing"

The Nebraska statutes govern the jurisdiction of DOH and DEQ respecting which agency has the power to grant a LLRW license such as the one sought by the USE and the Commission. *Compare* Neb.Rev. Stat. Ann. §§ 81–1578 et seq. (1999) *with* Neb.Rev.Stat. Ann. §§ 71–3501 et seq. (2001). By March 1, 1996, the Governor's office clearly realized that the statutes probably did not contemplate that DOH had the power to issue or deny a license to USE. In other words, the Governor's office realized that DOH probably lacked the statutory power to act as a co-equal decision-maker.

Despite being aware of the likely jurisdictional defect, and instead of taking administrative action to restrict DOH's involvement, seek a legislative clarification, or request a judicial declaration, Nebraska stalled. Even though DOH denied the license, the serious question of whether it had jurisdiction to do so remains unresolved.

From the very beginning of the Nelson governorship, the DOH staff and the Nelson administration worked together to make sure that DOH was fully involved in the licensing process. The DOH staff was perceived by the Nelson administration to be much more willing to be hard on USE.

For example, on February 4, 1991, Kate Allen wrote a memorandum to Nelson and Scofield recounting her conversations with Harry Borchert and Cheryl Rogers, DOH staffers involved in the licensing process. (Ex. 362.) In the memo, Allen recited the complaints of Borchert and Rogers about DEQ and USE. Those complaints included the following: (1) "DOH has been authorized for 10 LLRW positions, however, Ringenburg [sic] will only 'allow them' the money for 3 or 4 positions" despite the fact that the "funding for these positions comes from fees assessed on U.S. Ecology and do not involve[ ] General Fund monies" (*id.* at GOM46998); (2) "DOH is pushing for a 'hands-on' review" where "everything has been looked at in-house" while DEQ "has a 'hands-off' approach to the review process" and DEQ "want[s] the consultants to do all of the review" (*id.* at GOM46998); (3)

DOH staff examined "the financial assurance portion of U.S. Ecology's license and they were very concerned about what they read" (*id.* at GOM46999); and (4) DEQ's "position is to accept that U.S. Ecology is capable of doing everything in the license app[lication]" while "DOH's position is that U.S. Ecology has to be able to prove that they have the expertise, capability and willingness to do what Bechtel has written" (*id.* at GOM46999).

Allen specifically advised her superiors that: "DOH seems to be the only entity that is asking hard questions." (*Id.* at GOM46998.) From that point forward, and throughout the licensing process, DOH fully participated in the license review, the DOH director was a co-equal decision-maker, and DOH was accommodated when it asked for special staffing.

For example, according to Randy Wood, Kim Robak specifically instructed him, in the presence of Dr. Horton, that "it was the State's position that the Department of Health had jurisdiction" and "we should make sure that the Department of Health was completely involved . . . ." (Tr. 6671.) As another example, when DOH wanted to hire George Smith, as a technical reviewer and later as a "policy advisor," and despite the fact that he worked for a company that was owned by a direct competitor of USE (Tr. 1387–91, 3065 [26]), the HDR consultants were instructed to hire him. (Tr. 1387–91, 5349.) Remember also the previous discussion about the "Little Lab on the Prairie" installed by DOH.

With this background in mind, the question of jurisdiction can be examined. I turn to that question next.

In 1986, Nebraska enacted the "Low–Level Radioactive Waste Disposal Act." Neb.Rev.Stat. Ann. §§ 81–1578, et seq.

(1999). Among other things, that Act specifically assigned the Nebraska licensing responsibilities for an LLRW site to DEQ. Neb.Rev.Stat. Ann. §§ 81–1586, 1598, 1599(2).

Nebraska had also enacted the "Radiation Control Act." Neb.Rev.Stat. Ann. §§ 71–3501, et seq. (2001). That Act was in part intended to "provide for the availability of capacity either within or outside the state for the *management* of low-level radioactive waste generated within the state . . . ." Neb.Rev.Stat. Ann. § 3501(4) (emphasis added). In that regard, the Act gave DOH certain licensing powers. Neb. Rev.Stat. Ann. §§ 71–3503(8), 3503(12), 3507.

However, the definition of the word "management" under the Radiation Control Act provided a crucial limitation. That is:

> Management of low-level radioactive waste means the handling, processing, storage, reduction in volume, disposal, or isolation of such waste from the biosphere in any manner, *except the commercial disposal of low-level radioactive waste in a disposal facility, designated by the Central Interstate Low–Level Radioactive Waste Compact Commission* . . . .

Neb.Rev.Stat. Ann. § 71–3503(24) (emphasis added).

The legislative history makes clear that foregoing limitation was intended to harmonize the Low–Level Radioactive Waste Disposal Act with the Radiation Control Act by giving primary jurisdiction to DEQ. See, for example, the discussion of the legislative history of this limitation in letters addressed to Bill Lamson by DEQ and DOH lawyers in 1994. (Exs.8083,

---

**26.** Scientific Ecology Group (SEG) employed Smith. (Tr. 1387.) SEG was owned by Westinghouse. (Tr. 1388.) Westinghouse had submitted a proposal to the Commission to prosecute the license application and build the facility, but the Commission selected USE over Westinghouse. (Tr. 3065.)

8085.) Indeed, the sponsor of the above-quoted limitation, which limitation had been drafted by DOH, DEQ, and others, thought his amendment precluded DOH's direct involvement:

> The Department of Health would regulate the use of radioactive material and radiation generating equipment but does not have regulatory power when a low level radioactive waste site is involved. That is kind of a key distinction. We have always had a little conflict between the Department of Health and the Department of Environmental Control. Hopefully, this line that we're drawing will take care of that conflict.

(Ex. 8083 at LDM11518) (April 22, 1994, letter from DEQ lawyer to Bill Lamson quoting floor debate on Laws 1987, LB 390, an amendment to Nebraska's Radiation Control Act, and the statement of the sponsor, Senator Don Wesely.)

In 1989, during the Orr administration, DOH and DEQ, at the urging of Orr's low-level waste advisor, entered into a memorandum of understanding (MOU). (Ex. 3260.) The MOU recognized that DOH did not have the power to license a "commercial LLRW disposal facility designated by the [Commission] and licensed by [DEQ]" (*Id.* at 3260.0001.) But the 1989 MOU nevertheless committed the agencies to work together, and provided that: "[e]ach agency shall retain its power to approve and enforce its own separately issued permits and licenses." (*Id.* at 3260.0002.) In the event of a dispute, the Governor's policy research office would decide the question. (*Id.* at 3260.0003.)

In June of 1990, and before Nelson became Governor, the agencies amended their MOU. (Ex. 3380.) In the amended MOU, the agencies recognized that DOH did not have authority to regulate the "commercial disposal of LLRW in a disposal facility designated by the [Commission] . . . ." (*Id.* at 3380.0001.) But the 1990 MOU required that "[b]oth agencies will cooperate to issue one license" and "[t]here will be one license application." (*Id.* at 3380.0004.)

After Nebraska, with DOH joining in the decision, issued the tentative license denial in January of 1993, USE filed a "contested case." (Ex. 6113.) Among other things, USE contended that DOH had no jurisdiction to grant or deny the license. (*Id.* at 6113.0001.) In August of 1993, Bill Lamson, with Nelson's former law firm, was hired to represent DEQ, DOH, and Nebraska to "coordinate everything." (Tr. 7229–33; Exs. 1558, 1561 (at PRI 119493 (entry of 8/24/93 for WML)).)

On September 3, 1993, Lamson gave Horton and Wood a legal opinion in response to the jurisdictional challenge asserted by USE in the contested case proceeding. (Ex. 7067.) Even though USE had by then reduced its application to 110 acres thus effectively terminating the contested case (Ex. 1411, App. A at 24), Lamson marked his letter *"PERSONAL & CONFIDENTIAL"* and *"ATTORNEY/CLIENT WORK PRODUCT."* (Ex. 7067, at PRI033829.) It is noteworthy that had the Nebraska Attorney General been asked to give a legal opinion on the DOH and DEQ question, it is highly probable that the opinion would have been made public. *See* Nebraska Attorney General Opinion No. 92106, 1992 WL 473487 (August 26, 1992), at *14 ("[L]egal opinions issued by the Attorney General to state officials are public records. Nebraska Attorneys General have published such opinions since at least 1891 . . . .")

Lamson's private opinion stated that it "is our conclusion that each agency has licensing authority over differing aspects of such a facility." (Ex. 7067, at PRI033829.) In particular, DEQ "has authority over the commercial disposal of low-level radioactive waste at such facili-

ties" while DOH "retains licensing authority over all other aspects of the management of low-level radioactive waste at the facilities, such as receiving, handling, storing, and reducing in volume low-level radioactive waste." (*Id.* at PRI033835.)

Less than a year later in the spring of 1994, the question of jurisdiction arose again. In particular, the question arose as to which agency would actually grant or deny the license. Lisa Buechler, a lawyer with DEQ, sent Lamson a letter stating that "the staff does not even seem to be in agreement concerning the scope of review or decision-making authority of each agency." (Ex. 8083, at LDM11518.) She observed that "[p]roblems have arisen because staff from both agencies are not in agreement on the license application's compliance with regulatory requirements." (*Id.*)

Buechler's letter to Lamson, marked "confidential," was eight pages long, and contained a very detailed analysis of the issue. After reviewing the statutes, amendments to the statutes, and legislative history, she suggested "a key provision" of the Low–Level Radioactive Waste Disposal Act meant "that [DEQ] would license the Compact disposal facility, and the radiation elements of the facility would be dealt with through contract with the Health Department." (Ex. 8083, at LDM11517 (quoting Neb.Rev.Stat. Ann. § 81–1580 (1999) (last paragraph) and referring to legislative committee testimony of Dennis Grams, then Director of DEQ)) She added that "[t]his seems to be a similar understanding to that stated by Dr. Gregg Wright, then Director of [DOH], in Health and Human Services Committee testimony on January 28, 1986 ...." (*Id.*)

Darrell Klein, a lawyer with DOH, reviewed Buechler's letter and sent Lamson a letter expressing the views of DOH. (Ex. 8085.) His letter was marked "confidential" and "privileged." He asked: "[H]ow does [DOH's] authority over radioactive materials ... interact with [DEQ's] authority over disposal of LLRW at the proposed [Compact] facility?" (*Id.* at PRI041521.) Klein stressed that this question was not only important to the agencies, but also "affects the relationship of the state and the applicant as well." (*Id.* at PRI04521.)

On August 12, 1994, Lamson addressed an opinion letter to Wood and Horton, stating that: "We have been asked to re-examine our opinion regarding the jurisdictions of [DOH and DEQ] in light of materials provided by Lisa Buechler and Darrell Klein." (Ex. 7068, at PRI019291.) Lamson acknowledged "that there is some support" for the proposition that DOH's "authority is completely preempted in the case of a low-level radioactive waste disposal site." (*Id.* at PRI019293.) However, he stated that it remained his opinion that "both [DOH and DEQ] exercise licensing authority over differing aspects of the management of a low-level radioactive waste facility." (*Id.* at PRI019291.)

On March 1, 1996, Steve Moeller sent an e-mail to Tim Becker (chief of staff), Jean Lovell (head of PRO), Rick Becker (a PRO lawyer on' LLRW issues) and Trent Nowka (Governor's legislative liason). (Ex. 851.) In pertinent part, the note stated: "I would like Sen. Wesley to run an amendment onto LB 1201 cleaning up the Health statute *which exempts Health from being involved in the licensing of a CIC facility ....*" (*Id.* (emphasis added).) He observed that: "I think the [LMC] is ok with it." (*Id.*)

Moeller was denied permission to seek amendment of the statute. (Tr. 1699–1700.) Although Moeller was not certain who made the decision not to seek the amendment, he thought it was probably Tim Becker, Trent Nowka, or the Governor who made the decision. (Tr. 1700.)

When Lamson, whose job it was to "coordinate everything," was asked why no amendment was sought, he responded that "there was a concern that if either Department went into the legislature with a statutory amendment, there would have been a big free-for-all . . . ." (Tr. 7304.)

On June 17, 1997, USE filed a declaratory judgment action against DOH, DEQ, and the Directors in state court. (Exs. 1545, 1545a, 1545b (opinions, docket sheets).) Despite the fact that USE's "404" permit from the Corps of Engineers was about to expire, DEQ and DOH informed USE that if it used the permit to mitigate the insignificant wetland, then its license could be denied because USE would be deemed to have "commenced construction" without a license. Among other things, USE asserted that DOH lacked jurisdiction to grant or deny a license. The suit was defended by Bill Lamson.

On February 26, 1998, Judge Steven Burns of the District Court of Lancaster County, Nebraska, ruled that the Department of Health "does not have statutory authority to review, consider, or rule on the license application that has been filed by U.S. Ecology for a license to construct the disposal facility designated by the Compact." (Ex. 1405 at 16.) He also granted the relief sought by USE.

Nebraska appealed, and sought a stay. Judge Burn's decision was stayed on May 4, 1998. (Ex. 1545b.) After the final license denial decision by DOH and DEQ in December of 1998, the Nebraska Supreme Court, refusing to address whether DOH had authority, declared that the matter was not ripe when it was decided by Judge Burns and vacated his decision. (Ex. 1545, reported at 258 Neb. 10, 601 N.W.2d 775.) The Nebraska Supreme Court's decision was rendered on October 29, 1999.

The record does not reveal that Judge Burns or the Nebraska Supreme Court were made aware that Steve Moeller, a lawyer with the Governor's office having special expertise on LLRW issues, had come to the conclusion in 1996 that the statute "exempts Health from being involved in the licensing of a CIC facility . . . ." (Ex. 851.) On the contrary, Nebraska took the opposite position before Judge Burns, and then sought to delay resolution of the question when it was unsuccessful.

The question of whether DOH had authority to grant or deny the license obviously had profound significance to the Commission and USE. If DOH had no jurisdiction, then, at the very least, the applicant would not have had to convince two decision-makers of the correctness of its cause. As it was, USE was to put to a dual burden of persuasion before DOH and DEQ even though by 1996 it was clear to the Governor's office that DOH probably lacked jurisdiction.

In summary, while it is both unnecessary and unwise for me to decide the precise extent of DOH's licensing jurisdiction, it is undisputed that there was a very serious question about the matter and by 1996 the Nelson administration doubted whether DOH had the statutory power to grant or deny a license to USE. Upon coming to that realization, and instead of seeking to resolve the question, the Nelson administration did nothing. On the contrary, it impeded the judicial resolution of that question. In so doing, Nebraska acted in bad faith.

### 9. Nebraska Fails to Meet a Reasonable Deadline

On July 11, 1995, USE advised Nebraska that its application was complete. (Ex. 4870.) By then, and after responding to four rounds of questions from the 100 or so consultants for Nebraska, the submission was 30,000 pages in length. (Ex. 1411, App. A at 25.)

On July 26, 1995, Ringenberg and Rogers responded for DEQ and DOH. They advised that: "No further application related information will be accepted, unless requested by State reviewers." (Ex. 21.) They added: *"We believe the final review activities will take approximately one year to complete."* (*Id.* (emphasis added).)

By August of 1996, Nebraska had not issued the DSER or a decision regarding the application. (Ex. 1543, filing 128 at 3.) On August 27, 1996, the Commission held a special meeting to gather information so that it could determine an appropriate schedule for the State to complete its processing of the USE application. (*Id.*) Under the Compact, the Commission shall "require the appropriate state ... to process all applications for permits and licenses required for the development and operation of any regional facility or facilities within a reasonable period from the time that a completed application is submitted." Art. V(e)(2).

The Commission invited the Directors of DOH and DEQ to attend a meeting on the scheduling issue and offer their views in order to help determine an appropriate deadline. (Ex. 1543, filing 128 at 3.) They declined to attend or participate. (*Id.*) Nevertheless, the Commission gathered information, and received input from several sources. (*Id.*)

On September 30, 1996, the Commission passed two motions. (Ex. 1543, filing 128 at 3.) First, the Commission ordered Nebraska to issue the Draft Environmental Impact Analysis and Draft Safety Evaluation Report and a license decision between December 14, 1996, and January 14, 1997. (*Id.*) Second, the Commission ordered Nebraska to adopt a single, consolidated comment and public hearing schedule. (*Id.*)

Nebraska responded by suing the Commission. (Ex. 1543, filing 1.) Nebraska ultimately withdrew its challenge to the consolidated comment and hearing sched-

ule. (Ex. 1543, filing 128 at 5 & filing 141 at 3 n.2.) As discussed earlier, Judge Urbom found that the Commission had the power to set the deadline, and that the deadline was reasonable. (Ex. 1543, filing 128 at 14–18.) The court of appeals held that the Commission had the power to set the deadline, but did not reach the question of the reasonableness of the deadline because by then the license had been denied. (Ex. 1543, filing 141 at 9.) However, in a footnote the court of appeals added: "Without addressing the issue directly, we believe, in any event, that the deadline established by the Commission was reasonable." (Ex. 1543, filing 141 at 9 n.8.)

The evidence proves that the deadline established by the Commission was reasonable and the failure of Nebraska to meet the deadline amounted to bad faith. I so find. In particular, I rely upon the following: (1) after Governor Nelson was elected, and in 1991, Nebraska told the GAO that the process would be completed in about 15 months (Ex. 3596 at 3596.0004); (2) as pointed out by Nebraska's Auditor in 1992, the NRC had established a 15–month schedule as an appropriate target (Ex. 19 at 15), and despite the Auditor's urging, Nebraska failed to set its own deadline; (3) in 1995, Ringenberg and Rogers represented that the review would be completed in about one year (Ex. 21); (4) the Commission sought the views of Nebraska, but the Directors of DOH and DEQ declined to attend or participate in a meeting on the subject (Ex. 1543, filing 128 at 3); (5) the January 14, 1997, deadline imposed by the Commission gave Nebraska more than 16 months, measured from July 26, 1995, the date of Ringenberg and Rogers' letter, to complete the process; and (6) Nebraska did not make a decision until December of 1998, shortly before Governor Nelson left office after serving two terms, and more than eight

years after the license application had been filed.

In summary, the deadline set by the Commission was reasonable. The failure of Nebraska to meet the deadline was the product of bad faith.

### 10. Handpicking A Financial Analyst and the 1998 Pretextual Financial Assurance Decision

Nebraska handpicked a financial analyst to examine whether USE could finance construction of the project. After that, Nebraska used the reports of the analyst as a pretext to deny the license.

Nebraska's regular financial assurance reviewers (including a certified public accountant; a lawyer from Collier, Shannon; and Dale Jacobson, an environmental engineer with an MBA) agreed that USE had provided sufficient written assurances of its ability to finance construction. (E.g., Ex. 1411, at 10–1 to 10–23 (DSER); Tr. 1414, 1627–28 (testimony of Dale Jacobson).)[27] They proposed the issuance of a conditional license. That is, within 120 days after the issuance of a license, USE would be required to submit the specific financing arrangements for approval by Nebraska. (Ex. 1411, at 10–3.) As Dale Jacobson told Jay Ringenberg, the LLRW program manager with DEQ, in the "construction world" conditional licenses were the norm, and "once you had a license in hand ... people would be standing in line to finance it because of the nature of the business, being a Compact site as well as some form of a monopoly business." (Tr. 4736.)

It is important, at this point, to remember the e-mail that Allen sent to Wood, Nelson, and others on April 14, 1992. (Ex. 312.) After recounting USE troubles in California because of the slow pace of licensing in that state, Allen observed: "This [California delay] has got to be a setback for U.S. Ecology's financial situation. They need a license in hand before they get any credit with a bank.... U.S. Ecology is being squeezed pretty hard. We might want to be in a 'heads up' posture." (Id.)

With Kate Allen's e-mail keenly in mind, consider what action Wood took when he realized that the financial assurance reviewers were satisfied with USE's presentation on that subject. On May 28, 1997, he met with some of the regular financial assurance reviewers. (Ex. 5405.) He chastised them, stating: "How can you possibly contemplate issuing a license to a company that is near bankrupt." (Id.) Wood then directed that his consultants hire a "Financial Analyst" or "Investment Banker" and "Not an accountant." (Id.) Jacobson was instructed to do the screening, with the help of Wittenborn (a lawyer with Collier, Shannon and a financial assurance reviewer). (Id. at 5405.0002.) They were instructed that Ringenberg "will decide who to hire & then Randy will approve." (Id.)

Wood instructed Ringenberg to contact W. Don Nelson regarding the hiring of a financial analyst. (Tr. 2227–28). W. Don Nelson was Wood's friend (Tr. 2228), and he was also a political confidant and close friend (but no relation) of Governor Nelson's. (Tr. 958.) W. Don Nelson later went to work on Senator Nelson's staff. (Tr. 958.)

W. Don Nelson told Ringenberg to contact the firm of Conley, Smith. (Tr. 2229–30.) W. Don Nelson then worked for a company that was affiliated with Conley,

27. Before doing so, they had investigated the financial condition of AE and USE by doing such things as traveling to the corporate headquarters to interview important officers and by examining the 10–Q and 10–K filings with the Securities and Exchange Commission. (Tr. 1415–16.)

Smith. (Tr. 1422–23, 2229, 2377–79.) Along with other candidates, HDR interviewed Conley, Smith. HDR then hired Conley, Smith on a "sole source" basis. (Tr. 2232.) Conley, Smith was essentially a brokerage and investment advisor located in Omaha, Nebraska.

In September of 1997, the first Conley, Smith report was delivered. (Ex. 610.) Among other things, the report stated that AE, the parent of USE, was "in a relatively weak financial position" and "it is difficult to see how the Company could finance" the "proposed facility in Boyd County without guarantees from the major generators . . . ." (*Id.* at 11.)

John Conley was the author of the report and he had the help of Steve Penner. At trial, Conley indicated that the scope of his work was quite limited. He looked only at the financial condition of AE as shown primarily by the income statements and the balance sheets of AE. (Tr. 2439.) "Our focus was not to determine where they could find the money, but instead, if they had a balance sheet and the operational history to support financing the project." (Tr. 2462.) Essentially, Conley tried to determine whether AE could finance the project with its own assets or obtain conventional financing for the project. But, he did not contact possible sources of "third-party" funding such as banks, insurance companies, or investors. (Tr. 2438–39.)

Despite the fact that the Commission (with funding from the major generators) had already invested tens of millions of dollars in the project, no one at Conley, Smith contacted either the Commission or the generators. (Ex. 10,005 at Tr. 31, 35 (Dep. of Penner).) Conley testified that it was his understanding that the scope of Conley, Smith's work excluded consider-

ation of whether the major generators or the Commission would likely provide financing. (Tr. 2391–96, 2428–29, 2444–45.)

Had Conley contacted the Commission, he would have learned that the Commission's contract with USE allowed USE to obtain construction financing within 120 days after issuance of the license [28] (Ex. 13 at 23 ¶ 3.04), and that the Commission had the contractual right to provide the construction financing itself or designate another entity to provide the construction financing for USE (*id.* at 24 ¶ 3.05). Moreover, the Commission had the right to provide the financing in the form of a loan or as a contribution to USE (*id.* at 24–25 ¶ 3.06).

As for the generators, and even though the scope of his work did not allow him to consider the question, Conley admitted at trial "that the most likely source of funds comes from the Major Generators" and those generators "would have an incentive to do that." (Tr. 2546.) Conley thus ignored the most likely sources of financing and those sources had literally millions of reasons to provide it.

There were other serious deficiencies in the Conley, Smith report. For example, Conley admitted that although he knew that USE would essentially have a five-state monopoly on the disposal of low-level nuclear waste if the project were licensed, he made no attempt to determine whether operation of the Nebraska disposal site would generate a positive cash flow. (Tr. 2544–45.) Had he looked at the question, Conley would have learned that under its contract with the Commission (Ex. 13, Art. VI at 38–43) and under the provisions of the Compact (Art. III(c)), USE was guaranteed a very healthy (20 percent) rate of return. Thus, Conley did not even at-

---

**28.** Note the similarity to the conditional license proposed by Nebraska's regular financial assurance reviewers.

tempt the rather standard approach of capitalizing the anticipated income stream from the Nebraska project in order to understand whether the Nebraska project was an attractive asset upon which financing could be procured from conventional or nonconventional lenders if a license were granted. (Tr. 2547–48.)

One day after Wood, Conley, Jacobson, and others had a meeting regarding the first Conley, Smith report (Ex. 5559), and on September 11, 1997, Wood confronted Jacobson regarding the positive financial assurance findings in the soon-to-be publicly released DSER. (Tr. 1619–20; Ex. 611.) Wood told Dale Jacobson to change his "acceptable" position regarding financial qualifications of the applicant to "unacceptable." (Ex. 611, at JHC03770.) Jacobson refused. Jacobson told Wood that while he would not do as he was told, he could call it "inconclusive." Wood then directed Jacobson to call it "inconclusive" in the final evaluation findings, but "then we could call it 'unacceptable' in the DSER." With that disingenuous suggestion, both Ringenberg and Jacobson "disagreed." (Ex. 611, at JHC03770.)

Jacobson did add cryptic language to the DSER, in Section 8, to the effect that "[a] final evaluation of U.S. Ecology's financial qualifications will be conducted at the time that draft and final license decisions are made." (Ex. 1411, at 8–8.) Nonetheless, Section 10 of the DSER that was issued in October of 1997, without equivocation, stated that USE has provided the necessary financial assurance for construction and suggested the issuance of a conditional license requiring USE to provide construction financing within 120 days after issuance of the license. (Ex. 1411, at 10–3.) Specifically, "US Ecology has demonstrated that it meets the financial criteria established by the State of Nebraska to construct, operate, and maintain an LLRW disposal facility." (Ex. 1411, at 10–3.) In

the DSER, Nebraska applied DEQ regulation Title 194, Chapter 6, Section 001 and DOH regulation Title 180, Chapter 1, Section 012.33 and concluded that those regulations had been satisfied. (Ex. 1411, at 10–7.)

In May of 1998, the second Conley, Smith report was provided to Nebraska. (Ex. 5710.) Despite AE raising $1.9 million of equity capital, the report states: "[o]ur opinion has not changed." (*Id.* at 5710.0003.) That is: "We continue to believe the Company does not have the capability to develop the Boyd County Project without assistance from the major generators of waste." (*Id.*)

On July 24, 1998, there was a meeting with Wood and Schor. Dale Jacobson, the qualifications review manager, and Jim Wehrwein, the financial assurance review manager, together with most other review managers, met with Wood and Schor to discuss the "Decision Document." (Ex. 587, at JAD000888; Tr.1944–46.) The review managers learned of the decision and were surprised. (Tr.1944–46.) Dale Jacobson explicitly disagreed with the license denial decision regarding financial qualifications. (Tr.1946.)

On August, 6, 1998, Nebraska issued the proposed license denial decision to the public for comment. Nebraska announced that the license would be denied because both of the Departments concluded that USE and AE did not have the capacity to finance the proposed project; that is, "US Ecology Has Not Demonstrated that It is Financially Qualified," citing DEQ regulation Title 194, Chapter 6, Section 001 and DOH regulation Title 180, Chapter 1, Section 012.33. (Ex. 5752 at 7.)

Prior to the final decision being reached, the third Conley, Smith report was presented. (Ex. 5820.) "In spite of the substantial improvement in American Ecology's balance sheet resulting from the

agreement with the Chase Bank, the Company still does not appear to have the ability to finance a major project such as the low-level radioactive waste disposal site to be located near Butte, Nebraska without major assistance and/or guarantees from the largest members of the Central Interstate Compact." (Ex. 5820, at 5820.0005.) The report stated that outstanding debt was reduced from $42,734,000 to $787,000. (Ex. 5820, at 5820.0008.)

On December 18, 1998, the license was denied. As for the issue of financial assurance, the license was denied ostensibly because USE did not have the money on its own to finance construction and because it had not provided sufficient written assurance that it could obtain the funds. (Ex. 5828.) That is: "The Applicant Has Not Demonstrated That It Meets The Financial Assurance [Requirements] For the Construction of a Low Level Radioactive Waste Disposal Facility," citing DEQ regulations Title 194, Chapter 6, Section 001 and Title 194, Chapter 6, Section 002.08. (Ex. 5828, at 5828.0012.)

In contrast with the August, 1998 proposed decision, and despite the fact that the text of the December 1998 decision referred to both departments [29] as if they joined the opinion regarding financial assurance, the opinion did not rely upon the DOH regulations. (Ex. 5828, at 5828.0012–0014.) At trial, Schor testified that the reference to both departments was in error, and that he purposely did not decide whether the DOH financial assurance regulations had been satisfied. (Tr. 6411–6420.)

He stated that since the DEQ regulations were more specific than the DOH regulations he did not think it necessary to make a decision. (Tr. 6412–13.) Schor did

not adequately explain why, if that were truly so, the August, 1998 decision on financial assurance was based upon the asserted non-compliance with both departments' regulations. Charitably put, Schor's explanation did not make much sense. It is much more likely that Schor did not apply the DOH regulations because those regulations had in fact been satisfied, and he did not want to create a conflict with Wood by coming to the opposite conclusion.

In summary, the 1998 decision predicated upon a lack of financial assurance was pretextual and covered up the real and bad faith reason that drove the decision. For among other reasons, I make this finding because: (1) Kate Allen in effect told Wood how to squeeze USE, and she emphasized to him that USE would need a license before it could get financing; (2) after appropriate investigation, the regular reviewers (which included a Collier, Shannon lawyer; a CPA; and an environmental engineer with an MBA) were satisfied that sufficient written assurances had been provided; (3) normal construction practices assumed licensing conditioned upon a subsequent specific showing of acceptable financing arrangements; (4) outside the regular review process, Wood and Ringenberg relied upon a political confidant and friend of Governor Nelson's to locate a financial analyst; (5) the specially retained financial analyst's reports were of such a limited scope that they ignored crucial financing sources and methods; (6) Wood tried to pressure Jacobson to change his mind, and suggested a disingenuous way of dealing with the matter; (7) whatever serious financial problems AE earlier faced (and I agree that those problems were many and meaningful), by the time the

---

**29.** "The Departments concur with the Conley Smith report ...." (Ex. 5828, at 5828.0014

(emphasis added).)

final decision was reached those deficiencies had largely evaporated and both DEQ and DOH knew it; (8) DOH did not join in the decision regarding financial assurance; and, (9) there was absolutely no risk to Nebraska issuing a license conditioned upon providing construction financing acceptable to the regulators within 120 days after issuance of the decision as proposed in the DSER.

## 11. The 1998 Groundwater Decision Was a Pretext: Saying One Thing, Doing Another With the Hydrographs; "Spin[ing]" the Documents to "Support Randy's No Go Decision"; and It is "Not about Health and Safety"

As I have previously explained (*supra* Part I.D.2–4), both the IPA and the DSER, prepared by Nebraska's consultants, directly addressed and resolved favorably to USE each of the water arguments Nebraska later relied upon to deny the license. In this regard, it is particularly important to remember the significance of the DSER. In its "Info Guide" to the public released in 1997, Nebraska stressed that: "The DSER determines if the facility meets applicable state laws and regulations." (Ex. 3126, at 3126.0011.)

The irregular, unreasonable, and unfair way Nebraska changed its position and arrived at the 1998 denial proves that the water arguments relied upon by Nebraska were a prextext.[30] As one reads the following discussion, and with the exception of the financial assurance question, keep in mind that all the proffered reasons for the 1998 denial turned on the assertion that ground water was too high and discharged to the surface.

Since they allegedly played a central part in Nebraska's decision, we must start with the additional or so-called "later" hydrographs. On July 26, 1995, Nebraska advised USE that "[n]o further application related information will be accepted, unless requested by State reviewers." (Ex. 21.) About 17 months later, and in December of 1996, Nebraska requested from USE more hydrographic data; that is, it wanted hydrographs "from 1/95 to the present time." (Ex. 1273.) The letter promised USE that: "The data so gathered is to be used in our ongoing environmental surveillance activities, *not the formal technical review.*" (*Id.* (emphasis added).)

The difference between "formal technical review" and "environmental monitoring" discussed in the foregoing letter was that technical review involved the reviewers and their opinions about whether the license should be granted; while environmental monitoring dealt with how to monitor the site assuming that it was licensed. Jay Ringenberg, the LLRW program manager with DEQ and a coauthor of the letter, made it clear that the information that was being sought in the letter was intended for environmental monitoring purposes. He testified as follows:

Q. Didn't the reference to environmental monitoring and lag time have to do with establishing baselines for monitoring this site once it had been licensed?

A. The environmental monitoring program was used to establish baseline as well as quality assurance on the data and all that, yes, and the hydrographs would be part of that data set because they do establish baseline as far as maximum, in this case, maximum and minimum water levels on the site.

---

**30.** Once again, I emphasize that I do not decide the hydrologic questions. Rather, I find that the process by which Nebraska resolved those questions was unfair, unreasonable, and failed to reflect the scientific care and objectivity required by principles of good faith.

Q. And lag times for the precipitation events?

A. Yes.

Q. You would want to know that after the site was constructed?

A. Well, I think you would want to know that after the site was constructed in the future if you saw elevations in those wells, you would at least have some background to go back and look prior to the facility being built to [determine] how it operated from a precipitation and that. I think that would be useful information for us.

Q. *That doesn't have anything to do with whether you grant a licence though, does it?*

A. *No. It has to do with just the environmental monitor[ing] program established in the baseline, right.*

(Tr. 4891–92 (emphasis added).)

However, Ringenberg also testified that the letter did not explicitly preclude the use of the hydrographs for "licensing," but only prohibited Nebraska from using the hydrographs for formal "technical review." (Tr. 4890–93.) Given this linguistic sleight of hand, Ringenberg stated that Nebraska was free to use the requested data to deny the license so long as Nebraska did not give the information to its technical reviewers for formal "technical review." (*Id.*) That is precisely what happened.

USE submitted the requested hydrographs on June 8, 1998. (Ex. 1297.) The hydrographs were not given to any of Nebraska's four hydrologist-reviewers for analysis. (Tr. 2692–93.) And, sure enough, Nebraska used the hydrographs to deny the license (Ex. 5828, at 5828.0004 [31]) even though the letter which requested the data said that it would be used for environmental monitoring.

Bluntly stated, this conduct amounted to a rank "bait and switch."

Aside from this grossly unfair misuse of the requested data, there is a good deal more in the way of evidence showing a lack of good faith regarding the issue of groundwater and the 1998 denial decision. I focus on that evidence next.

By the time Nebraska had requested the additional hydrographs in late 1996, USE had already submitted mountains of hydrographic data, including hydrographic data from the wet years starting in 1992 and extending through 1994. Moreover, Nebraska's technical reviewers requested and were provided with a special computer study on the subject of high groundwater. It was conducted by Dr. Stewart Taylor, a Princeton Ph.D. in hydrology and a Bechtel employee, who was advising USE.

The reviewer-hydrologists wanted to see if the high ground water might discharge to the surface after construction, particularly in the swale. Taylor prepared the requested computer study, calibrated it to the wet years as he was asked to do, and provided it to Nebraska. (Tr. 4319–4321; Ex. 3384 at 3384.3145–90 (SAR, Appendix G–7 ("Local Model") (Rev.8)).) It showed no discharge of groundwater to the surface. (Tr. 4319–21.) The 1997 DSER explicitly recognized and agreed with this model and its finding. (Ex. 1411, at 2–32 to 2–33, and 2–38.)

Therefore, by the time the DSER and IPA were issued in October of 1997, USE had no reason to believe that there were any groundwater problems insofar as licensing was concerned. USE knew that it was required to submit additional hydrographic data, but it reasonably believed that the data would be used for environ-

---

**31.** "Hydrographs provided by the applicant for 1995, 1996, and 1997 document ground water at or near the surface of the site." (*Id.*)

mental monitoring purposes. Indeed, that is exactly what the DSER anticipated insofar as the additional hydrographs were concerned. (Ex. 1411, at 2–70 (stating that the "LLRW program has determined that U.S. Ecology's preoperational environmental monitoring program is acceptable and adequately characterizes the site prior to construction and operation") & Ex. 1411, at 2–76 (requiring submission of additional hydrographs for the purpose of such monitoring).)

In the spring of 1998, but before USE submitted the additional hydrographic data, Wood, and his subordinates, had already begun to plan on how to deny the license by using groundwater as a pretext. They also discussed and implemented means to disguise how the decision was ultimately made.

On March 17, 1998, Ringenberg and Rogers had a meeting with many of the review managers. (Ex. 576, at JAD000641–42.) As was his practice, Jacobson took detailed notes.

Those notes reflected that they discussed the directors' desire to be done by June, and that "Wood['s] issues" included "Groundwater-all facets." (*Id.* at JAD000641) "Rest are fixable." (*Id.*) The review managers were instructed about how the decision would be made, and how the decision documents would be issued. The process which was described involved the review managers submitting drafts, to which the "Directors will comment, add, delete" and if the review managers and directors disagree, "so be it." (*Id.* at JAD000642.) However: "*No one will 'take ownership'*" for the decision. (*Id.* (emphasis added).)

On April 9, 1998, Wood and Schor had a meeting with Ringenberg, Jacobson, and others. (Ex. 576, at JAD000633–36.)

Marvin Carlson, who is a geologist, and not a hydrologist, was present. He was the review manager for site characteristics and that area included consideration of ground and surface water. Once again, Jacobson took detailed notes.

Among other things, Jacobson noted that "Wood intends to meet with the [review managers] to '*discuss*' the reviewers['] significant issues. *May not write this down.*" (*Id.* at JAD000634 (emphasis added, but quotation marks around the word "discuss" in the original).) Next to Woods' name, and the words: "The Pivotal Issue," the following language appears: "*Groundwater—Inspite [sic] of our analysis.*" (*Id.* at JAD000635 (emphasis added).) In short, Wood had made up his mind by the spring of 1998, and plans were in the works to shape the views of the consultants to support his opinion.

In response to Nebraska's request, and on June 8, 1998, USE submitted its "1997 Environmental Monitoring Report." (Ex. 1297.) Among other things, the report included hydrographs for calendar years 1995, 1996, and 1997.

On June 27, 1998, Marvin Carlson, the review manager for the area that included groundwater and surface water, submitted his draft responses to the public comments that had been given in February of 1998. (Ex. 141; Tr. 2826.) [32] His responses entirely supported USE, and completely rebuffed the claims of the LMC experts and other site opponents who testified at the February of 1998 public hearings. For example: (1) "The disposal facility is not within a hydrogeologic unit and is above any potential groundwater level" (Ex. 141, at ALG51683); (2) "An underlying buffer zone is described in the application ... [and][s]cenarios are analyzed in the appli-

---

**32.** The document bears two dates, June 27, 1998, and September 25, 1998. According to Carlson, the document was submitted to DEQ twice. (Tr. 2826–27.)

cation for direct release of contaminants into the groundwater negating reliance on either natural or engineered barriers" (*id.* at ALG51684); (3) "The piezometric surface from a subsurface unit, as measured in a well, could be higher than ground-level without saturation at the surface" (*id.* at ALG51685); (4) "The disposal facility is above any potential groundwater level, is not in a wetland, and no part of the site lies within a 100–year floodplain" (*id.* at ALG51686); and (5) "There are no flowing wells or springs on site" (*id.* at ALG51687).

It is therefore clear that on June 27, 1998, nearly three weeks after the hydrographs were submitted by USE on June 8, 1998, and long after the testimony at the February, 1998 public hearing, Marvin Carlson submitted an evaluation that found that water was not a problem.[33]

On July 14, 1998, Wood and Schor probably made the license denial decision in the presence of Jacobson, Ringenberg, Smith (the SEG "policy advisor"), and lawyers from DEQ and DOH. (Ex. 587; Tr. 2318–19, 2358–59.) Except for Jacobson and Smith, no review managers were present at this meeting. In particular, Carlson, the review manager for site suitability, was not present. Once again, Jacobson took detailed notes.

Contrary to the sequential process outlined in the "Info Guide" released to the public in October, 1997, Wood and Schor decided to collapse several steps of the process into one. Rather than finishing and publishing the review managers' responses to comments on the DSER, then preparing and publishing the Safety Evaluation Report (SER), and after that issuing a tentative license decision, Wood and Schor directed that these three documents be prepared all at once and available "by 8–4–98 or shortly thereafter." (Ex. 587, at JAD000884.)

Before discussing the "Decision Document," Ringenberg handed out a legal memorandum on "Executive Privilege." (Ex. 587, at JAD000885.) After that, they discussed "issues." Next to the name "Carlson," Jacobson's notes reflect the following: "Engineered Barriers"; "Depth to Groundwater"; "Groundwater Discharge to the Surface"; "Capillary Action"; "The Ditch"; and "Hydrographs." (Ex. 587, at JAD000885.) Next to the initials for Randy Wood, Jacobson wrote: "The hearing *will not* be held *Before* the election. Wood expects it will take 4 days & will be very vocal." (*Id.* at JAD000884 (emphasis in original).)

On July 18, 1998, Craig Osborn with HDR sent an e-mail to other consultants relating to a surprise visit of DEQ employees on the previous day (July 17, 1998). (Ex. 211.) Because this entire document is remarkable and shows that all pretense of fairness and objectivity had been abandoned by Wood, it is fully reproduced below:

| From: | Osborn, Craig |
|---|---|
| Sent: | Saturday, July 18, 1998 12:19 PM |
| To: | Butterfield, Barry |
| Cc: | Plummer, Chuck; Quandahl, Cathy; Conzett, Mike; 'Jacobson, Dale' |
| Subject: | RM mtg |

While it is not clear precisely when Carlson actually first saw the hydrographs, at his deposition, Carlson said that he first saw some of the hydrographs "weeks" before the first part of July. (Tr. 2791.) Carlson tried to change his testimony at trial, but he had no reasonable explanation for the difference between his trial testimony and his deposition testimony. (Tr. 2791–92.)

---

**33.** Carlson suggested that he may have written these evaluations prior to June 27, 1998, the date he submitted them, and prior to June 8, 1998, the date the hydrographs were received by Nebraska. Even so, Carlson clearly testified that he *submitted* his favorable evaluations to the state on June 27, 1998. (Tr. 2826.) Therefore, it is undisputed that Carlson's favorable evaluation was submitted 19 days *after* the hydrographs had been received.

*PLEASE CALL ALL RMs and NOTIFY THEM OF A MANDATORY MTG.* on July 27th at Mahoney Lodge. [Only this emphasis in original, remaining emphasis added.] *We need to also advise them that they may be asked to meet with Randy* during the remainder of that week, with the most likely days being Tuesday and Thursday the 28th and 30th, *to reconsider their response to comments.*

*Jay, Lisa, Tom Lamberson, and Carla made an unannounced visited [sic] with me, Cathy, John, and Gerry yesterday* at the response to comment work session. *The visit consumed the day so that nothing related to the work at hand was accomplished. They spent their time trying to figure out how to spin responses, evaluations, and the SER/EIA so that they would support Randy's no go decision. Their conclusion was that first they must compose the decision document and then find the technical support or lack there of [sic] for the decisions.* Consequently, the schedule is as follows:

July 20th LLRW Staff to compose document

July 21st Present 1st cut to Randy

*Remainder of the week write and rewrite to suit Randy's mood and have a final copy ready by July 24th.*

August 6th, press release with all final documents in hand.

You, Cathy and Gerry should continue the march and get all of the responses done and into the three ring binder at least on a first cut basis so they will be easier to edit. Dale, Wherwein [sic], and you are the only three left. Also a quick review of the program responses needs to be done. HDR has Mahoney on Tue, Wed, and Thu of next week to complete these activities.

Then *on July 27th, I reserved two rooms* in the lower level at Mahoney *for the unveiling of the decision document* to all review managers for discussion *and a please reconsider your technical positions meeting.*

*The mission impossible aspect of this is that parallel to the decision document discussions you and I,* along with help from many many others (among those suggested were Trudy, Jan, Lisa's assistant, and a couple of HHS names I have never heard before) *are to prepare the final SER, EIA, and Response to Public Comments so that they are ready for print on the 31st. The desire is to have this entire set of documents express the same specific information so that there is no conflict with Randy's decision document. This directive from Tom and Jay was so absurd that no one in the room believed it including Carla, Gerry, Cathy and myself.* We will give it our best effort. Plan on having fun the final week of July.

I received clearance from Lampson [sic] and therefore will be going to Chicago on business Mon thru Thu. returning midnight on Thursday the 30th. I will check in to see how things are going. Don't let Gerry sway us from getting the responses done.

(Ex. 211 (emphasis added, except as noted).)

On July 24, 1998, Barry Butterfield, the environmental review manager, Marvin Carlson, the site characteristics review manager, and Dale Jacobson, together with most of the other review managers, had a meeting with Wood and Schor to discuss the "Decision Document." (Ex. 587, at JAD000888; Tr.1944–46.) The review managers learned of the decision and some were surprised. (Tr.1944–46.)

Butterfield told Wood and Schor that the decision was inconsistent with the IPA and that the decision was "technically unsupportable." (Tr.1945.) Wood's re-

sponse was that *"this decision is not about health and safety, it's about regulatory interpretation."* (*Id.* (emphasis added).) Other review managers also objected to the decision. Dale Jacobson explicitly disagreed with the license denial decision because he did not believe relocation of the swale amounted to an engineered barrier.[34] (Tr.1946.)

Jacobson's notes indicate that the following topics were discussed: "Depth to Water Table"; "Buffer Zone for Environmental (vertical) Monitoring"; "Engineered structures-substitute for suitable site"; "Groundwater discharge to surface"; "Site Deficiencies–Require active maintenance." (Ex. 587, at JAD000888.) There is no indication that Marvin Carlson expressed an opinion on the Directors' decision at this meeting.

On July 27, 1998, Craig Osborn, of HDR, collected various responses to public comments on the DSER. These responses were drafted *before* the announcement to review managers of Randy Wood's "no go" decision. (Ex. 467.) Osborn distributed these initial drafts to the review managers with the following comment: "Please review the responses, note areas of disagreement requiring modification, indicate suggested corrections, and return the responses by 9:00AM. Thursday, July 30th. FYI. [T]he Department's comments and regulatory positions have not been incorporated into this version of the responses." (Ex. 467, at HDR36732.) Despite the inconsistent position he later took on July 30, 1998, Marvin Carlson, the

review manager for the area dealing with groundwater and surface water, made no suggested changes to the response to comments distributed by Osborn. (Tr. 2712, 2781–87.)

These responses to comments were wholly inconsistent with Carlson's and Nebraska's later reasons for the denial of the license. For example, regarding concerns that groundwater levels were higher than the bottom of the disposal cells, the authors[35] acknowledged that USE had *"submitted new groundwater hydrographs for the years 1995, 1996 and 1997."* (Ex. 467 at 143 (emphasis added).) In regard to those later hydrographs, *"[t]he LLRW Program reevaluated the disposal unit design considering the new groundwater levels and determined that the bottom of the disposal cells, the basemat, is above the highest observed groundwater level"* and *"[t]he disposal facility is not within a hydrogeologic unit and is above any potential groundwater level."* (*Id.* (emphasis added).)[36]

On July 30, 1998, the review managers, Osborn, and Ringenberg assembled before the Directors to discuss the "Decision Document." (Ex. 214.) Marvin Carlson informed the Directors that he had now concluded that groundwater was a problem despite the fact that he had previously believed otherwise. Carlson stated that he based his opinion on the hydrographs submitted by USE on June 8, 1998. (Ex. 140, at ALG51675, ALG51679–80 (Carlson's briefing drafts for July 30, 1998 meeting).)

---

**34.** He was not alone. Jay Ringenberg, the DEQ program director, believed that the swale was not a credible pathway for release of radioactive materials. (Tr.2049.)

**35.** Strangely, no one knew who wrote the specific comments in Exhibit 467. (*E.g.*, Tr. 1887, 2704.) Osborn suggested that Carlson probably wrote the comments related to site characteristics (Tr. 1887), but Carlson was

unwilling to admit authorship, stating that Exhibit 467 was a "program document" put together by Osborn and "several others who were working with him." (Tr. 2704.)

**36.** Exhibit 467 was submitted to Carlson and others as "Confidential: *Not for Public Release.*" (Ex. 467, at HDR36731 (emphasis in original).)

Unlike all the earlier reviews of technical information regarding hydrology in which he consulted technical experts, Carlson, a geologist who professes no expertise in hydrology (*e.g.* Tr. 2677, 2744–45), had no substantive consultations with any of the several hydrologists on Nebraska's technical review team regarding the hydrographs. (Tr. 2615 (all technical reviewers were "highly qualified")); (Tr. 2692 (four hydrologists); Tr. 2725 (no "communication or conversation with any other living human being" after receipt of hydrographs and before July 30).) He made his judgment simply by looking at the peaks in the hydrographs. (Tr. 2691 ("visual inspection"); Tr. 2697 (now, plateaus and not spikes); Tr. 2743 ("eyeballed" them).) He performed no quantitative or statistical analysis. (Tr. 2692 (no technical review undertaken); Tr. 2698–99 (no comparison to precipitation data, no well-by-well comparison of old and new hydrographs); Tr. 3006–08 (no numerical comparison of the early and later hydrographs to assess the differences, if any, in the duration of time water was near the surface).)

On August 3, 1998, Wood had a meeting with Nelson and various staff members, including Rick Becker, a PRO staffer assigned to LLRW issues. (Tr. 6462–64; 6880–82, 6884.) The Governor was informed of Wood's decision. Nelson and Wood then called Lamson and told their lawyer of the decision. (Tr. 7195.)

After that, and on August 5, 1998, the proposed decision was announced. (Ex. 5752.) Of the seven reasons given for the proposed denial, five were based on issues related to high groundwater. (*Id* at 4–7.)

In so doing, Nebraska did not follow the procedure·set out in the "Info Guide" that was distributed to the public in October, 1997. That is, Nebraska did not use the

following sequence: (1) the issuance of a response to·public comments by the experts; (2) followed by a Safety Evaluation Report (SER); (3) followed by the proposed license decision. (Ex. 3126, at 3126.006.) Instead·Nebraska collapsed the· process into one. As a result, no one was required to "take credit" for a particular position, and efforts were made to make the scientifically-based documents (the response to comments and the SER) appear consistent with the decision document. Just as the Governor's office pulled the "boot straps" in January of 1993 prior to the first "intent to deny," Wood tried to engineer the same trick in the summer of 1998 by "spinning" the scientific documents to support his decision.

After the public comment period ended in early November, public hearings were held. (Filing 463 at ¶ B(63) (Order on Final Pretrial Conf.).) At the public hearings, USE presented a vigorous point-by-point rebuttal to the proposed license denial decision. In particular, USE presented the testimony of Dr. Taylor. As noted earlier, Dr. Taylor had prepared the groundwater models and other sophisticated hydrological data that Nebraska relied upon in the DSER when finding that there were no water problems.

Among other things, Dr. Taylor explained that the 1995–1997 hydrographs were statistically no different than the 1992–1994 (wet year) hydrographs that were available to Nebraska and reviewed in the DSER. (Ex. 1323 at 772–79, 783–84) (testimony); Ex. 1330, at USE104261–63 (written response) & USE104269 (Figure 1–4, BAO–13 Hydrograph (1992–1997)[37].) At trial, Nebraska's experts made no effort to dispute the fact that the later hydrographs were not statistically different than

---

**37.** Figure 1–4, the BAO–13 Hydrograph for 1992–1997, is particularly compelling regarding the lack of a real difference between the early and later hydrographs. (Ex. 1330, at USE104269.)

the earlier hydrographs. (*E.g.*, Tr. 5808–09, 6178–79.)

At the public hearing, USE also offered to build only 4 class A waste cells and one class B–C cell. (Ex. 1330 at 1205–07 (testimony of DeOld).) Among other things, this might have obviated any need to relocate the swale and it would likely have avoided any possibility of even a small amount of groundwater entering the leachate collection system. (Ex. 1330 at 1206–07 (testimony of DeOld).)

Despite these responses from USE, the license was denied on December 18, 1998. (Ex. 5828.) Of the six reasons given for the denial, five were based upon groundwater concerns. (Ex. 5828, at 5828.0002–12.)

In summary, the 1998 decision to deny the license ostensibly because of concerns about water was pretextual, unreasonable, and unfair. For among other reasons, I make this finding of bad faith because: (1) Nebraska promised one thing, but did the opposite with the hydrographs; (2) Wood tried to disguise how the real decision was reached and essentially instructed the consultants to write what they did not believe; (3) keeping in mind that the Compact required Wood to read the regulations in good faith, the decision was, by Wood's own admission, not about health and safety, but was based upon some vague, and ultimately unreasonable, concept of "regulatory interpretation"; and (4) the decision supposedly turned on hydrology and performance testing issues, but it was reached without consulting the experts previously hired by Nebraska to advise it on those precise subjects.

Nebraska makes two arguments that warrant a brief response. I turn to those next.

First, Nebraska argues that the DSER was not intended to be a document that bound the directors of DEQ and DOH. It is suggested that the DSER was merely a document prepared by Nebraska's scientists. Accordingly, so the argument goes, the directors were free to come to different conclusions after the public comments and hearings. As a result, Nebraska argues that any incompatibility between the DSER and the ultimate license denial decision is not evidence of bad faith. Even though I agree that the DSER was not "binding," I am (to put it mildly) not persuaded.

Initially, this argument ignores the fact that Wood tried to influence what the consultants wrote when he did not like their views. Hence, Wood certainly acted as if what the consultants wrote was very significant. Furthermore, the DSER represented a two-volume, reasoned analysis by HDR and JHC-supervised scientists who appeared to exercise both care and objectivity after being paid large sums of money to study the water questions and express an opinion. In fact, the DSER was so important that Nebraska told the public that it "determines if the facility meets applicable state laws and regulations." (Ex. 3126, at 3126.0011 ("Info Guide").) Thus, deviations from the reasoned conclusions of the DSER (and the IPA) by agency directors who had no expertise in hydrology and related disciplines are therefore properly viewed with great skepticism, particularly given all the other evidence of bad faith about how the final decision was reached.

Moreover, Wood's proffered reason for deviating from the DSER on groundwater issues was preposterous. Essentially, Wood testified that at a public hearing he listened to a farmer who was a site opponent. (Tr. 6834–44.) That man said he had drawn cross sections using certain groundwater elevations, the elevations of the land and the footing plans for the proposed waste structure. The man also said his drawing showed that groundwater

might intercept the waste structure. After that, Wood had HDR prepare similar cross sections (*e.g.*, Ex. 6034), and Wood came to the same conclusion as the farmer. With that, Wood decided to deny the license because of high groundwater.

Wood's alleged epiphany was both damning and silly. If all it took to properly decide the complex hydrology questions[38] was putting elevations and building plans on a drawing, then all the money that Nebraska demanded from the Commission to study this precise issue was a gigantic waste. Indeed, such a huge and unnecessary expense would itself constitute overwhelming evidence of bad faith.

In truth, both the DSER and the IPA looked far more carefully and closely at these questions because they were not susceptible to simplistic resolution by lay people drawing cross sections. On the contrary, a scientist's care and objectivity, using sophisticated techniques such as computer models and NRC-approved performance testing, was required. And, although they fully knew that groundwater rose and fell, sometimes appearing to come close to the surface, the scientists found no problems. (*E.g.*, Ex. 1411, at Exec. Summ at 5, 2–26, 2–28, 2–30 to 2–33, 3–8 to 3–12, 3–27 to 3–28, 6–91 (DSER); Ex. 3124 at vii (Table 1), 53, 84–85, 127–28(IPA).)

In short, Wood's reason for deviating from the DSER and IPA was not credible. Like many other excuses, it was a pretext. The failure to follow the advice of Nebraska's own scientists is strong evidence of bad faith.

Next, Nebraska argues that Marvin Carlson agreed with Wood. According to Nebraska, Dr. Carlson, a "world class" geology professor, had no reason to be biased against the application. Once

again, and for at least three reasons, I am not persuaded by this argument either.

Initially, and on the question of bias, Carlson had a strong reason not to cross Wood. Carlson's Conservation and Survey Division at the University of Nebraska (Tr. 2587, 2941) had a "longstanding" and ongoing consulting relationship with DEQ that extended well beyond this project, and in part depended upon DEQ for funding (Tr. 4861–62). In that regard, Carlson's group was unlike HDR and JHC who had no similar long-term ties with DEQ. It is therefore quite inaccurate to imply that Carlson lacked a reason to curry favor with Wood and DEQ.

Moreover, as of June 27, 1998, in his draft response to the public comments, Carlson clearly favored granting the application. In that document he rebutted virtually all the grounds Wood would later use to support the denial. Still further, on July 27, 1998, Carlson voiced no objection to responses to comments that were fully supportive of USE and specifically discussed the later hydrographs submitted by USE on June 8, 1998.

Therefore, as late as July 27, 1998, and nearly two months after USE had supplied the later hydrographs on June 8, the hard evidence shows that Carlson favored granting the application. Given the undisputed fact that others were in effect required to "spin" the documents to support "Randy's no-go decision," it is not surprising that Carlson wilted on July 30, 1998, when he met with the directors and agreed with Wood on the water issues.

Lastly, and perhaps most importantly, Carlson was not a hydrologist, and claimed no expertise in hydrology. (*E.g.*, Tr. 2677, 2744–45.) Unlike when the DSER was

---

**38.** If anyone seriously doubts the complexity of these issues, one should read Dr. Taylor's report on his computer study which examined, at the request of Nebraska's technical reviewers, the question of whether groundwater discharged to the surface during the wet years. (Ex. 3384 (SAR, Appendix G–7 ("Local Model") (Rev.8)).)

prepared, he did not submit the hydrographs to the four staff hydrologists for analysis. (Tr. 2692–93, 2725.) Except for looking at the graphs, he made no scientific evaluation of them. (Tr. 2691–92, 2697–99, 3006–08.)[39] Had he done so, he would have realized that the later hydrographs were not statistically different than the earlier hydrographs. Without the expertise and careful analysis of trained hydrologists, Carlson's opinion is no more persuasive than Wood's on the issue of hydrology or, more importantly, on the issue of good faith.

### F. Facts Relevant To Monetary Relief

The Commission will be entitled to monetary relief. I next discuss factual issues related to that remedy.[40]

Initially, I discuss the three types of monetary damages suffered by the Commission, the principal amount of those damages, and the prejudgment interest due on those damages calculated to the date I will enter judgment (September 30, 2002.) I then discuss the one area of monetary relief that the Commission is precluded as a matter of fact from seeking.

The great bulk of the Commission's damages flowed from payments it made to Nebraska (including the LMC) or to USE (and its consultants) in direct pursuit of the licensing efforts. According to Richard Kuzelka, the Commission's accountant, that sum is $88,554,291.77. (Tr. 1016–17, 1025–26; Exs. 1083 (spreadsheet, at last page), 1533 (checks and wire transfers doc-

umenting payments).)[41] The Commission lost the entire value of those payments as a direct result of Nebraska's bad faith conduct. From the date of each payment to the date of judgment, using the federal judgment rate at the time of the payment, the simple interest on the principal amount is $46,207,748.73. (Appendix, at pages 8–12.) The total damages for this category is then $134,762,040.50. (*Id.*)

The second category of damages suffered by the Commission was the loss of "capital" USE had contributed to the Commission. According to its contract with the Commission, USE was obligated to contribute a certain percentage of each invoice to the Commission until a threshold of $6.26 million was reached. (Ex. 13 at 21–22 ¶ 3.02(b).)[42] To do this, USE invoiced the Commission for its work, less the amount of its required contribution. The net effect of this arrangement was that during this process USE gave the equivalent of $6,247,920.07 to the Commission in the form of work intended to achieve a license. (Tr. 995; Ex. 1083 (spreadsheet, at last page).) The Commission lost the entire value of those contributions as a direct result of Nebraska's bad faith conduct. In other words, Nebraska's conduct rendered this "sweat equity" worthless. From the date each such equity payment was made to the date of judgment, using the federal judgment rate at the time of the payment, the simple interest on the principal amount is

---

**39.** For example, no effort was made to rerun Dr. Taylor's groundwater model. (Tr. 4893, 4898–99, 6149–50.) According to Taylor, had his model been run again, and calibrated to the later hydrographs, the results (no discharge to the surface) would have been the same. (Tr. 4320–21.)

**40.** Although the Commission initially requested an award of attorney fees, that request was withdrawn after trial. (Pls.' Post Trial Br. at 47.)

**41.** The amount paid directly to Nebraska exceeded $25 million as of June 30, 1998. (Ex. 36 (chart showing breakdown of payments to payees).)

**42.** By putting this requirement in the contract, the Commission required that USE put its "skin in the game." That is, USE had a strong incentive to do a good job since it was required to dedicate over $6 million to the Commission's efforts.

$6,012,540.36. (Appendix, at pages 13–14.) The total damages for this category is then $12,260,460.43. (*Id.*)

The third category of damages suffered by the Commission related to the so-called "community improvement funds" that the Commission was required to pay to certain Nebraska villages and the like (such as the Village of Butte or School District # 5) as a result of the Commission selecting Nebraska as the host state. (Tr. 1003; Ex. 36 (Summary of Project Costs, Distribution of Community Improvement Fund).) Each non-host state was required to contribute $75,000 per year to the Commission, and the total of $300,000 collected from the four non-host states was then paid to these entities each year. The Commission paid a total $3,000,000 in community improvement funds. (Tr. 1004.) The Commission lost the entire value of those payments as a direct result of Nebraska's bad faith conduct. Calculated from the last day of each year the community improvement funds were paid to the date of judgment, using the federal judgment rate at the time of the payment, the simple interest on the principal amount is $1,385,739.44. (Appendix, at page 15.) The total damages for this category is then $4,385,739.44. (*Id.*)

Based upon the three categories of damage set forth above, and as a direct result of Nebraska's breach of its obligation of good faith, I find as a matter of fact that the Commission's total damages are $151,408,240.37, which includes prejudgment interest calculated to September 30, 2002. I further find that there was a complete lack of performance on the part of Nebraska such that the Commission received nothing of value from its dealing with Nebraska. I also find that any monies expended before the Nelson administration took office were rendered entirely worthless as a direct result of Nebraska's behavior during the Nelson administration.

Therefore, it is appropriate to award damages for the time before Governor Nelson took office.

Lastly, I turn to the one monetary claim for which I find the Commission is not entitled to relief. The Commission seeks an accounting for so-called federal rebate funds; that is, the Commission wants an accounting for funds that the Commission received and paid to Nebraska pursuant 42 U.S.C. § 2021e(d). The evidence reflects that on February 3, 1995, Nebraska sued the Commission over the Commission's failure to pay certain of those funds to Nebraska. (Ex. 7050 (docket sheet and selected filings).) In the process of defending itself, the Commission alleged, and also asserted in a counterclaim, that Nebraska had violated its good faith obligation by failing to properly account for and use the rebate funds. (Ex. 7050, filing 26 at 8 ¶ 19, 9 ¶ 22.)

On June 20, 1996, the parties settled their dispute. (Ex. 5184.) The settlement agreement required the Commission to make certain rebate fund payments to Nebraska, and called upon Nebraska to give an accounting to the Commission. On July 17, 1996, I entered a judgment of dismissal with prejudice regarding Nebraska's claim and the Commission's counterclaim. (Ex. 7050, filing 58.) Given the settlement agreement and the dismissal with prejudice, the Commission is not entitled to rebate fund relief.

While the Commission suggests that the settlement agreement was later breached by post-settlement abuse of rebate funds, I do not find that there is sufficient evidence to support that contention. That being so, the Commission has settled its claim for rebate funds, and it is, therefore, bound by the settlement agreement and foreclosed from seeking relief regarding those monies.

However, to the extent that Nebraska also contends that the rebate settlement forecloses the Commission from pursuing this case or non-rebate related relief, I reject Nebraska's preclusion argument as a matter of fact. The good faith issue regarding the processing and denial of the license, as opposed to misuse of the rebate funds, was not and could not have been at issue in the rebate case. Indeed, the license had not been denied at the time the case was settled and thus the significantly different issues presented in this case had not yet fully arisen, and could not have been discovered by the Commission, when the parties settled their dispute in the rebate fund litigation. Still further, neither the settlement agreement nor the judgment of dismissal in the rebate fund case fairly suggest that the parties or the court intended to foreclose the Commission from pursuing this case or non-rebate related relief. Finally, and perhaps most importantly, the proof for the rebate fund claim and this claim are very different.

## II. LAW

Initially, I state my views on liability. After that, I state my opinion on the proper remedy.

### A. Liability

In this section, I discuss what legal precepts govern the question of liability. In particular, I discuss the meaning of Nebraska's good faith obligation. I also address separately the most important of Nebraska's legal arguments.

#### 1. The Genesis, Meaning, and Application of Good Faith

The Compact provides that each state has "the right to rely on the good faith performance of each other party state." Art. III(f). The state selected to host a disposal facility is required "to process all applications for permits and licenses required for the development and operation of any regional facility or facilities within a reasonable period from the time that a completed application is submitted." Art. V(e)(2).

Under the Compact, the Commission is directed to "require all party states ... to perform their duties and obligations arising under this compact ...." Art. IV(m)(8). Pursuant to that mandate, the Commission contends that Nebraska breached its "good faith" obligation under Art. III(f) when processing the license pursuant to Art. V(e)(2). Given the foregoing, I must ascertain the meaning of "good faith" in order to decide whether the Commission has proven its case.

A Compact between states is "after all, a contract.... It remains a legal document that must be construed and applied in accordance with its terms." *Texas v. New Mexico*, 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987) (internal quotations and citations omitted). This being true, it is appropriate to apply the ordinary contract understanding of "good faith." In doing so, I rely upon the *Restatement (Second) of Contracts* (1981) ("Restatement") because it represents a universally accepted standard for the interpretation of contracts and also because it expresses an interpretative principle which is consistent with the words, structure, and purpose [43] of the Compact.[44]

Section 205 provides that: "Every contract imposes upon each party a duty of

---

43. "The provisions of this compact shall be liberally construed to give effect to the purpose thereof." Art. IX.

44. Since a Compact is also a federal law, Nebraska law is not controlling. *Entergy,*

*Ark., Inc. v. Nebraska,* 210 F.3d 887, 897 (8th Cir.2000) ("The Compact is federal law because it is a congressionally sanctioned agreement within the meaning of the Compact Clause.") (citations omitted).

good faith and fair dealing in its performance and its enforcement." *Restatement* § 205. Insofar as pertinent here, the *Restatement* defines "good faith" in this way:

Good faith is defined in Uniform Commercial Code § 1–201(19) as "honesty in fact in the conduct or transaction concerned." ... Good faith performance ... of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving "bad faith" because they violate community standards of decency, fairness or reasonableness.

*Id.* at cmt. a.

The *Restatement* also provides examples of "bad faith." In that regard, it describes the following as improper:

Subterfuges and evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified. But the obligation goes further: bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. A complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

*Id.* at cmt. d.

■ With this understanding of "good faith" and "bad faith" articulated, it is possible to assess Nebraska's behavior. I previously set forth the evidence that I found particularly indicative of "bad faith."

(*Supra* Part I.E.1–11) I now conclude as a matter of law that Nebraska breached its "good faith" obligation under Art. III(f) when processing the license pursuant to Art. V(e)(2).

Specifically, I conclude that Nebraska breached its duty of good faith because (1) Governor Nelson, either directly or through his subordinates, influenced the process in order to fulfill a campaign promise which required that the license be denied without regard to the technical merits; (2) Governor Nelson's administration did not work diligently to ensure that the application was considered fairly and reasonably; and (3) DEQ and DOH did not act fairly or reasonably.[45] The record is littered with "inaction," "subterfuges," "evasions of the spirit of the bargain," "lack of diligence and slacking off," "willful rendering of imperfect performance," and "interference with or failure to cooperate in the other party's performance." Frankly, I cannot conceive of a stronger case of bad faith in the performance of a contract.

Having come to this unpleasant conclusion, it is appropriate to add two ending remarks. First, I am firmly convinced that then Governor Nelson believed his conduct to be justified, and that he honestly thought he was acting in the best interests of his constituents. The evidence shows that from the beginning of the process, Nelson thought the Commission's method of selecting a site was terribly flawed, and that Nebraskans had been deprived of their right to community consent. Second, and this point cannot be overemphasized, subjective beliefs that one's conduct is justified do not diminish the obligation imposed under the Compact to exercise objective good faith. *Restatement* § 205 at cmt. d ("Subterfuges and

---

**45.** Any one of these three conclusions is enough to justify a decision in favor of the Commission. That is, I would reach the same decision, and award the same relief, even if only one, but any one, of these three conclusions were true.

evasions violate the obligation of good faith in performance even though the actor believes his conduct to be justified.").

Simply put, even if one thinks his predecessor entered into a bad bargain, one must nevertheless perform his responsibilities in good faith. Unfortunately, that did not happen here.

### 2. Nebraska's Legal Arguments Lack Merit

In defense to liability, Nebraska asserts various legal arguments. I find that all of them lack merit.

Relying on what has become known as the *Noerr–Pennington* doctrine, Nebraska asserts that the five [46] lawsuits it filed against the Commission and USE between 1993 and 1997 were governmental petitioning activities protected by the First Amendment, and thus cannot serve as a basis for liability against the State. I reject this argument because the doctrine does not apply and, even if it did, the sham exception to the doctrine precludes Nebraska from relying upon it.

■■■ In essence, the *Noerr–Pennington* doctrine immunizes from federal antitrust liability activities that attempt to influence executive, legislative, administrative, or judicial action or proceedings to eliminate competition unless such activities fall within the "sham" exception to the doctrine. *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). The "sham" exception applies to "situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticom-

petitive weapon." *City of Columbia v. Omni Outdoor Adver. Inc.*, 499 U.S. 365, 380, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991) (emphasis in original). A "classic example" of the sham exception

> is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay. A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all.

*Id.* (internal citations and quotation marks omitted).

■■■ While it is true the *Noerr–Pennington* doctrine has been applied outside the antitrust context to cases dealing with tortious interference with business, alleged conspiracies to influence government action under 42 U.S.C. §§ 1983 and 1985, unfair labor practices, and to defendants who were government officials acting in their official capacities, the parties have not cited, nor has the court found, any case applying the doctrine in the context of a claim similar to that asserted here—that a party state has breached its duties under an interstate compact. *South Dakota v. Kansas City S. Indus., Inc.*, 880 F.2d 40, 50 n. 24 (8th Cir.1989) (noting other contexts in which *Noerr–Pennington* doctrine has been applied); *Hufsmith v. Weaver*, 817 F.2d 455, 458–59 (8th Cir.1987) (same); *In re IBP Confidential Bus. Documents Litig.*, 755 F.2d 1300, 1311–13 (8th Cir. 1985) (same); *Fischer Sand & Aggregate Co. v. City of Lakeville*, 874 F.Supp. 957, 959 (D.Minn.1994) ("The fact that Defendants are government officials and acted in their official capacity does not deprive them of the protection of the *Noerr–Pennington* doctrine.").

---

**46.** I have not based Nebraska's liability in this case on the rebate fund litigation. That was the sixth case that Nebraska filed against the Commission.

Without precedent for doing so, I think it unwise to extend the doctrine to disputes between entities whose duties are defined by an interstate compact approved by the Congress pursuant to a specific provision of the Constitution. Neither First Amendment principles nor concepts of federalism which underlie application of the *Noerr–Pennington* doctrine in other circumstances involving state actors would be furthered by allowing the doctrine to be invoked as a defense to a state's alleged breach of an interstate compact. On the contrary, the *Noerr–Pennington* doctrine could well be used by recalcitrant states to flaunt their compact obligations without serving any other useful goal.

■ Further, even if the *Noerr–Pennington* doctrine is applicable to this case, I find that Nebraska's initiation of a string of lawsuits against the Commission and USE fall within the "sham" exception to the doctrine. As described previously in this opinion, a review of the litigation filed by Nebraska establishes that the lawsuits were objectively baseless, particularly when they are viewed in their entirety. Nebraska lost five of the six lawsuits it filed against the Commission and USE, and settled the sixth. The first of those cases was dismissed because it was filed more than two years too late, and the next one was dismissed on res judicata grounds. The second case dismissed on res judicata grounds was so closely related to the first lawsuit Nebraska had filed that sanctions were warranted. Further, and most importantly, the evidence establishes that these baseless lawsuits were in fact intended to interfere with the license review process through repeated abuse of the judicial process, not the outcome of that process. As stated in Kate Allen's notes, Governor Nelson had a "plan" to keep site

proponents "off balance" by using litigation. Because such activity was "not genuinely aimed at procuring favorable government action at all," *City of Columbia*, 499 U.S. at 380, 111 S.Ct. 1344, Nebraska may not claim *Noerr–Pennington* immunity from liability in this case even if Nebraska might generally avail itself of that defense in other circumstances.

■ Based on the defense of res judicata, Nebraska argues that the settlement of, and this court's judgment of dismissal with prejudice in, the rebate fund litigation precludes the Commission's "good faith" claim in this case. As I have indicated previously (*supra* Part I.F), the Commission's good faith claim in this case is substantially different from, and could not have been discovered until after, the "good faith" counter-claim asserted in the rebate fund litigation. That is, the "good faith" claim in the 1996 rebate fund case related to how Nebraska handled the rebate funds, while the "good faith" claim here relates to the processing of the license.[47]

The facts necessary to prove the claim in this suit are far different from the facts necessary to prove the claim asserted in the earlier litigation. Therefore, the defense of res judicata or claim preclusion cannot bar the Commission from seeking relief related to how Nebraska processed the license. *See, e.g., County of Boyd v. U.S. Ecology, Inc.*, 48 F.3d 359, 361 (8th Cir.1995) (stating the test this way: "If the facts needed to prove the later case are the same as those needed to prove the earlier case, claim preclusion applies.") (citing *Murphy v. Jones*, 877 F.2d 682, 685 (8th Cir.1989)).

■ Regarding the assertion that the Commission's suit is barred by the

---

**47.** To be clear, I have not found Nebraska liable based upon any facts related to its use (or misuse) of the rebate funds. In particular,

I have not held Nebraska responsible because of the "slow down" to the extent that activity was related to the rebate fund controversy.

statute of limitations, that argument is not persuasive for at least two reasons. Although it is a federal law, because the Compact does not contain a statute of limitations applicable to actions for breach of the good faith obligation, the district court must "look to [state] law for the most analogous statute of limitations, but ... the characterization of plaintiff's claim for statute of limitations purposes is a question of federal law." *Johnson v. State Mut. Life Assur. Co. of Am.*, 942 F.2d 1260, 1262 (8th Cir.1991) (en banc). As noted earlier, this action is most similar to a contract action between private parties. Thus, I conclude that the most analogous statute of limitations under Nebraska law is the five-year statute of limitations for actions on written contracts. *See* Neb. Rev.Stat. Ann. § 25–205 (Cum.Supp.2001).

■ Even when a judge applies a state statute of limitations to a federal claim, the "[c]ourt looks to federal common law to determine the time at which a plaintiff's federal claim accrues." *Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 330 (8th Cir.1998) (determining the accrual date under Nebraska's statute of limitations pertaining to written contracts in the context of claim for benefits under a pension plan). Thus, the question of when the Commission's action accrued is a federal, and not a state law, question.

■ The facts relevant to accrual are these: (1) the Commission's good faith claim of breach related to how Nebraska processed the license application; (2) Nebraska's contractual obligation of good faith was continuous from the start of the process until the end of it; (3) the evidence shows that there was a continuous breach of the duty of good faith throughout the eight years of the Nelson administration, culminating with the final decision itself; (4) the licensing activity was not complete until Nebraska made the decision in December of 1998; and (5) this suit was commenced in December, 1998 and the Commission was realigned as a plaintiff in early 1999.

■ As the Eighth Circuit said long ago regarding when a breach of contract cause of action accrues, "common sense indicates that there is no accrual until all facts exist so that the plaintiff can allege a complete cause of action." *Butler v. Local Union 823, Int'l Bhd. of Teamsters*, 514 F.2d 442, 450 (8th Cir.1975) (determining when breach of contract regarding a collective bargaining agreement accrued).[48] In this case, all of the facts essential to the Commission's claim of breach did not exist until the 1998 decision was rendered. The Commission's suit was on file only months later. Therefore, the fact that there may have been bad faith conduct as early as the first months of the Nelson administration does not result in this suit being barred by Nebraska's five-year statute of limitation.[49]

■ Moreover, since there is no question that the Commission has acted diligently throughout the entire licensing process, if any of Nebraska's statutes of limitation were to bar this action, or any part of it, such statutes would be unenforceable. Under the Compact, "[a]ll laws ... or parts thereof of any party state

---

48. The Supreme Court disapproved of *Butler* on other grounds having to do with punitive damages. *IBEW v. Foust*, 442 U.S. 42, 45 n. 6, 51–52, 99 S.Ct. 2121, 60 L.Ed.2d 698 (1979).

49. I would come to the same conclusion even if I applied the two-year statute of limitations for claims against the State of Nebraska. *See* Neb.Rev.Stat. Ann. § 25–218 (1995). Nevertheless, I do not believe that the two-year statute is either the most analogous or the most appropriate for application in this case. For statute of limitations purposes, the most appropriate analogy in a suit alleging a breach of an interstate compact is to a contract action between private parties.

which are inconsistent with this compact are hereby declared null and void for purposes of this compact." Art. VI(c). The assertion of a statute of limitations to bar the Commission's enforcement of the "good faith" obligation in the circumstances of this case would be entirely inconsistent with the Compact's insistence that Nebraska exercise good faith. This is particularly true where, as here, 19 boxes of very damaging evidence were hidden in the basement of a Nebraska employee who had worked to further Nebraska's bad faith conduct, and that evidence was not produced to the Commission until two years after this suit was filed.

 Nebraska's laches argument is similarly unpersuasive. The doctrine of laches is an equitable defense to be applied when one party is "guilty of unreasonable and inexcusable delay that has resulted in prejudice" to the other party. *Goodman v. McDonnell Douglas Corp.*, 606 F.2d 800, 804 (8th Cir.1979). Nebraska has neither proven "unreasonable and inexcusable delay" on the part of the Commission nor "prejudice" on its part.

 Nebraska also argues that the Commission's suit is barred by concepts of estoppel.[50] The estoppel argument is premised on the fact that in 1993 USE amended its application to reduce the size of the site to 110 acres with the Commission's approval after USE had first filed a contested case. Since USE thereafter dismissed its contested case, Nebraska argues that the Commission is estopped from arguing that the 1993 intent to deny was done in bad faith.

 As applied to a party other than the United States, the doctrine of equitable estoppel has three elements. *See, e.g.,*

*Bostwick Irr. Dist. v. United States*, 900 F.2d 1285, 1291 (8th Cir.1990) (in irrigation districts' suit to enjoin government from charging districts for expenses incurred by Army Corps of Engineers, court found no basis for estopping the government from asserting its claim to recover the Corps' costs since districts failed to establish the "ordinary requirements of estoppel"). First, the party against whom the estoppel is asserted "must make a misrepresentation or take an action with reason to believe that the other party will rely upon it." *Id.* at 1291. Second, the party claiming the benefit of the estoppel "must not have access to the truth." *Id.* Third, the party claiming the benefit of the estoppel "must rely upon the first party's action to its detriment." *Id.* Nebraska has failed to prove any of these three elements.

Nebraska also argues that the Commission lacks "standing" to bring this action. This argument appears premised on two theories, and they are: (1) the obligation of good faith runs in favor of the party states and not the Commission, and (2) the Commission in reality sues to recover monies belonging to the generators and not for itself.

 As to the first theory, that the good faith obligation runs in favor of the states and not the Commission, the Eighth Circuit Court of Appeals previously rejected a similar argument. *Entergy Ark., Inc., v. Nebraska*, 241 F.3d 979, 987 (8th Cir.2001) (rejecting the argument that "the Commission is not a party to the Compact and so it may only seek future performance, not damages or an accounting for past breaches."). Following the reasoning of the Court of Appeals that the Compact delegated to the Commission the enforcement responsibility of the obligations im-

---

**50.** Nebraska also makes a closely related waiver argument. Among other reasons, I reject the waiver argument for many of the

same reasons as I reject the laches and estoppel arguments.

posed upon member states, I reject Nebraska's new variation of its old argument.

 As to the second theory that the Commission is but a stalking horse for the power companies, the funding agreements between the generators and the Commission do not support that claim. (Exs. 14, 15, 16 (amendments 1–7).) On the contrary, there is no evidence that the generators have the power to control the disposition of the proceeds of a money judgment in the hands of the Commission.[51] Still further, under the Compact, the Commission has obligations to the member states and otherwise which are far more expansive than any contractual obligations they may have to the generators. Finally, the Commission has been in full control of this litigation as evidenced by the fact that it has separate and independent counsel and it has taken positions contrary to Entergy & Wolf Creek. In fact, Entergy & Wolf Creek sued the Commission for not taking action against Nebraska more quickly.

While the generators may well be interested in whether the Commission is successful, the Commission is the real party in interest and has standing to sue. *Kansas v. Colorado*, 533 U.S. 1, 8, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001) (even though Kansas predicated its damage claims upon injuries to individual farmers and even though Kansas might use the damage award to compensate those farmers, it was the real party in interest under a suit for breach of an interstate compact since it had control over any damage award and it controlled its own litigation).

 Nebraska next argues that the Commission's sole remedy for breach of the good faith obligation is to revoke Nebraska's membership in the Compact. *See* Art. V(g). In a related case, the Eighth Circuit Court of Appeals rejected a very similar argument, and so do I. *Nebraska v. Central Interstate Low–Level Radioactive Waste Compact* [52] *Com'n*, 187 F.3d 982, 986 (8th Cir.1999) (the remedy of revoking Nebraska's membership in the Compact was not an exclusive remedy and the Commission could set a deadline for completion of the license; stating that "the Compact's language clearly makes revocation optional.").

 Lastly, Nebraska argues that the Commission has failed to exhaust administrative remedies. I reject this argument for two reasons. First, there is no such requirement under the Compact (or any other law of which I am familiar). Second, if Nebraska means that the Commission must pursue the pending "contested case," my preliminary injunction opinion clearly set forth why that option is perfectly useless. Therefore, the failure to exhaust administrative remedies is no defense.

### B. The Proper Remedy

Next, I discuss the legal doctrines that govern the proper remedy. First, I examine the question of monetary relief. After that, I discuss the question of equitable relief.

Candidly, selection of the proper remedy was the most challenging aspect of this

---

**51.** In fact, in the opinion I issue today denying the claims of Entergy & Wolf Creek against the Commission, I refuse to impose a trust on any recovery the Commission may make in this case. At this point, the Commission is free to do whatever it thinks best subject to the Compact and whatever contractual obligations it may have with others.

**52.** The docket sheet and selected filings for this case comprise Exhibit 1543. The word "Compact" is not a part of the Commission's name as it appears on the docket sheet and rulings of this court. It does appear in the case name of the opinion of the Court of Appeals for the Eighth Circuit, cited here. I have followed the naming convention of the court of appeals, as its opinion is the only published opinion.

case. I began selection of the remedy by rejecting Nebraska's argument that the only remedy I may impose if I find liability is to require the parties to pursue the contested case proceeding. That remedy is no remedy at all. I conclude that, aside from a declaration that Nebraska acted in bad faith, only monetary damages as contrasted with affirmative equitable relief should be awarded.

### 1. Money

It requires no citation of authority to recognize that the entry of a monetary judgment against an otherwise sovereign State by a single unelected federal district judge is an extraordinary act. Nonetheless, the law of this case, which I firmly believe to be correct, is that Nebraska does not have immunity under the Constitution against damages for its wrongful conduct and that this court has the responsibility to remedy any such violation. *Entergy*, 241 F.3d at 987–88 ("Nebraska argues that the Commission ... may only seek future performance, not damages or an accounting for past breaches.... By entering into a compact in which the party states delegated to the Commission their authority to sue for breach and required the Commission to enforce contractual obligations, Nebraska waived its Eleventh Amendment immunity from suit by the Commission in federal court."). Monetary damages have been awarded in other cases involving compacts approved by Congress and breached by one of the party states. *See, e.g., Kansas v. Colorado*, 533 U.S. 1, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001) (damages awarded to Kansas for Colorado's violations of Arkansas River Compact). Thus, insofar as the Constitution is concerned, I conclude that monetary damages may appropriately be awarded here.

Moreover, the Compact authorizes the Commission to "initiate *any* proceedings ... before *any* court of law ... relating to the terms of the provisions of this com-

pact." Art. IV(e) (emphasis added). The Compact also directs the Commission, in mandatory language, to "require all party states ... to perform their duties and obligations arising under this compact by an appropriate action" in this court. Art. IV(m)(8).

Therefore, I read the Compact to allow the Commission to seek, and I read the Compact to permit this court to award, relief against Nebraska in the form of monetary damages or otherwise. As I later discuss, Nebraska has made it impossible to award meaningful active equitable relief insofar as licensing is concerned. If a monetary damage award were not possible, Nebraska would escape its full Compact obligations. Such an absurd result is clearly not contemplated by the words, structure, or purpose of the Compact.

In summary, I have carefully considered and balanced the legal and equitable remedies available to me. As a result, I have concluded that a money judgment against Nebraska for approximately $151 million is required.

### (a) The Measure of Damages

When a compact is breached, the question of how to figure damages is frequently difficult, but that difficulty has not impeded the Supreme Court in providing a party injured as a result of a breach with relief in the form of damages. *See, e.g., Kansas v. Colorado*, 533 U.S. at 16–17, 121 S.Ct. 2023 (determining damages for the failure to supply water in part "by estimating the amount of farmland affected by Colorado's violations, the crops planted on that farmland, the price of those crops, and the difference in yield between what the affected land would have produced with the additional water and what the land actually produced with the water it received"). With that overarching principle in mind, I next ascertain the proper measure of damages to be used in this case.

Judicial remedies serve to protect one or more of the following interests of a contracting party:

(a) his "expectation interest," which is his interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed,

(b) his "reliance interest," which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made, or

(c) his "restitution interest," which is his interest in having restored to him any benefit that he has conferred on the other party.

*Restatement (Second) of Contracts ("Restatement")* § 344 (1981).

Before attempting to discern the value of these "interests" in this case, two points should be made. First, these interests "are not inflexible limits on relief." *Id.* cmt. a. That is, "in situations in which a court grants such relief as justice requires, the relief may not correspond precisely to any of these interests." *Id.* Second, damages need not be proven with the accuracy of a calculator:

Courts have traditionally required greater certainty in the proof of damages for breach of a contract than in the proof of damages for a tort. The requirement does not mean, however, that the injured party is barred from recovery unless he establishes the total amount of his loss. It merely excludes those elements of loss that cannot be proved with reasonable certainty. . . .

Doubts are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. A court may take

into account all the circumstances of the breach, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts. Damages need not be calculable with mathematical accuracy and are often at best approximate.

*Restatement* § 352 cmt. a.

■ Although the Commission paid Nebraska something over $25 million, the Commission, quite understandably, does not appear to rely upon the "restitution interest" measure of damages. If one variant of that measure were applied, it would grossly understate the real damages suffered by the Commission since that measure is sometimes limited to only those amounts paid to the party in breach. Because the "restitution interest" measure of damages is inadequate to provide complete relief, I do not rely on it.

In essence, the Commission has asked me to enforce its "expectation" or "reliance" interests by ordering that the licensing process proceed under judicial supervision and by awarding damages for the amount of money expended or lost by the Commission after the Nelson administration took office. Alternatively, the Commission has requested damages, starting from the beginning of the licensing process until its conclusion, equal to: (1) the payments that the Commission made to Nebraska or to USE in direct pursuit of the licensing efforts, in the principal sum of $88,554,291.77; (2) the capital or "sweat equity" that USE had contributed to the Commission and which became worthless, in the principal sum of $6,247,920.07; and (3) the community improvement funds that the Commission paid to certain Nebraska villages and the like, in the principal sum of $3,000,000. I find that it is appropriate to grant this alternative request for relief.

Under either the "expectation interest" measure of damages or the "reliance interest" standard, the Commission is entitled to the alternative amount of damages it seeks. That is, the Commission has presented exacting evidence that its "out-of-pocket" loss is $97,802,211.84, exclusive of interest.

### (i) Expectation Interest

■ The injured party has a right to damages based on his expectation interest as measured by:

(a) the loss in the value to him of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that he has avoided by not having to perform.

*Restatement* § 347.

The "loss in value" to the Commission of Nebraska's promised performance under the Compact is unknown and incapable of measurement to any reasonable degree of certainty. That is, the very significant value to the Commission of Nebraska's "good faith" performance regarding the licensing effort is incapable of measurement in money.

This does not mean, however, that monetary relief cannot be awarded under this theory. This "merely excludes those elements of loss that cannot be proved with reasonable certainty." *Restatement* § 352 cmt. a.

Under the "expectation theory," the Commission is also entitled to "any other loss, including incidental or consequential loss," caused by the breach. In this regard, "the injured party is entitled to recover for all loss actually suffered." *Restatement* § 347 cmt. c. The "terms used to describe the type of loss are not, however, controlling, *and the general principle is that all losses, however described, are recoverable.*" *Id.* (emphasis added). As a result, each of the three categories of "other loss" proven by the Commission-the amounts it paid to pursue the license, the loss of the value of the "sweat equity" contribution, and the community improvement funds paid to Nebraska political subdivisions-are recoverable.[53]

The Commission fully performed its side of the bargain. Hence, the Commission has not avoided any costs or loss. *See Restatement* § 347(c) (pertaining to deductions from damages for cost or loss avoided). Thus, there is nothing to subtract from the Commission's damages.

In summary, under the "expectation interest" measure of damages, the Commission is entitled to $97,802,211.84, exclusive of interest.

### (ii) Reliance Interest

As an alternative measure, "the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." *Restatement* § 349. The alternative "reliance" remedy has been explained as one which attempts to place the injured party

---

**53.** The Commission acted diligently to protect itself. Therefore, section 350 does not come into play. *Restatement* § 350 (regarding avoidability of damages). All of the damages sought by the Commission were foreseeable to Nebraska. Therefore, Section 351 does not prohibit an award. *Restatement* § 351 (regarding foreseeability). The amounts awarded to the Commission are supported by evidence which permits them to be established with reasonable certainty. Therefore, Section 352 does not bar recovery. *Restatement* § 352 (regarding reasonable certainty).

in the same situation as if the contract had not been entered into:

> The underlying principle in reliance damages is that a party who relies on another party's promise made binding through contract is entitled to damages for any losses actually sustained as a result of the breach of that promise. *See Restatement (Second) of Contracts* § 344(b) ("[Judicial remedies serve to protect the promisee's] reliance interest, which is his interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made."); 3 Dan B. Dobbs, *Law of Remedies* § 12.3(1) (2d ed. 1993) ("The reliance recovery is a reimbursement for losses the plaintiff suffers in reliance on the defendant's contractual promise."). As a general proposition, these damages are available for injuries resulting from activities that occurred either before or after the breach.[54] *See* Calamari & Perillo, *The Law of Contracts,* § 14.9 ("[A] party may recover expenses of preparation of part performance, as well as other foreseeable expenses incurred in reliance upon the contract."); *Restatement (Second) Contracts* § 350 cmt. g, illus. 18; *cf. Restatement (Second) Contracts* § 349 ("As an alternative to the measure of damages stated in § 347, the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance . . . .").

*Glendale Federal Bank, FSB v. United States,* 239 F.3d 1374, 1382–83 (Fed.Cir. 2001) (savings and loan prevailed on a claim against the United States contending that enactment of a federal law breached a contract to treat supervisory goodwill, cre-ated as a result of its acquisition of a failed thrift, as regulatory capital; the savings and loan was entitled to reliance damages for pre-breach or post-breach activities, including such things as "lost historic cost of funds advantage over its competitors" valued at $335,400,000).

 The amounts the Commission paid to Nebraska, to Nebraska's political subdivisions, and to USE (including its consultants) are obviously recoverable as "expenditures made in preparation for performance or in performance." *Restatement* § 349. That leaves the "sweat equity" component.

 While less obvious, the loss of the "sweat equity" is recoverable as a part of reliance damages. Keep in mind that the purpose of this alternative remedy is to reimburse the injured party *"for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made." Restatement* § 344(b) (emphasis added). Thus, reliance "loss" is not solely measured by "expenditures."

In this case, the Commission entered into its contract with USE relying upon the Compact's assurance that all the member states, including Nebraska, would act in good faith. As a part of that contract with USE, the Commission was entitled to and did receive "sweat equity" from USE. When Nebraska breached its "good faith" obligation, that equity became worthless. Given the fact that the Commission was required under the Compact to seek a site somewhere,[55] had there never been a contract (Compact) with Nebraska, the Commission nevertheless would have had a contract with USE and the Commission would have enjoyed the resultant equity

---

**54.** This point-that damages are recoverable for pre-breach and post-breach loss under the reliance theory-is especially relevant here.

**55.** Art. V.

undiminished by Nebraska's bad faith. As a result, the loss of the sweat equity is properly recoverable as a component of reliance damages.

█ Under the reliance theory, the party in breach may reduce the damages under limited circumstances. That is, the court should subtract "any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." *Restatement* § 349. This Nebraska has failed to do.

In summary, under the "reliance interest" measure of damages, the Commission is entitled to $97,802,211.84, exclusive of interest.

### (iii) Nebraska's Damage Causation Argument Lacks Merit

To the extent that Nebraska makes a causation argument regarding damages, I reject it. Nebraska seems to think that the Commission was obligated to prove that a license would have been granted. I reject this argument for three reasons.

█ First, Nebraska misunderstands the claim of breach and therefore Nebraska misunderstands the issue of loss causation. Nebraska has not been sued for failure to grant the license although the failure to grant the license is very important. In fact, the Commission does not claim that anyone had a right to a license under the Compact. On the other hand, the Commission does claim it had a right to "good faith" consideration and processing of a license application. That is, Nebraska's good faith obligation was never conditioned upon whether it would grant a license. On the contrary, Nebraska had an unconditional obligation to process the license application in "good faith" whether it ultimately granted or denied it, and the Commission was entitled to receive that performance whether the license was granted or denied. That right had great,

although difficult to measure, value. Therefore, whether a license would or would not have been issued is irrelevant to the Commission's damage claim.

█ Second, even if the question of whether the license should have been issued is relevant to loss causation (and I conclude that it is not), Nebraska's behavior made it impossible to decide that question. Therefore, Nebraska cannot take advantage of the uncertainty it created by its wrongful conduct, and the Commission may prove its damages according to the applicable measures of damage. As Professor Corbin has stated,

> Where a contract right is conditional upon the happening of some uncertain event and the breach by the promisor makes it impossible to determine with reasonable certainty whether or not the event would have occurred if there had been no breach, the promisee can recover damages measured by the market value of the conditional right at the time of breach.

11 Arthur Linton Corbin, *Corbin on Contracts* § 1030, at 159 (1964) (reprinted without revision, 2002).

As I have previously indicated, the Commission has proven its damages with the requisite degree of certainty under two well-recognized damage measures. The law does not allow Nebraska to breach its contract, and thereby inject uncertainty into the equation in order to create a defense to damages.

█ Third, even if the question of whether the license should have been issued is relevant, Nebraska would have the burden of proof. *See, e.g., Restatement* § 349. As indicated earlier, Nebraska has failed to convince me that the license would have been denied had it acted in good faith.

### (b) Prejudgment Interest

 "A compact is a voluntary contract between states, and, if approved by Congress, it also becomes federal law." *Nebraska v. Central Interstate Low–Level Radioactive Waste Compact Com'n,* 187 F.3d 982, 985 (8th Cir.1999) (citing *Texas v. New Mexico,* 482 U.S. 124, 128, 107 S.Ct. 2279, 96 L.Ed.2d 105 (1987)). "The question of whether interest is to be allowed, and also the rate of computation, is a question of federal law where the cause of action arises from a federal statute." *Mansker v. TMG Life Ins. Co.,* 54 F.3d 1322, 1330 (8th Cir.1995) (ERISA); *Dependahl v. Falstaff Brewing Corp.,* 653 F.2d 1208, 1218 (8th Cir.1981) (ERISA). *See also, EFCO Corp. v. Symons Corp.,* 219 F.3d 734, 742–43 (8th Cir.2000) (Lanham Act).

 In this circuit, "[a]s a general rule, prejudgment interest is to be awarded when the amount of the underlying liability is reasonably capable of ascertainment and the relief granted would otherwise fall short of making the claimant whole because he or she has been denied the use of money which was legally due." *Stroh Container Co. v. Delphi Indus., Inc.,* 783 F.2d 743, 752 (8th Cir.1986) (confirmation of award under Federal Arbitration Act (FAA)) (citing *Short v. Central States, Southeast & Southwest Areas Pension Fund,* 729 F.2d 567, 576 (8th Cir.1984) (ERISA), *abrogated on other grounds in Baxter ex rel. Baxter v. Lynn,* 886 F.2d 182, 187 (8th Cir.1989); *Behlar v. Smith,* 719 F.2d 950, 954 (8th Cir.1983) (Title VII)). *Accord, Frazier v. Iowa Beef Processors, Inc.,* 200 F.3d 1190, 1194 (8th Cir. 2000) (state-law retaliatory discharge); *Val–U Constr. Co. v. Rosebud Sioux Tribe,* 146 F.3d 573, 582 (8th Cir.1998) (FAA) (restating general rule but finding exceptional or unusual circumstances and not awarding prejudgment interest); *Smith v. World Ins. Co.,* 38 F.3d 1456, 1467 (8th Cir.1994) (ADEA) ("Prejudgment interest is appropriate when the damage award does not otherwise make the plaintiff whole."); *United States v. American Comm'l Barge Line Co.,* 988 F.2d 860, 864 (8th Cir.1993) (admiralty) (prejudgment interest "is part of the damages suffered by the plaintiff"); *Manko v. United States,* 830 F.2d 831, 837 (8th Cir.1987) (Swine Flu Act) ("Prejudgment interest is normally taken to refer to an award imposed by law to compensate someone for the loss of use of money that he or she would have had but for the defendant's wrongdoing. The law imposes this additional burden on a defendant in order that compensation may be fully made. This remedial incident does not depend on contract . . . ."). "Prejudgment interest, like restitution, can be either legal or equitable in nature." *Kerr v. Charles F. Vatterott & Co.,* 184 F.3d 938, 946 (8th Cir.1999) (ERISA). *See also, Dependahl,* 653 F.2d at 1219 ("Both at law and equity, interest is allowed on money due.").

 "Awarding prejudgment interest is intended to serve at least two purposes: to compensate prevailing parties for the true costs of money damages incurred, and, where liability and the amount of damages are fairly certain, to promote settlement and deter attempts to benefit unfairly from the inherent delays of litigation." *Stroh,* 783 F.2d at 752 (citing *General Facilities, Inc. v. National Marine Serv., Inc.,* 664 F.2d 672, 674 (8th Cir. 1981) (maritime collision)). *Accord, Val–U Constr.,* 146 F.3d at 582; *Philipp v. ANR Freight System, Inc.,* 61 F.3d 669, 674 (8th Cir.1995) (ADEA) (prejudgment interest denied); *Mansker,* 54 F.3d at 1331; *EEOC v. Rath Packing Co.,* 787 F.2d 318, 333 (8th Cir.1986) (Title VII) (prejudgment interest denied). Although the Eighth Circuit has held that it is not an abuse of discretion to deny prejudgment

interest "where the issue of liability is highly challenged and the damages are quite large but virtually impossible to ascertain prior to trial," *Pioneer Hi–Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1246 (8th Cir.1994) (Lanham Act); *accord, EFCO*, 219 F.3d at 743, it has also held that prejudgment interest should be awarded even though liability is disputed if the amount of the liability is not in issue, *see, e.g., Mansker*, 54 F.3d at 1330–31; *Dependahl*, 653 F.2d at 1219.

▆▆▆▆▆ "Thus, prejudgment interest should ordinarily be granted unless exceptional or unusual circumstances exist making the award of interest inequitable." *Stroh*, 783 F.2d at 752 (citing *Ohio River Co. v. Peavey Co.*, 731 F.2d 547, 549 (8th Cir.1984) (admiralty)). *Accord, Frazier*, 200 F.3d at 1194; *Val–U Constr.*, 146 F.3d at 582; *Mansker*, 54 F.3d at 1331; *Lutheran Med. Ctr. v. Contractors, Laborers, Teamsters & Eng'rs Health & Welfare Plan*, 25 F.3d 616, 623 (8th Cir.1994) (ERISA), *abrogated on other grounds in Martin v. Arkansas Blue Cross and Blue Shield*, 299 F.3d 966, 972–73 (2002) (en banc). *See also, Cargill, Inc. v. Taylor Towing Serv., Inc.*, 642 F.2d 239, 242 & 242 n. 5 (8th Cir.1981) (maritime collision) ("A vital ingredient in the determination of whether to award prejudgment interest is a desire to make whole the party injured, but in appropriate circumstances compensatory principles must be tempered by an assessment of the equities.") (citing *Lodges 743 & 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*, 534 F.2d 422, 447 (2d Cir.1975)) (Labor–Management Relations Act); *Board of Comm'rs of Jackson Cty. v. United States*, 308 U.S. 343, 352, 60 S.Ct. 285, 84 L.Ed. 313 (1939) (prejudgment interest is denied when its exaction would be inequitable); and *Land O'Lakes Creameries, Inc. v. Commodity Credit Corp.*, 265 F.2d 163, 166 (8th Cir. 1959) (Agriculture Act) ("The rule as to allowance of interest is a flexible one, and generally will not be allowed where its imposition would result in an inequity."). Circumstances that make the award of interest inequitable "may include bad faith or dilatoriness by the claimant, or a claimant's assertion of frivolous claims." *Stroh*, 783 F.2d at 752 (citing *Cargill*, 642 F.2d at 242). However, "[t]he good or bad faith of the opposing party is not of dispositive significance . . . ." *Id.* (citing *Lodges 743 & 1746*, 534 F.2d at 447; *Hodgson v. American Can Co.*, 440 F.2d 916, 922 (8th Cir. 1971) (Fair Labor Standards Act)).

▆▆▆▆▆ "The award of prejudgment interest is generally entrusted to the district court's discretion." *EFCO*, 219 F.3d at 742 (citing *Mansker*, 54 F.3d at 1330). "[I]t is never automatic." *Thomas v. Bakery, Confectionery & Tobacco Workers Int'l Union, Local 433*, 982 F.2d 1215, 1220 (8th Cir.1992) (Labor–Management Relations Act). "As always, however, the word 'discretion' does not mean that the Court may simply do whatever it wishes. 'Discretion' refers to an exercise of informed judgment in accordance with appropriate criteria, but with a zone of choice within which the trial court's decision will not be disturbed." *United States v. American Comm'l Barge Line Co.*, 988 F.2d at 863.

The "zone of choice" bounding my discretion in the present case is largely defined by the United States Supreme Court's decision in *Kansas v. Colorado*, 533 U.S. 1, 121 S.Ct. 2023, 150 L.Ed.2d 72 (2001). That case was an original action brought in 1985 to resolve disputes arising under the Arkansas River Compact, as approved by Congress in 1949. A special master found that increases in groundwater well pumping in Colorado had materially depleted the river's waters in violation of the compact, and he recommended that damages be awarded to Kansas for losses since 1950. He also recommended that the damage award include prejudgment

interest beginning in 1969, when Colorado knew, or should have known, that it was violating the compact.

In overruling an exception by Colorado to the special master's recommendation that prejudgment interest be awarded, the Supreme Court dispelled any notion that the unliquidated nature of the claim precluded such an award under federal law. It stated:

> This common-law distinction [between liquidated and unliquidated claims] has long since lost its hold on the legal imagination. Beginning in the early part of the last century, numerous courts and commentators have rejected the distinction for failing to acknowledge the compensatory nature of interest awards. This Court allied itself with the evolving consensus in 1933, when we expressed the opinion that the distinction between cases of liquidated and unliquidated damages "is not a sound one." *Funkhouser v. J.B. Preston Co.*, 290 U.S. 163, 168, 54 S.Ct. 134, 78 L.Ed. 243 (1933). The analysis supporting that conclusion gave no doubt as to our reasoning: "Whether the case is of the one class or the other, the injured party has suffered a loss which may be regarded as not fully compensated if he is confined to the amount found to be recoverable as of the time of breach and nothing is added for the delay in obtaining the award of damages." *Ibid.* Our cases since 1933 have consistently acknowledged that a monetary award does not fully compensate for an injury unless it includes an inter-

est component. *See, e.g., Milwaukee v. Cement Div., National Gypsum Co.*, 515 U.S. 189, 195, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995) ("The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss"); *West Virginia v. United States*, 479 U.S. 305, 310–311, n. 2, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987); *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655, n. 10, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983).

*Id.* at 10–11, 121 S.Ct. 2023 (footnote omitted).[56]

The Court noted that the special master, in concluding that the unliquidated nature of the claim did not bar an award of prejudgment interest, "was fully cognizant of both the displaced common-law rule and the subsequent doctrinal evolution. In addition, he gave careful consideration to equitable considerations that might mitigate against an award of interest, concluding that 'considerations of fairness,' *Board of Comm'rs of Jackson Cty. v. United States*, 308 U.S. 343, 352, 60 S.Ct. 285, 84 L.Ed. 313 (1939), supported the award of at least some prejudgment interest in this case." *Kansas v. Colorado*, 533 U.S. at 11, 121 S.Ct. 2023. The Court found "no fault in the Special Master's analysis of either our prior cases or the equities of this matter." *Id.*

Kansas, in taking exception to the special master's recommendation that the prejudgment interest begin to accrue in 1969 rather than 1950, argued that the Supreme

---

**56.** Justice O'Connor, joined by Justices Scalia and Thomas, dissented from this portion of the Court's opinion and disagreed that the common-law distinction had been abrogated by the time the compact was entered into in 1949. Justice O'Connor also noted that it had not been suggested by the Court until 1987, in *Texas v. New Mexico*, that monetary damages could be recovered from a State as a remedy for its violation of an interstate compact for

the delivery of water. The majority rejected this reasoning because under it "States who entered into interstate compacts before 1987 ... would retain a perpetual incentive to breach their contractual obligations and reap the benefits of such a breach with the full knowledge that the courts lack the authority to order a fully compensatory remedy." *Id.*, 533 U.S. at 11 n. 4, 121 S.Ct. 2023.

Court's opinions subsequent to *Jackson County* had effectively foreclosed the equities-balancing approach that the special master adopted. The Court found some merit to Kansas' argument, noting that *National Gypsum*, 515 U.S. at 193, 115 S.Ct. 2091 affirmed a court of appeals' decision that read the Supreme Court's cases as "disapproving of a 'balancing of the equities' as a method of deciding whether to allow prejudgment interest." *Kansas v. Colorado*, 533 U.S. at 13, 121 S.Ct. 2023. However, the Court determined that under the circumstances the special master had "acted properly ... in only awarding as much prejudgment interest as was required by a balancing of the equities." *Id.* The Court explained:

> [D]espite the clear direction indicated by some of our earlier opinions, we cannot say that by 1949 our caselaw had developed sufficiently to put Colorado on notice that, upon a violation of the Compact, we would automatically award prejudgment interest from the time of injury. Given the state of the law at that time, Colorado may well have believed that we would balance the equities in order to achieve a just and equitable remedy, rather than automatically imposing prejudgment interest in order to achieve full compensation.... While we are confident that, when it signed the Compact, Colorado was on notice that it might be subject to prejudgment interest if such interest was necessary to fashion an equitable remedy, we are unable to conclude with sufficient certainty that Colorado was on notice that such interest would be imposed as a matter of course.

*Id.* at 13–14, 121 S.Ct. 2023 (citations omitted). Upon examining the equities for itself, the Supreme Court ultimately agreed with Colorado's counter-argument that interest should not begin to accrue until the filing of the complaint in 1985, "[g]iven the uncertainty over the scope of damages that prevailed during the period between 1968 and 1985 and the fact that it was uniquely within Kansas' power to begin the process by which those damages would be quantified." *Id.* at 16, 121 S.Ct. 2023.[57]

I turn next to analysis of the cases cited by the Court in *Kansas v. Colorado*. Those cases, *Milwaukee v. Cement Div., Nat'l Gypsum Co.*, 515 U.S. 189, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995); *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983); and *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), indicate that I should award prejudgment interest in this case.

*National Gypsum* was an admiralty case, and federal courts routinely have awarded prejudgment interest in admiralty cases. *Ohio River Co.*, 731 F.2d at 549 ("Prejudgment interest is awarded in admiralty suits in the discretion of the district court to ensure compensation of the injured party in full and should be granted unless there are exceptional or peculiar circumstances."); *see also, Federal Barge Lines, Inc. v. Republic Marine, Inc.*, 616 F.2d 372, 373 (8th Cir.1980) ("The rationale for an award of prejudgment interest in an admiralty case is restitution; such an award is for the purpose of fully compensating an injured party for its losses."). At issue in *National Gypsum* was whether an award of prejudgment interest could be

---

**57.** While Justices Stevens, Souter, Ginsberg, and Breyer agreed with the special master's position that interest should begin to accrue in 1969, Chief Justice Rehnquist and Justice Kennedy were of the opinion that interest should run from the date of the filing of the complaint; in order to produce a majority for a judgment, the 1985 date was settled upon. *Id.* at 15 n. 5, 121 S.Ct. 2023.

denied where the plaintiff's loss was primarily attributable to its own negligence and there was a genuine dispute over the defendant's liability. The Supreme Court held that neither of these factors justified the district court's departure from the general rule of awarding prejudgment interest. It analogized the defendant's "good-faith" argument to "the venerable common-law rule that prejudgment interest is not awarded on unliquidated claims" and observed that "the liquidated/unliquidated distinction has faced trenchant criticism for a number of years." *National Gypsum*, 515 U.S. at 197, 115 S.Ct. 2091. The magnitude of the plaintiff's fault was rejected as an exceptional circumstance because damages had been assessed by applying a comparative fault rule. The Court reiterated, however, that an award of prejudgment interest in admiralty cases "has never been automatic," and that "[w]hether it ought or ought not to be allowed depends upon the circumstances of each case, and rests very much in the discretion of the tribunal which has to pass upon the subject, whether it be a court or a jury." *Id.* at 196, 115 S.Ct. 2091. The Court declined to exhaustively catalog the circumstances that will justify a denial of prejudgment interest, but observed that "the most obvious example is the plaintiff's responsibility for 'undue delay in prosecuting the lawsuit.'" *Id.* (quoting *General Motors Corp. v. Devex Corp.*, 461 U.S. at 657, 103 S.Ct. 2058).

*Devex*, the second case cited in *Kansas v. Colorado*, was a patent infringement suit. Under the common law standard in such cases, prejudgment interest was generally awarded from the date on which damages were liquidated, and could be awarded from the date of infringement in the absence of liquidation only in exceptional circumstances, such as bad faith on the part of the infringer. *See Duplate Corp. v. Triplex Safety Glass Co.*, 298 U.S. 448, 459, 56 S.Ct. 792, 80 L.Ed. 1274 (1936). In 1946, however, Congress adopted amendments to the patent laws that included a provision for the award of interest. The issue presented in *Devex* was whether the 1946 amendment merely incorporated the *Duplate* standard, or was intended as a substantive change in the law. The Supreme Court interpreted the statute as providing that "prejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." *Devex*, 461 U.S. at 654, 103 S.Ct. 2058. In so holding, it noted that "[t]he traditional view, which treated prejudgment interest as a penalty awarded on the basis of the defendant's conduct, has long been criticized on the ground that prejudgment interest represents 'delay damages' and should be awarded as a component of full compensation." *Id.* at 655 n. 10, 103 S.Ct. 2058. The Court emphasized, however, that it did not construe the statute as requiring the award of prejudgment interest in all cases, but that "it may be appropriate to limit prejudgment interest, or perhaps even deny it altogether," under certain circumstances. *Id.* at 657, 103 S.Ct. 2058.

The final case cited by the Supreme Court in *Kansas v. Colorado* for the proposition that "a monetary award does not fully compensate for an injury unless it includes an interest component" is *West Virginia v. United States*, 479 U.S. 305, 107 S.Ct. 702, 93 L.Ed.2d 639 (1987), an action for reimbursement of costs incurred by the Army Corps of Engineers in preparing temporary housing sites for flood victims at the request of the State. The Court of Appeals held that under federal law, prejudgment interest was allowable as a matter of right in a breach-of-contract action where the amount due was liquidated, ascertained, or agreed to (rejecting the trial court's determination that whether prejudgment interest was owing depended upon a balancing of the equities).

The Supreme Court affirmed, noting that "[p]rejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Id.* at 310 n. 2, 107 S.Ct. 702. The Supreme Court likewise rejected the "balancing of equities" approach, but with the following qualification: "This is not to say that an equitable consideration such as laches cannot bar an otherwise valid claim for interest." *Id.* at 311 n. 3, 107 S.Ct. 702 (internal citation omitted).

■ The line of Supreme Court cases culminating in *Kansas v. Colorado* clearly supports an award of prejudgment interest here. The amount of Nebraska's liability for payments received from the Commission, for USE credits or "sweat equity," and for community improvement fund payments, is readily ascertainable, and it is apparent that the Commission will not be fully compensated for its losses unless the judgment includes an interest component. There are no exceptional or unusual circumstances-such as bad faith or delay by the Commission-which would make the award of interest on the full amount inequitable.[58] Thus, it remains only to decide what interest rate "will most accurately measure [the Commission's] losses." *See Kansas v. Colorado*, 533 U.S. at 13, 121 S.Ct. 2023.

■ Ascertainment of the appropriate prejudgment interest rate is a factual question, not a legal one. *See SCNO*

*Barge Lines, Inc. v. Sun Transp. Co., Inc.*, 775 F.2d 221, 226 (8th Cir.1985); *Ohio River Co.*, 731 F.2d at 550. In admiralty, at least, the Eighth Circuit has held that an appropriate rate is the prevailing rate of interest in effect during the applicable time period, *see id.*, and it has approved using the prime rate as a guide, *see General Facilities*, 664 F.2d at 674 (citing *Federal Barge Lines* ). *See also, Rath Packing*, 787 F.2d at 334 n. 14 (noting that prejudgment interest awards based on prime rates have been permitted by other courts in EEOC cases). The Commission, though, has not presented any evidence of the applicable prime rates.

■ Instead, the Commission has requested that prejudgment interest be awarded in accordance with the federal postjudgment rate, as established by 28 U.S.C. § 1961(a). This statute currently provides, in part, that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C.A. § 1961(a) (West Supp.2002).[59] The Eighth Circuit has approved of using the statutory rate for determining prejudgment interest in ERISA cases. *See Kerr*, 184 F.3d, at 946; *Mansker*, 54 F.3d, at 1331; *Dependahl*, 653 F.2d, at 1219 (applying the pre–1982 version of § 1961, which provided that "[s]uch interest shall be calculated from the date of entry of the judgment, at the

---

58. Although Nebraska acted in bad faith, prejudgment interest is not assessed against it as a penalty.

59. Prior to December 21, 2000, the statute provided that "[s]uch interest shall be calculated from the date of the entry of the judgment, at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction

price for the last auction of fifty-two week United States Treasury bills settled immediately prior to the date of the judgment." 28 U.S.C.A. § 1961(a) (West 1994). Although the statute provides that postjudgment interest shall be compounded annually, *see* 28 U.S.C. § 1961(b), the Commission requests only simple interest prior to judgment, which I find to be appropriate.

rate allowed by State law."). I conclude that it is also appropriate to resort to the statutory rate in this case as a conservative measure of the loss of use of the Commission's funds, and, accordingly, I will take judicial notice of this rate throughout the liability period, beginning in 1987.

In summary, with prejudgment interest, the Commission will be awarded damages in the sum of $151,408,240.37.

## 2. Equitable Relief

■ The Congress, the Commission, Arkansas, Kansas, Louisiana, and Oklahoma all had a reasonable expectation that Nebraska would act in good faith when it processed the license application, and they all relied upon that reasonable belief. Sadly, that expectation was dashed, and money cannot serve as a complete or adequate substitute for Nebraska's breach.

■ Unhappily, I am also convinced that equitable relief (beyond a declaration of bad faith) cannot be used to make the Commission whole. Rather than make things worse, I shall do nothing. No affirmative equitable relief is better than problematic equitable relief. *See, e.g., Lemon v. Kurtzman*, 411 U.S. 192, 200, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973) ("[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable"; "courts eschew rigid absolutes and look to practical realities and necessities inescapably involved in reconciling competing interests") (footnote omitted); *Restatement* § 366 ("A promise will not be specifically enforced if the character and magnitude of the performance would impose on the court burdens in enforcement or supervision that are disproportionate to the advantages to be gained from enforcement and to the harm to be suffered from its denial."). My reasons for this conclusion are set forth below.

The equitable relief sought by the Commission is relicensing under court supervision. The Commission seeks an independent body to conduct the relicensing. Should a license be issued, the Commission seeks court supervision over Nebraska's regulation of the license granted by the independent body. For two pragmatic reasons, I conclude that it is not appropriate to order relicensing under court supervision.

First, no competent entity exists that could appropriately be given the relicensing or regulatory responsibility. Both DOH and DEQ have demonstrated a consistent and long-standing lack of professionalism and independence. Many of the people who were involved in Nebraska's misbehavior are still at the agencies. Some of them would have responsibility over the LLRW program should relicensing be undertaken or a license be granted. I have no confidence that the staff of DOH or DEQ could be restored to an objective state of mind by a mere court order even should I impose the supervision of a special master. Still further, many of the key consultants-including the Collier, Shannon law firm and Dr. Marvin Carlson-have been put in the position of having to defend Nebraska in this litigation. To suggest that these consultants could fairly be expected to drop their defensive duties and resume the role of independent consultants is not realistic. Like water in a well laced with poison, the only alternative is to look elsewhere.

But where do I look? Nebraska is an "agreement state" (*e.g.*, Ex. 8083), meaning that the NRC has ceded its federal regulatory jurisdiction over low-level radioactive nuclear waste to Nebraska. *See* 42 U.S.C. § 2021(b) ("During the duration of such an agreement it is recognized that the State shall have authority to regulate the materials covered by the agreement for protection of the public health and safety from radiation hazards."). The

NRC is not before me as a party, and I cannot therefore order it to reassume the jurisdiction it delegated to Nebraska.

Given the fact that low-level radioactive nuclear waste licensing and regulation obviously requires special expertise, and given the fact that neither the NRC nor Nebraska can be counted on to do the relicensing or the regulation of a license should one be granted, this court would have to fashion a completely new and independent regulatory body to do the work. Such an exercise of power amounts to an executive or legislative undertaking far beyond the competence of this court. *See, e.g., Missouri v. Jenkins,* 515 U.S. 70, 132–33, 115 S.Ct. 2038, 132 L.Ed.2d 63 (1995) ("There simply are certain things that courts, in order to remain courts, cannot and should not do" and those activities include the exercise of "legislative or executive, rather than judicial, power.") (Justice Thomas, concurring).

Second, as it has a right to do under the Compact, Art. VII(d), Nebraska has withdrawn from the Compact, Neb.Rev.Stat. Ann. § 71–3522 (2001), and that withdrawal creates a fog of uncertainty about this court's ability to effectively enforce an equitable order during any necessary remedial period. As previously noted, Nebraska's withdrawal from the Compact appears to be effective in August of 2004.

Given the likelihood of an appeal and the need to give the licensing body a reasonable time to reconsider the application, it is doubtful that the relicensing effort could be completed until after Nebraska was no longer a member of the Compact. At that point, the Compact would arguably no longer govern Nebraska as to its future behavior, but this court would be exercising remedial powers over Nebraska pursuant to the Compact. Such a situation creates monumental legal uncertainties about a whole host of issues.

For example, once Nebraska were no longer a member of the Compact, the Compact's prohibition against Nebraska enacting inconsistent laws, Art. VI(b), arguably would not apply to Nebraska. After the effective date of the withdrawal, what would prohibit Nebraska from simply repealing all of its laws regarding low-level nuclear waste licensing? If it did that, what would be the effect of that repeal on a license granted pursuant to my remedial order? I do not know the answer to these questions, but those issues or a host of more difficult ones would surely arise. While such legal disputes could be resolved in court, that litigation, which I would have no power to stop, would in turn serve only to frustrate, delay, and possibly defeat the essential purpose of any remedial order I might enter.

Since I lack the power to stop Nebraska from exercising its right to withdraw under the Compact, Nebraska will at least be able to frustrate, if not defeat, any order that I might enter. Given that trump card, it would be unwise to allow Nebraska to play it.

In summary, Nebraska has made it impossible for the equitable remedy of relicensing to work. No proper court order can fix the problem. Therefore, I declare that Nebraska breached its "good faith" obligation under Art. III(f) of the Compact when processing the license application involved in this case pursuant to Art. V(e)(2). Aside from that equitable declaration, I will order no additional equitable relief.

### III. CONCLUSION

Nebraska breached its good faith obligation under the Compact. Nebraska must pay the Commission $151,408,240.37 for its violation of federal law. While that is not complete or adequate relief, it is the best I can do.

Lastly, I hope that this opinion will not be misused for partisan political purposes.

Nebraskans have had quite enough of that self-serving behavior.

IT IS ORDERED that a judgment in conformity with this memorandum and order shall be entered today by separate document.

### JUDGMENT

Today, and in the past, the court has filed memoranda and orders which dispose of all of the claims of each of the parties. Pursuant to those decisions,

IT IS ORDERED that:

1. Judgment is entered *for* the State of Nebraska, defendant, and all other defendants, and *against* Entergy Arkansas, Inc., Entergy Gulf States, Inc., Entergy Louisiana, Inc., and Wolf Creek Nuclear Operating Corporation, plaintiffs, and U.S. Ecology, Inc., intervenor-plaintiff, *providing that:* the plaintiffs and intervenor-plaintiff shall take nothing as against the State of Nebraska, defendant, and all other defendants; each and all of the plaintiffs' and intervenor-plaintiff's claims against the State of Nebraska, defendant, and all the other defendants, are denied with prejudice; and costs shall be taxed to the plaintiffs and intervenor-plaintiff.

2. Judgment is entered *for* the Central Interstate Low–Level Radioactive Waste Commission, realigned plaintiff, and *against* Entergy Arkansas, Inc., Entergy Gulf States, Inc., Entergy Louisiana, Inc., and Wolf Creek Nuclear Operating Corporation, plaintiffs, and U.S. Ecology, Inc., intervenor-plaintiff, *providing that:* the plaintiffs and intervenor-plaintiff shall take nothing as against the Commission; each and all of the plaintiffs' and intervenor-plaintiff's claims against the Commission are denied with prejudice; and costs shall be taxed to the plaintiffs and intervenor-plaintiff.

3. Judgment is entered *for* the Central Interstate Low–Level Radioactive Waste Commission, realigned plaintiff, and *against* the State of Nebraska, the Nebraska Department of Environmental Quality, and the Nebraska Department of Health and Human Services Regulation & Licensure *as provided in the following subparagraphs:*

A. Regarding the "good faith" claim, the Commission shall have and recover against the State of Nebraska the sum of $151,408,240.37 plus post-judgment interest as provided by law from this date forward until said sum is paid in full.

B. The Court declares that the State of Nebraska breached its "good faith" obligation under Art.III(f) of the Central Interstate Low–Level Radioactive Waste Compact when processing the license application involved in this case pursuant to Art.V(e)(2) of said compact.

C. The preliminary injunction (filing 81) previously entered against the defendants shall remain in effect until this case has become final and the judgment against Nebraska, and others, has been paid, whereupon the injunction shall be dissolved without further order of this court.

D. Costs shall be taxed to the State of Nebraska.

4. Judgment is entered *for* the State of Nebraska, defendant, and all other defendants, and *against* the Central Interstate Low–Level Radioactive Waste Commission, realigned plaintiff, *providing that:* the Commission shall take nothing as against the State of Nebraska, defendant, and all other defendants, regarding the Commission's fiduciary duty claim and misuse of rebate claim; and the Commission's fiduciary duty claim and misuse of rebate claim are denied with prejudice.

## APPENDIX
## CENTRAL INTERSTATE LOW–LEVEL
## RADIOACTIVE WASTE COMPACT

The consent of Congress is hereby given to the states of Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Nebraska, North Dakota, and Oklahoma to enter into the Central Interstate Low–Level Radioactive Waste Compact, and to each and every part and article thereof. Such compact reads substantially as follows:

### CENTRAL INTERSTATE LOW–LEVEL RADIOACTIVE WASTE COMPACT

### ARTICLE I. POLICY AND PURPOSE

The party states recognize that each state is responsible for the management of its non-federal low-level radioactive wastes. They also recognize that the Congress, by enacting the Low–Level Radioactive Waste Policy Act (Public Law 96–573) has authorized and encouraged states to enter into compacts for the efficient management of wastes. It is the policy of the party states to cooperate in the protection of the health, safety and welfare of their citizens and the environment and to provide for and encourage the economical management of low-level radioactive wastes. It is the purpose of this compact to provide the framework for such a cooperative effort; to promote the health, safety and welfare of the citizens and the environment of the region; to limit the number of facilities needed to effectively and efficiently manage low-level radioactive wastes and to encourage the reduction of the generation thereof; and to distribute the costs, benefits and obligations among the party states.

### ARTICLE II. DEFINITIONS

As used in this compact, unless the context clearly requires a different construction:

a. 'commission' means the Central Interstate Low–Level Radioactive Waste Commission;

b. 'disposal' means the isolation and final disposition of waste;

c. 'extended care' means the care of a regional facility including necessary corrective measures subsequent to its active use for waste management until such time as the regional facility no longer poses a threat to the environment or public health;

d. 'facility' means any site, location, structure or property used or to be used for the management of waste;

e. 'generator' means any person who, in the course of or as incident to manufacturing, power generation, processing, medical diagnosis and treatment, biomedical research, other industrial or commercial activity, other research or mining in a party state, produces or processes waste. 'Generator' does not include any person who receives waste generated outside the region for subsequent shipment to a regional facility;

f. 'host state' means any party state in which a regional facility is situated or is being developed;

g. 'low-level radioactive waste' or 'waste' means, as defined in the Low–Level Radioactive Waste Policy Act (Public Law 96–573), radioactive waste not classified as: High-level radioactive waste, transuranic waste, spent nuclear fuel, or by-product material as defined in section 11 e. (2) of the Atomic Energy Act of 1954, as amended through 1978.

h. 'management of waste' means the storage, treatment or disposal of waste;

i. 'notification of each party state' means transmittal of written notice to the Governor, presiding officer of each legislative body and any other persons designated by the party state's Commission member to receive such notice;

j. 'party state' means any state which is a signatory party to this compact;

k. 'person' means any individual, corporation, business enterprise, or other legal entity, either public or private;

l. 'region' means the area of the party states;

m. 'regional facility' means a facility which is located within the region and which has been approved by the Commission for the benefit of the party States;

n. 'site' means any property which is owned or leased by a generator and is contiguous to or divided only by a public or private way from the source of generation;

o. 'state' means a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands or any other territorial possession of the United States;

p. 'storage' means the holding of waste for treatment or disposal; and

q. 'treatment' means any method, technique or process, including storage for radioactive decay, designed to change the physical, chemical or biological characteristics or composition of any waste in order to render such waste after for transport or management, amendable for recovery, convertible to another usable material, or reduced in volume.

## ARTICLE III. RIGHTS AND OBLIGATIONS

a. There shall be provided within the region one or more regional facilities which together provide sufficient capacity to manage all wastes generated within the region. It shall be the duty of regional facilities to accept compatible wastes generated in and from party states, and meeting the requirements of this Act, and each party state shall have the right to have the wastes generated within its borders managed at such facility.

b. To the extent authorized by Federal law and host State law, a host state shall regulate and license any regional facility within its borders and ensure the extended care of such facility.

c. Rates shall be charged to any user of the regional facility, set by the operator of a regional facility and shall be fair and reasonable and be subject to the approval of the host state. Such approval shall be based upon criteria established by the Commission.

d. A host state may establish fees which shall be charged to any user of a regional facility and which shall be in addition to the rates approved pursuant to section c. of this Article, for any regional facility within its borders. Such fees shall be reasonable and shall provide the host state with sufficient revenue to cover any costs associated with such facilities. If such fees have been reviewed and approved by the Commission and to the extent that such revenue is insufficient, all party states shall share the costs in a manner to be determined by the Commission.

e. To the extent authorized by Federal law, each party state is responsible for enforcing any applicable Federal and state laws and regulations pertaining to the packaging and transportation of waste generated within or passing through its borders and shall adopt practices that will ensure that waste shipments originating within its borders and destined for a regional facility will conform to applicable packaging and transportation laws and regulations.

f. Each party state has the right to rely on the good faith performance of each other party state.

g. Unless authorized by the Commission, it shall be unlawful after January 1, 1986, for any person:

1. to deposit at a regional facility, waste not generated within the region;

2. to accept, at a regional facility, waste not generated within the region;

3. to export from the region, waste which is generated within the region; and

4. to transport waste from the site at which it is generated, except to a regional facility.

## ARTICLE IV. THE COMMISSION

a. There is hereby established the Central Interstate Low–Level Radioactive Waste Commission. The Commission shall consist of one voting member from each party state to be appointed according to the laws of each state. The appointing authority of each party state shall notify the Commission in writing of the identity of its member and any alternates. An alternate may act on behalf of the member only in the absence of such member. Each state is responsible for the expenses of its member of the Commission.

b. Each Commission member shall be entitled to one vote. Unless otherwise provided herein, no action of the Commission shall be bonding unless a majority of the total membership casts its vote in the affirmative.

c. The Commission shall elect from among its membership a chairman. The Commission shall adopt and publish, in convenient form, by-laws and policies which are not inconsistent with this compact.

d. The Commission shall meet at least once a year and shall also meet upon the call of the chairman, by petition of a majority of the membership or upon the call of a host state member.

e. The Commission may initiate any proceedings or appear as an intervenor or party in interest before any court of law, or any Federal, state or local agency, board or Commission that has jurisdiction over any matter arising under or relating to the terms of the provisions of this compact. The Commission shall determine in which proceedings it shall intervene or otherwise appear and may arrange for such expert testimony, reports, evidence or other participation in such proceedings as may be necessary to represent its views.

f. The Commission may establish such committees as it deems necessary for the purpose of advising the Commission on any and all matters pertaining to the management of waste.

g. The Commission may employ and compensate a staff limited only to those persons necessary to carry out its duties and functions. The Commission may also contract with and designate any person to perform necessary functions to assist the Commission. Unless otherwise required by the acceptance of a Federal grant, the staff shall serve at the Commission's pleasure irrespective of the civil service, personnel or other merit laws of any of the party states or the Federal government and shall be compensated from funds of the Commission.

h. Funding for the Commission shall be as follows:

1. The Commission shall set and approve its first annual budget as soon as practicable after its initial meeting. Party states shall equally contribute to the Commission budget on an annual basis, an amount not to exceed $25,000 until surcharges are available for that purpose. Host states shall begin imposition of the surcharges provided for in this section as soon as practicable and shall remit to the Commission funds resulting from collection of such surcharges within 60 days of their receipt; and

2. Each state hosting a regional facility shall annually levy surcharges on all users of such facilities, based on the volume and characteristics of wastes received at such facilities, the total of which:

(A) Shall be sufficient to cover the annual budget of the Commission; and

(B) shall be paid to the Commission, provided, however, that each host state collecting such surcharges may retain a portion of the collection sufficient to cover the administrative costs of collection, and that the remainder be sufficient only to cover the approved annual budget of the Commission.

i. The Commission shall keep accurate accounts of all receipts and disbursements. An independent certified public accountant shall annually audit all receipts and disbursements of Commission funds and submit an audit report to the Commission. Such audit report shall be made a part of the annual report of the Commission required by this Article.

j. The Commission may accept for any of its purposes and functions any and all donations, grants of money, equipment, supplies, materials and services, conditional or otherwise from any person and may receive, utilize and dispose of same. The nature, amount and conditions, if any, attendant upon any donation or grant accepted pursuant to this section, together with the identity of the donor, grantor or lender, shall be detailed in the annual report of the Commission.

k. (1) Except as otherwise provided herein, nothing in this compact shall be construed to alter the incidence of liability of any kind for any act, omission, course of conduct, or on account of any casual or other relationships. Generators, transporters of waste, owners and operators of facilities shall be liable for their acts, omissions, conduct or relationships in accordance with all laws relating thereto.

(2) The Commission herein established is a legal entity separate and distinct from the party states and shall be so liable for its actions. Liabilities of the Commission shall not be deemed liabilities of the party states. Members of the Commission shall not be personally liable for actions taken by them in their official capacity[.]

l. Any person or party state aggrieved by a final decision of the Commission may obtain judicial review of such decisions in the United States District Court in the District wherein the Commission maintains its headquarters by filing in such court a petition for review

within 60 days after the Commission's final decision. Proceedings thereafter shall be in accordance with the rules of procedure applicable in such court.

m. The Commission shall:

1. Receive and approve the application of a non-party state to become a party state in accordance with article VII;

2. submit an annual report, and otherwise communicate with, the Governors and the presiding officers of the legislative bodies of the party states regarding the activities of the Commission;

3. hear and negotiate disputes which may arise between the party states regarding this compact;

4. require of and obtain from the party states, and non-party states seeking to become party states, data and information necessary to the implementation of Commission and party states' responsibilities;

5. approve the development and operation of regional facilities in accordance with Article V;

6. notwithstanding any other provision of this compact, have the authority to enter into agreements with any person for the importation of waste into the region and for the right of access to facilities outside the region for waste generated within the region. Such authorization to import or export waste requires the approval of the Commission, including the affirmative vote of any host state which may be affected;

7. revoke the membership of a party state in accordance with Articles V and VII;

8. require all party states and other persons to perform their duties and obligations arising under this compact by an appropriate action in any forum designated in section e. of Article IV; and

9. take such action as may be necessary to perform its duties and functions as provided in this compact.

## ARTICLE V. DEVELOPMENT AND OPERATION OF REGIONAL FACILITIES

a. Following the collection of sufficient data and information from the states, the Commission shall allow each party state the opportunity to volunteer as a host for a regional facility.

b. If no state volunteers or if no proposal identified by a volunteer state is deemed acceptable by the Commission, based on the criteria in section c. of this Article, then the Commission shall publicly seek applicants for the development and operation of regional facilities.

c. The Commission shall review and consider each applicant's proposal based upon the following criteria:

1. The capability of the applicant to obtain a license from the applicable authority;

2. the economic efficiency of each proposed regional facility, including the total estimated disposal and treatment costs per cubic foot of waste;

3. financial assurances;

4. accessibility to all party states; and

5. such other criteria as shall be determined by the Commission to be necessary for the selection of the best proposal, based on the health, safety and welfare of the citizens in the region and the party states.

d. The Commission shall make a preliminary selection of the proposal or proposals considered most likely to meet the criteria enumerated in section c. and the needs of the region.

e. Following notification of each party state of the results of the preliminary selection process, the Commission shall:

1. Authorize any person whose proposal has been selected to pursue licensure of the regional facility or facilities in accordance with the proposal originally submitted to the Commission or as modified with the approval of the Commission; and

2. require the appropriate state or states or the U.S. Nuclear Regulatory Commission to process all applications for permits and licenses required for the development and operation of any regional facility or facilities within a reasonable period from the time that a completed application is submitted.

f. The preliminary selection or selections made by the Commission pursuant to this Article shall become final and receive the Commission's approval as a regional facility upon the issuance of license by the licensing authority. If a proposed regional facility fails to become licensed, the Commission shall make another selection pursuant to the procedures identified in this Article.

g. The Commission may, by two-thirds affirmative vote of its membership, revoke the membership of any party state which, after notice and hearing, shall be found to have arbitrarily or capriciously denied or delayed the issuance of a license or permit to any person authorized by the Commission to apply for such license or permit. Revocation shall be in the same manner as provided for in section e. of Article VII.

## ARTICLE VI. OTHER LAWS AND REGULATIONS

a. Nothing in this compact shall be construed to:

1. Abrogate or limit the applicability of any act of Congress or diminish or otherwise impair the jurisdiction of any Federal agency expressly conferred thereon by the Congress;

2. prevent the application of any law which is not otherwise inconsistent with this compact;

3. prohibit or otherwise restrict the management and waste on the site where it is generated if such is otherwise lawful;

4. affect any judicial or administrative proceeding pending on the effective date of this compact;

5. alter the relations between, and the respective internal responsibilities of, the government of a party state and its subdivisions; and

6. affect the generation or management of waste generated by the Federal government or federal research and development activities.

b. No party state shall pass or enforce any law or regulation which is inconsistent with this compact.

c. All laws and regulations or parts thereof of any party state which are inconsistent with this compact are hereby declared null and void for purposes of this compact. Any legal right, obligation, violation or penalty arising under such laws or regulations prior to enactment of this compact shall not be affected.

d. No law or regulation of a party state or of any subdivision or instrumentality thereof may be applied so as to restrict or make more costly or inconvenient access to any regional facility by the generators of another party state than for the generators of the state where the facility is situated.

## ARTICLE VII. ELIGIBLE PARTIES, WITHDRAWAL, REVOCATION, ENTRY INTO FORCE, TERMINATION

a. This compact shall have as initially eligible parties the states of Arkansas, Iowa, Kansas, Louisiana, Minnesota, Missouri, Nebraska, North Dakota and Oklahoma. Such initial eligibility shall terminate on January 1, 1984.

b. Any state may petition the Commission for eligibility. A petitioning state shall become eligible for membership in the compact upon the unanimous approval of the Commission.

c. An eligible state shall become a member of the compact and shall be bound by it after such state has enacted the compact into law. In no event shall the compact take effect in any state until it has been entered into force as provided for in section f. of this Article.

d. Any party state may withdraw from this compact by enacting a statute repeating [sic] the same. Unless permitted earlier by unanimous approval of the Commission, such withdrawal shall take effect five-years after the Governor of the withdrawing state has given notice in writing of such withdrawal to each Governor of the party states. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

e. Any party state which fails to comply with the terms of this compact or fulfill its obligations hereunder may, after notice and hearing, have its privileges suspended or its membership in the compact revoked by the Commission. Revocation shall take effect one

year from the date such party state receives written notice from the Commission of its action. The Commission may require such party state to pay to the Commission, for a period not to exceed five-years from the date of notice of revocation, an amount determined by the Commission based on the anticipated fees which the generators of such party state would have paid to each regional facility and an amount equal to that which such party state would have contributed in accordance with section d. of Article III, in the event of insufficient revenues. The Commission shall use such funds to ensure the continued availability of safe and economical waste management facilities for all remaining party states. Such state shall also pay an amount equal to that which such party state would have contributed to the annual budget of the Commission if such party state would have remained a member of the compact. All legal rights established under this compact of any party state which has its membership revoked shall cease upon the effective date of revocation; however, any legal obligations of such party state arising prior to the effective date of revocation shall not cease until they have been fulfilled. Written notice of revocation of any state's membership in the company [sic] shall be transmitted immediately following the vote of the Commission, by the chairman, to the Governor of the affected party state, all other Governors of the party states and the Congress of the United States.

 f. This compact shall become effective after enactment by at least three eligible states and after consent has been given to it by the Congress. The Congress shall have the opportunity to withdraw such consent every five-years. Failure of the Congress to withdraw its consent affirmatively shall have the effect of renewing consent for an additional five-year period. The consent given to this compact by the Congress shall extend to any future admittance of new party states under sections b. and c. of this Article and to the power to ban the exportation of waste pursuant to Article III.

 g. The withdrawal of a party state from this compact under section d. of this Article or the revocation of a state's membership in this compact under section 3. of this Article shall not affect the applicability of this compact to the remaining party states.

 h. This compact shall be terminated when all party states have withdrawn pursuant to section d. of this Article.

## ARTICLE VIII. PENALTIES

 a. Each party state, consistent with its own law, shall prescribe and enforce penalties against any person for violation of any provision of this compact.

 b. Each party state acknowledges that the receipt by a regional facility of waste packaged or transported in violation of applicable laws and regulations can result in sanctions which may include suspension or revocation of the violator's right of access to the regional facility.

## ARTICLE IX. SEVERABILITY AND CONSTRUCTION

 The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared by a court of competent jurisdiction to be contrary to the Constitution of any participating state or of the United States or the applicability thereof to any government, agency, person or circumstances is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If any provision of this compact shall be held contrary to the Constitution of any state participating therein, the compact shall remain in full force and effect as to the state affected as to all severable matters. The provisions of this compact shall be liberally construed to give effect to the purpose thereof.

The foregoing document is found at 99 Stat. 1863–1871.

### CIC Project Payments–Prejudgment Simple Interest (Flat Rate) Calculations

This calculation includes each payment made by the Commission and the Post-judgment Interest Rate (the "Rate") under 28 U.S.C. Sec.1961(a), in effect at the time of payment. Simple interest is calculated as follows: The number of days between the payment date and September 30, 2002, is totaled and divided by 365, down to four decimal points (the nearest

one/ten thousandth of a year). This number is multiplied by the Rate in effect at the date of payment, and this result is multiplied by the amount of the payment resulting in a total interest amount. The total simple interest and the payment have been combined for the Balance for each payment. The historical post judgment interest rates may be found at any number of public sources, such as the web site for the United States District Court for the Northern District of Oklahoma, available at www.oknd.uscourts.gov.

| Payment Number | Payment Date | Assumed End Date | Federal Rate | CIC Payment | Simple Interest | Balance |
|---|---|---|---|---|---|---|
| 1 | 12/26/87 | 09/30/02 | 7.22% | $ 25,000.00 | $ 26,664.55 | $ 51,664.55 |
| 4 | 03/03/88 | 09/30/02 | 6.59% | $ 345,388.99 | $ 332,000.77 | $ 677,389.76 |
| 6 | 05/23/88 | 09/30/02 | 7.20% | $ 159,176.94 | $ 164,626.46 | $ 323,803.40 |
| 7 | 06/21/88 | 09/30/02 | 7.59% | $ 153,410.80 | $ 166,332.02 | $ 319,742.82 |
| 8 | 08/17/88 | 09/30/02 | 7.95% | $ 97,569.85 | $ 109,594.06 | $ 207,163.91 |
| 9 | 08/17/88 | 09/30/02 | 7.95% | $ 38,929.82 | $ 43,727.41 | $ 82,657.23 |
| 10 | 09/01/88 | 09/30/02 | 8.32% | $ 273,305.28 | $ 320,339.55 | $ 593,644.83 |
| 11 | 10/06/88 | 09/30/02 | 8.04% | $ 271,550.70 | $ 305,478.02 | $ 577,028.72 |
| 12 | 10/27/88 | 09/30/02 | 8.15% | $ 207,298.42 | $ 235,416.60 | $ 442,715.02 |
| 13 | 11/30/88 | 09/30/02 | 8.55% | $ 271,770.72 | $ 321,617.19 | $ 593,387.91 |
| 14 | 01/03/89 | 09/30/02 | 9.20% | $ 323,827.06 | $ 409,580.01 | $ 733,407.07 |
| 15 | 02/22/89 | 09/30/02 | 9.32% | $ 294,719.48 | $ 373,863.85 | $ 668,583.33 |
| 16 | 04/03/89 | 09/30/02 | 9.43% | $ 277,261.02 | $ 353,002.96 | $ 630,263.98 |
| 17 | 04/03/89 | 09/30/02 | 9.43% | $ 292,158.27 | $ 371,969.83 | $ 664,128.10 |
| 18 | 04/03/89 | 09/30/02 | 9.43% | $ 394,935.03 | $ 502,823.06 | $ 897,758.09 |
| 19 | 05/31/89 | 09/30/02 | 9.15% | $ 394,432.71 | $ 481,537.50 | $ 875,970.21 |
| 20 | 05/31/89 | 09/30/02 | 9.15% | $ 135,660.78 | $ 165,619.51 | $ 301,280.29 |
| 21 | 07/17/89 | 09/30/02 | 8.16% | $ 600,500.96 | $ 647,482.84 | $ 1,247,983.80 |
| 22 | 08/15/89 | 09/30/02 | 7.75% | $ 1,297,864.40 | $ 1,321,101.51 | $ 2,618,965.91 |
| 23 | 10/04/89 | 09/30/02 | 8.19% | $ 792,456.01 | $ 843,550.10 | $ 1,636,006.11 |
| 24 | 10/16/89 | 09/30/02 | 8.19% | $ 490,859.89 | $ 521,186.69 | $ 1,012,046.58 |
| 25 | 01/15/90 | 09/30/02 | 7.74% | $ 853,052.98 | $ 839,528.94 | $ 1,692,581.92 |
| 26 | 12/12/89 | 09/30/02 | 7.69% | $ 726,509.28 | $ 715,576.81 | $ 1,442,086.09 |
| 27 | 03/01/90 | 09/30/02 | 7.97% | $ 1,149,190.42 | $ 1,153,287.21 | $ 2,302,477.63 |
| 31 | 07/23/90 | 09/30/02 | 8.09% | $ 1,163,445.13 | $ 1,148,039.20 | $ 2,311,484.33 |
| 33 | 08/16/90 | 09/30/02 | 7.88% | $ 1,823,245.14 | $ 1,742,954.42 | $ 3,566,199.56 |
| 34 | 09/17/90 | 09/30/02 | 7.95% | $ 945,947.07 | $ 905,730.07 | $ 1,851,677.14 |
| 35 | 12/01/90 | 09/30/02 | 7.28% | $ 1,495,815.86 | $ 1,289,142.47 | $ 2,784,958.33 |
| 36 | 12/10/90 | 09/30/02 | 7.28% | $ 875,723.16 | $ 753,154.55 | $ 1,628,877.71 |
| 37 | 12/10/90 | 09/30/02 | 7.28% | $ 822,136.22 | $ 707,067.78 | $ 1,529,204.00 |
| 38 | 12/28/90 | 09/30/02 | 7.02% | $ 792,942.03 | $ 654,858.89 | $ 1,447,800.92 |
| CIC | 12/03/90 | 09/30/02 | 7.28% | $ 422,741.06 | $ 364,163.28 | $ 786,904.34 |
| 40 | 01/17/91 | 09/30/02 | 6.62% | $ 996,396.16 | $ 772,381.19 | $ 1,768,777.35 |
| 41 | 02/10/91 | 09/30/02 | 6.62% | $ 748,987.82 | $ 577,336.23 | $ 1,326,324.05 |
| 42 | 04/18/91 | 09/30/02 | 6.26% | $ 996,377.39 | $ 714,814.24 | $ 1,711,191.63 |
| 43 | 05/09/91 | 09/30/02 | 6.07% | $ 438,525.99 | $ 303,524.14 | $ 742,050.13 |
| 44 | 05/10/91 | 09/30/02 | 6.07% | $ 287,466.66 | $ 198,921.18 | $ 486,387.84 |
| 46 | 06/17/91 | 09/30/02 | 6.09% | $ 1,395,485.76 | $ 959,982.18 | $ 2,355,467.94 |
| 47 | 07/03/91 | 09/30/02 | 6.39% | $ 146,774.79 | $ 105,532.00 | $ 252,306.79 |
| 48 | 07/22/91 | 09/30/02 | 6.39% | $ 498,325.06 | $ 356,641.28 | $ 854,966.34 |
| 49 | 08/15/91 | 09/30/02 | 6.26% | $ 516,910.07 | $ 360,288.30 | $ 877,198.37 |
| 50 | 08/15/91 | 09/30/02 | 6.26% | $ 50,055.39 | $ 34,888.80 | $ 84,944.19 |
| 51 | 09/05/91 | 09/30/02 | 5.68% | $ 425,571.06 | $ 267,751.12 | $ 693,322.18 |
| 52 | 08/15/91 | 09/30/02 | 6.26% | $ 289,977.00 | $ 202,115.08 | $ 492,092.08 |
| 53 | 10/08/91 | 09/30/02 | 5.57% | $ 507,081.44 | $ 310,301.89 | $ 817,383.33 |
| 54 | 10/08/91 | 09/30/02 | 5.57% | $ 80,403.00 | $ 49,201.57 | $ 129,604.57 |
| 55 | 10/23/91 | 09/30/02 | 5.42% | $ 556,557.36 | $ 330,166.60 | $ 886,723.96 |
| 56 | 10/23/91 | 09/30/02 | 5.42% | $ 375,840.00 | $ 222,959.61 | $ 598,799.61 |
| 57 | 10/23/91 | 09/30/02 | 5.42% | $ 100,000.00 | $ 59,323.01 | $ 159,323.01 |
| 58 | 12/04/91 | 09/30/02 | 4.98% | $ 43,763.00 | $ 23,603.17 | $ 67,366.17 |
| 59 | 12/11/91 | 09/30/02 | 4.98% | $ 703,245.90 | $ 378,617.57 | $ 1,081,863.47 |
| 60 | 01/21/92 | 09/30/02 | 4.02% | $ 528,361.96 | $ 227,240.52 | $ 755,602.48 |
| 61 | 01/21/92 | 09/30/02 | 4.02% | $ 314,172.00 | $ 135,120.64 | $ 449,292.64 |
| 62 | 02/20/92 | 09/30/02 | 4.21% | $ 551,575.18 | $ 246,527.66 | $ 798,102.84 |

| Payment Number | Payment Date | Assumed End Date | Federal Rate | CIC Payment | Simple Interest | Balance |
|---|---|---|---|---|---|---|
| 63 | 01/16/92 | 09/30/02 | 4.02% | $ 100,000.00 | $ 43,063.56 | $ 143,063.56 |
| 64 | 02/20/92 | 09/30/02 | 4.21% | $ 122,771.00 | $ 54,872.75 | $ 177,643.75 |
| 66 | 05/08/92 | 09/30/02 | 4.40% | $ 417,682.96 | $ 191,182.07 | $ 608,865.03 |
| 68 | 05/08/92 | 09/30/02 | 4.40% | $ 1,323,576.97 | $ 605,828.38 | $ 1,929,405.35 |
| 70 | 05/08/92 | 09/30/02 | 4.40% | $ 811,130.95 | $ 371,271.30 | $ 1,182,402.25 |
| 72 | 06/09/92 | 09/30/02 | 4.26% | $ 955,772.35 | $ 419,987.32 | $ 1,375,759.67 |
| 74 | 07/09/92 | 09/30/02 | 4.11% | $ 935,275.90 | $ 393,350.14 | $ 1,328,626.04 |
| 76 | 08/05/92 | 09/30/02 | 3.51% | $ 769,564.20 | $ 274,409.30 | $ 1,043,973.50 |
| 78 | 09/03/92 | 09/30/02 | 3.41% | $ 780,210.67 | $ 268,165.67 | $ 1,048,376.34 |
| 80 | 10/15/92 | 09/30/02 | 3.24% | $ 826,191.49 | $ 266,732.64 | $ 1,092,924.13 |
| 82 | 11/05/92 | 09/30/02 | 3.24% | $ 976,207.10 | $ 313,344.83 | $ 1,289,551.93 |
| 84 | 12/11/92 | 09/30/02 | 3.72% | $ 1,372,451.42 | $ 500,760.52 | $ 1,873,211.94 |
| 85 | 01/07/93 | 09/30/02 | 3.67% | $ 171,118.00 | $ 61,131.37 | $ 232,249.37 |
| 86 | 01/14/93 | 09/30/02 | 3.67% | $ 784,878.13 | $ 279,842.81 | $ 1,064,720.94 |
| 88 | 02/12/93 | 09/30/02 | 3.45% | $ 924,632.57 | $ 307,374.47 | $ 1,232,007.04 |
| 90 | 03/12/93 | 09/30/02 | 3.21% | $ 865,573.02 | $ 265,593.14 | $ 1,131,166.16 |
| 92 | 04/09/93 | 09/30/02 | 3.37% | $ 1,250,425.97 | $ 399,573.45 | $ 1,649,999.42 |
| 94 | 05/07/93 | 09/30/02 | 3.25% | $ 1,010,126.65 | $ 308,773.58 | $ 1,318,900.23 |
| 95 | 06/04/93 | 09/30/02 | 3.54% | $ 271,716.00 | $ 89,731.05 | $ 361,447.05 |
| 96 | 06/19/93 | 09/30/02 | 3.54% | $ 751,815.85 | $ 247,184.69 | $ 999,000.54 |
| 97 | 07/09/93 | 09/30/02 | 3.54% | $ 223,698.00 | $ 73,114.31 | $ 296,812.31 |
| 98 | 07/23/93 | 09/30/02 | 3.58% | $ 456,286.68 | $ 150,193.07 | $ 606,479.75 |
| 99 | 08/13/93 | 09/30/02 | 3.58% | $ 91,489.00 | $ 29,926.43 | $ 121,415.43 |
| 100 | 08/20/93 | 09/30/02 | 3.43% | $ 373,039.21 | $ 116,664.59 | $ 489,703.80 |
| 102 | 09/10/93 | 09/30/02 | 3.43% | $ 715,245.55 | $ 222,275.00 | $ 937,520.55 |
| 104 | 09/08/93 | 09/30/02 | 3.43% | $ 412,184.47 | $ 128,170.96 | $ 540,355.43 |
| 106 | 11/12/93 | 09/30/02 | 3.38% | $ 604,116.60 | $ 181,478.61 | $ 785,595.21 |
| 107 | 12/17/93 | 09/30/02 | 3.61% | $ 309,956.00 | $ 98,374.85 | $ 408,330.85 |
| 108 | 12/23/93 | 09/30/02 | 3.61% | $ 464,186.09 | $ 147,049.45 | $ 611,235.54 |
| 109 | 12/24/93 | 09/30/02 | 3.61% | $ 100,000.00 | $ 31,669.10 | $ 131,669.10 |
| 111 | 01/14/93 | 09/30/02 | 3.67% | $ 561,155.25 | $ 200,075.98 | $ 761,231.23 |
| 113 | 02/18/94 | 09/30/02 | 3.74% | $ 1,023,696.90 | $ 329,996.13 | $ 1,353,693.03 |
| 115 | 03/11/94 | 09/30/02 | 4.22% | $ 815,655.30 | $ 294,697.38 | $ 1,110,352.68 |
| 116 | 04/08/94 | 09/30/02 | 4.51% | $ 285,465.00 | $ 109,239.01 | $ 394,704.01 |
| 117 | 05/07/94 | 09/30/02 | 5.02% | $ 700,649.26 | $ 295,642.51 | $ 996,291.77 |
| 118 | 05/12/94 | 09/30/02 | 5.02% | $ 335,284.00 | $ 141,244.22 | $ 476,528.22 |
| 119 | 05/19/94 | 09/30/02 | 5.02% | $ 683,073.98 | $ 287,099.18 | $ 970,173.16 |
| 120 | 06/10/94 | 09/30/02 | 5.28% | $ 249,841.00 | $ 109,652.96 | $ 359,493.96 |
| 121 | 07/11/94 | 09/30/02 | 5.31% | $ 971,012.56 | $ 424,210.91 | $ 1,395,223.47 |
| 122 | 07/11/94 | 09/30/02 | 5.31% | $ 34,893.00 | $ 15,243.87 | $ 50,136.87 |
| 123 | 08/07/94 | 09/30/02 | 5.49% | $ 559,941.10 | $ 250,642.52 | $ 810,583.62 |
| 124 | 08/12/94 | 09/30/02 | 5.49% | $ 285,912.00 | $ 127,765.77 | $ 413,677.77 |
| 125 | 09/15/94 | 09/30/02 | 5.69% | $ 329,165.36 | $ 150,708.41 | $ 479,873.77 |
| 126 | 09/09/94 | 09/30/02 | 5.67% | $ 338,387.00 | $ 154,701.36 | $ 493,088.36 |
| 127 | 09/30/94 | 09/30/02 | 5.69% | $ 291,662.36 | $ 132,855.64 | $ 424,518.00 |
| 128 | 10/26/94 | 09/30/02 | 6.06% | $ 640,042.00 | $ 307,742.01 | $ 947,784.01 |
| 129 | 10/29/94 | 09/30/02 | 6.06% | $ 276,984.64 | $ 133,040.50 | $ 410,025.14 |
| 130 | 11/09/94 | 09/30/02 | 6.06% | $ 355,801.00 | $ 170,247.56 | $ 526,048.56 |
| 131 | 11/23/94 | 09/30/02 | 6.48% | $ 389,842.68 | $ 198,495.50 | $ 588,338.18 |
| 132 | 12/14/94 | 09/30/02 | 7.22% | $ 76,708.00 | $ 43,198.88 | $ 119,906.88 |
| 133 | 12/30/94 | 09/30/02 | 7.22% | $ 330,226.42 | $ 184,925.17 | $ 515,151.59 |
| 134 | 01/09/95 | 09/30/02 | 7.34% | $ 433,635.00 | $ 245,997.45 | $ 679,632.45 |
| 135 | 01/27/95 | 09/30/02 | 7.34% | $ 325,615.16 | $ 183,540.08 | $ 509,155.24 |
| 136 | 02/09/95 | 09/30/02 | 7.34% | $ 555,159.00 | $ 311,476.14 | $ 866,635.14 |
| 137 | 02/24/95 | 09/30/02 | 7.03% | $ 542,617.73 | $ 290,014.31 | $ 832,632.04 |
| 138 | 03/08/95 | 09/30/02 | 6.57% | $ 348,089.00 | $ 173,118.58 | $ 521,207.58 |
| 139 | 03/23/95 | 09/30/02 | 6.57% | $ 404,048.31 | $ 199,858.46 | $ 603,906.77 |
| 140 | 04/05/95 | 09/30/02 | 6.41% | $ 258,379.00 | $ 124,102.27 | $ 382,481.27 |
| 141 | 04/17/95 | 09/30/02 | 6.41% | $ 524,716.60 | $ 250,921.35 | $ 775,637.95 |
| 142 | 05/17/95 | 09/30/02 | 6.28% | $ 696,788.65 | $ 322,852.53 | $ 1,019,641.18 |
| 143 | 05/05/95 | 09/30/02 | 6.28% | $ 394,580.00 | $ 183,640.78 | $ 578,220.78 |
| 144 | 06/01/95 | 09/30/02 | 5.88% | $ 222,986.00 | $ 96,199.46 | $ 319,185.46 |
| 145 | 06/19/95 | 09/30/02 | 5.88% | $ 647,659.16 | $ 277,531.71 | $ 925,190.87 |
| 146 | 07/01/95 | 09/30/02 | 5.53% | $ 428,258.00 | $ 171,812.89 | $ 600,070.89 |

| Payment Number | Payment Date | Assumed End Date | Federal Rate | CIC Payment | Simple Interest | Balance |
|---|---|---|---|---|---|---|
| 147 | 07/15/95 | 09/30/02 | 5.53% | $ 639,799.31 | $ 255,324.10 | $ 895,123.41 |
| 148 | 08/04/95 | 09/30/02 | 5.70% | $ 283,334.00 | $ 115,660.82 | $ 398,994.82 |
| 149 | 08/04/95 | 09/30/02 | 5.70% | $ 404,257.07 | $ 165,023.27 | $ 569,280.34 |
| 150 | 09/03/95 | 09/30/02 | 5.89% | $ 252,721.86 | $ 105,379.89 | $ 358,101.75 |
| 151 | 09/09/95 | 09/30/02 | 5.89% | $ 35,143.00 | $ 14,619.89 | $ 49,762.89 |
| 152 | 10/11/95 | 09/30/02 | 5.52% | $ 507,659.00 | $ 195,468.47 | $ 703,127.47 |
| 153 | 10/18/95 | 09/30/02 | 5.62% | $ 173,216.48 | $ 67,716.63 | $ 240,933.11 |
| 154 | 11/04/95 | 09/30/02 | 5.62% | $ 250,374.00 | $ 97,224.96 | $ 347,598.96 |
| 155 | 11/15/95 | 09/30/02 | 5.45% | $ 231,490.16 | $ 86,792.64 | $ 318,282.80 |
| 156 | 12/06/95 | 09/30/02 | 5.45% | $ 329,005.00 | $ 122,322.26 | $ 451,327.26 |
| 157 | 12/15/95 | 09/30/02 | 5.35% | $ 174,470.22 | $ 63,446.69 | $ 237,916.91 |
| 158 | 01/06/96 | 09/30/02 | 5.16% | $ 237,786.00 | $ 82,661.19 | $ 320,447.19 |
| 159 | 01/11/96 | 09/30/02 | 5.16% | $ 100,000.00 | $ 34,692.16 | $ 134,692.16 |
| 160 | 01/18/96 | 09/30/02 | 5.16% | $ 151,276.00 | $ 52,331.22 | $ 203,607.22 |
| 161 | 02/05/96 | 09/30/02 | 4.89% | $ 244,753.00 | $ 79,647.39 | $ 324,400.39 |
| 162 | 02/23/96 | 09/30/02 | 4.89% | $ 105,947.30 | $ 34,221.82 | $ 140,169.12 |
| 163 | 03/06/96 | 09/30/02 | 5.25% | $ 236,564.00 | $ 81,629.16 | $ 318,193.16 |
| 164 | 03/29/96 | 09/30/02 | 5.25% | $ 154,792.09 | $ 52,900.73 | $ 207,692.82 |
| 165 | 03/29/96 | 09/30/02 | 5.25% | $ 449,369.00 | $ 153,573.39 | $ 602,942.39 |
| 166 | 04/18/96 | 09/30/02 | 5.46% | $ 144,524.03 | $ 50,934.86 | $ 195,458.89 |
| 167 | 05/08/96 | 09/30/02 | 5.60% | $ 209,044.00 | $ 74,921.37 | $ 283,965.37 |
| 168 | 05/10/96 | 09/30/02 | 5.60% | $ 204,005.29 | $ 73,052.90 | $ 277,058.19 |
| 169 | 05/31/96 | 09/30/02 | 5.62% | $ 272,978.00 | $ 97,218.01 | $ 370,196.01 |
| 170 | 06/06/96 | 09/30/02 | 5.62% | $ 151,375.36 | $ 53,770.77 | $ 205,146.13 |
| 171 | 06/05/96 | 09/30/02 | 5.62% | $ 245,727.00 | $ 87,323.70 | $ 333,050.70 |
| 172 | 06/30/96 | 09/30/02 | 5.89% | $ 182,727.04 | $ 67,317.99 | $ 250,045.03 |
| 173 | 07/07/96 | 09/30/02 | 5.89% | $ 530,519.00 | $ 194,847.86 | $ 725,366.86 |
| 174 | 08/07/96 | 09/30/02 | 5.81% | $ 134,005.00 | $ 47,887.33 | $ 181,892.33 |
| 175 | 09/09/96 | 09/30/02 | 5.67% | $ 148,993.07 | $ 51,196.63 | $ 200,189.70 |
| 176 | 08/27/96 | 09/30/02 | 5.67% | $ 246,741.00 | $ 85,282.82 | $ 332,023.82 |
| 177 | 10/10/96 | 09/30/02 | 5.64% | $ 174,499.39 | $ 58,807.92 | $ 233,307.31 |
| 178 | 09/24/96 | 09/30/02 | 5.90% | $ 289,057.00 | $ 102,653.25 | $ 391,710.25 |
| 179 | 11/08/96 | 09/30/02 | 5.49% | $ 130,053.69 | $ 42,096.35 | $ 172,150.04 |
| 180 | 10/25/96 | 09/30/02 | 5.64% | $ 267,516.00 | $ 89,535.33 | $ 357,051.33 |
| 181 | 12/12/96 | 09/30/02 | 5.45% | $ 193,840.75 | $ 61,302.00 | $ 255,142.75 |
| 182 | 11/22/96 | 09/30/02 | 5.49% | $ 371,636.00 | $ 119,510.20 | $ 491,146.20 |
| 183 | 01/03/97 | 09/30/02 | 5.61% | $ 205,751.02 | $ 66,283.17 | $ 272,034.19 |
| 184 | 01/03/97 | 09/30/02 | 5.61% | $ 100,000.00 | $ 32,215.23 | $ 132,215.23 |
| 185 | 12/24/96 | 09/30/02 | 5.45% | $ 400,718.00 | $ 126,008.79 | $ 526,726.79 |
| 186 | 01/31/97 | 09/30/02 | 5.64% | $ 141,249.02 | $ 45,135.91 | $ 186,384.93 |
| 187 | 01/24/97 | 09/30/02 | 5.61% | $ 357,727.00 | $ 114,087.96 | $ 471,814.96 |
| 188 | 03/07/97 | 09/30/02 | 5.67% | $ 205,582.94 | $ 64,925.40 | $ 270,508.34 |
| 189 | 02/25/97 | 09/30/02 | 5.64% | $ 342,100.00 | $ 107,996.00 | $ 450,096.00 |
| 190 | 04/04/97 | 09/30/02 | 6.00% | $ 183,943.18 | $ 60,625.66 | $ 244,568.84 |
| 191 | 03/25/97 | 09/30/02 | 5.67% | $ 465,792.00 | $ 145,799.91 | $ 611,591.91 |
| 192 | 05/02/97 | 09/30/02 | 6.06% | $ 157,563.38 | $ 51,718.00 | $ 209,281.38 |
| 193 | 04/25/97 | 09/30/02 | 6.06% | $ 343,369.00 | $ 113,105.18 | $ 456,474.18 |
| 194 | 06/06/97 | 09/30/02 | 5.88% | $ 157,645.44 | $ 49,319.10 | $ 206,964.54 |
| 195 | 05/23/97 | 09/30/02 | 5.88% | $ 358,251.00 | $ 112,886.17 | $ 471,137.17 |
| 196 | 07/03/97 | 09/30/02 | 5.65% | $ 189,691.59 | $ 56,230.56 | $ 245,922.15 |
| 197 | 06/26/97 | 09/30/02 | 5.65% | $ 390,336.00 | $ 116,130.84 | $ 506,466.84 |
| 198 | 07/31/97 | 09/30/02 | 5.56% | $ 155,758.22 | $ 44,771.83 | $ 200,530.05 |
| 199 | 07/25/97 | 09/30/02 | 5.56% | $ 288,645.00 | $ 83,233.20 | $ 371,878.20 |
| 200 | 09/06/97 | 09/30/02 | 5.58% | $ 191,096.85 | $ 54,046.38 | $ 245,143.23 |
| 201 | 08/25/97 | 09/30/02 | 5.58% | $ 503,843.00 | $ 143,422.15 | $ 647,265.15 |
| 202 | 10/09/97 | 09/30/02 | 5.49% | $ 246,476.87 | $ 67,361.32 | $ 313,838.19 |
| 203 | 09/25/97 | 09/30/02 | 5.60% | $ 415,339.00 | $ 116,677.26 | $ 532,016.26 |
| 204 | 11/05/97 | 09/30/02 | 5.49% | $ 200,662.12 | $ 54,025.39 | $ 254,687.51 |
| 204B | 11/06/97 | 09/30/02 | 5.42% | $ 318,951.79 | $ 84,730.90 | $ 403,682.69 |
| 205 | 10/24/97 | 09/30/02 | 5.49% | $ 410,911.00 | $ 111,373.54 | $ 522,284.54 |
| 206 | 12/05/97 | 09/30/02 | 5.47% | $ 266,538.12 | $ 70,276.10 | $ 336,814.22 |
| 207 | 11/25/97 | 09/30/02 | 5.42% | $ 508,636.00 | $ 133,686.26 | $ 642,322.26 |
| 208 | 01/05/98 | 09/30/02 | 5.47% | $ 288,692.64 | $ 74,776.71 | $ 363,469.35 |
| 209 | 01/02/98 | 09/30/02 | 5.47% | $ 100,000.00 | $ 25,946.78 | $ 125,946.78 |

| Payment Number | Payment Date | Assumed End Date | Federal Rate | CIC Payment | Simple Interest | Balance |
|---|---|---|---|---|---|---|
| 209A | 12/29/97 | 09/30/02 | 5.47% | $ 424,038.00 | $ 110,278.32 | $ 534,316.32 |
| 210 | 02/20/98 | 09/30/02 | 5.23% | $ 328,981.15 | $ 79,365.18 | $ 408,346.33 |
| 211 | 01/23/98 | 09/30/02 | 5.34% | $ 339,727.00 | $ 85,056.95 | $ 424,783.95 |
| 213 | 02/25/98 | 09/30/02 | 5.23% | $ 187,018.00 | $ 44,983.19 | $ 232,001.19 |
| 214 | 03/13/98 | 09/30/02 | 5.41% | $ 403,173.95 | $ 99,262.91 | $ 502,436.86 |
| 215 | 04/10/98 | 09/30/02 | 5.39% | $ 333,366.43 | $ 80,454.51 | $ 413,820.94 |
| 216 | 03/25/98 | 09/30/02 | 5.41% | $ 453,595.00 | $ 110,870.42 | $ 564,465.42 |
| 217 | 05/08/98 | 09/30/02 | 5.41% | $ 206,132.34 | $ 49,040.53 | $ 255,172.87 |
| 218 | 04/24/98 | 09/30/02 | 5.41% | $ 230,815.00 | $ 55,391.43 | $ 286,206.43 |
| 219 | 06/05/98 | 09/30/02 | 5.43% | $ 192,704.02 | $ 45,271.46 | $ 237,975.48 |
| 220 | 05/22/98 | 09/30/02 | 5.43% | $ 229,828.00 | $ 54,471.93 | $ 284,299.93 |
| 221 | 07/09/98 | 09/30/02 | 5.41% | $ 229,686.96 | $ 52,593.10 | $ 282,280.06 |
| 222 | 06/25/98 | 09/30/02 | 5.41% | $ 532,095.00 | $ 122,942.43 | $ 655,037.43 |
| 223 | 07/17/98 | 09/30/02 | 5.38% | $ 107,812.69 | $ 24,386.34 | $ 132,199.03 |
| 224 | 08/07/98 | 09/30/02 | 5.38% | $ 165,952.40 | $ 37,023.87 | $ 202,976.27 |
| 225 | 07/24/98 | 09/30/02 | 5.38% | $ 244,021.00 | $ 54,944.00 | $ 298,965.00 |
| 226 | 09/10/98 | 09/30/02 | 5.27% | $ 209,869.11 | $ 44,885.26 | $ 254,754.37 |
| 227 | 08/26/98 | 09/30/02 | 5.27% | $ 251,255.00 | $ 54,280.83 | $ 305,535.83 |
| 228 | 10/09/98 | 09/30/02 | 4.73% | $ 217,493.58 | $ 40,924.31 | $ 258,417.89 |
| 229 | 09/24/98 | 09/30/02 | 4.73% | $ 290,572.00 | $ 55,239.81 | $ 345,811.81 |
| 230 | 11/06/98 | 09/30/02 | 4.24% | $ 268,358.81 | $ 44,412.34 | $ 312,771.15 |
| 231 | 10/23/98 | 09/30/02 | 4.24% | $ 298,275.00 | $ 49,848.67 | $ 348,123.67 |
| 232 | 12/11/98 | 09/30/02 | 4.51% | $ 245,065.51 | $ 42,087.87 | $ 287,153.38 |
| 233 | 11/27/98 | 09/30/02 | 4.62% | $ 289,398.00 | $ 51,348.31 | $ 340,746.31 |
| 234 | 01/07/99 | 09/30/02 | 4.55% | $ 324,393.60 | $ 55,016.18 | $ 379,409.78 |
| 235 | 12/28/98 | 09/30/02 | 4.51% | $ 209,561.00 | $ 35,549.79 | $ 245,110.79 |
| 237 | 01/27/99 | 09/30/02 | 4.55% | $ 277,100.00 | $ 46,305.23 | $ 323,405.23 |
| 238 | 02/18/99 | 09/30/02 | 4.58% | $ 268,216.28 | $ 44,464.23 | $ 312,680.51 |
| 239 | 02/26/99 | 09/30/02 | 4.58% | $ 91,181.87 | $ 15,024.29 | $ 106,206.16 |
| 240 | 02/25/99 | 09/30/02 | 4.58% | $ 260,922.00 | $ 43,025.62 | $ 303,947.62 |
| 241 | 04/01/99 | 09/30/02 | 4.73% | $ 69,903.14 | $ 11,581.89 | $ 81,485.03 |
| 242 | 04/21/99 | 09/30/02 | 4.73% | $ 129,085.02 | $ 21,052.73 | $ 150,137.75 |
| 243 | 04/21/99 | 09/30/02 | 4.73% | $ 65.63 | $ 10.70 | $ 76.33 |
| 245 | 05/27/99 | 09/30/02 | 4.88% | $ 5,348.47 | $ 873.65 | $ 6,222.12 |
| 246 | 05/27/99 | 09/30/02 | 4.88% | $ 161,638.15 | $ 26,402.99 | $ 188,041.14 |
| 247 | 06/29/99 | 09/30/02 | 5.16% | $ 54,676.96 | $ 9,195.93 | $ 63,872.89 |
| 248 | 07/29/99 | 09/30/02 | 4.97% | $ 438.54 | $ 69.15 | $ 507.69 |
| 249 | 09/21/99 | 09/30/02 | 5.29% | $ 18,536.78 | $ 2,965.85 | $ 21,502.63 |
| 250 | 09/20/99 | 09/30/02 | 5.29% | $ −6,335.42 | $ (1,014.57) | $ (7,349.99) |
| 251 | 11/15/99 | 09/30/02 | 5.47% | $ 5,924.82 | $ 932.48 | $ 6,857.30 |
| | TOTALS | | | $88,554,291.77 | $46,207,748.73 | $134,762,040.50 |

**US Ecology Credits—Prejudgment Simple Interest (Flat Rate) Calculations**

This calculation includes each credit from U.S. Ecology used by the Commission and the Post-judgment Interest Rate (the "Rate") under 28 U.S.C. Sec.1961(a), in effect on the last day of the work month when the credit or "sweat equity" was contributed. Simple interest is calculated as follows: The number of days between the credit date and September 30, 2002, is totaled and divided by 365, down to four decimal points (the nearest one/ten thousandth of a year). This number is multiplied by the Rate in effect at the date of credit, and this result is multiplied by the amount of the credit resulting in a total interest amount. The total simple interest and the credit have been combined for the Balance for each credit. The historical post judgment interest rates may be found at any number of public sources, such as the web site for the United States District Court for the Northern District of Oklahoma, available at www.oknd.uscourts.gov.

| Payment Number | Last Day of Work Month | Assumed End Date | Federal Rate | USE Share | Simple Interest | Balance |
|---|---|---|---|---|---|---|
| 1 | 07/31/87 | 09/30/02 | 6.64% | $ 5,698.58 | $ 5,743.17 | $ 11,441.75 |
| 2 | 09/30/87 | 09/30/02 | 7.88% | $ 11,934.27 | $ 14,116.61 | $ 26,050.88 |

| Payment Number | Last Day of Work Month | Assumed End Date | Federal Rate | USE Share | Simple Interest | Balance |
|---|---|---|---|---|---|---|
| 3 | 11/30/87 | 09/30/02 | 6.93% | $ 10,481.95 | $ 10,782.55 | $ 21,264.50 |
| 4 | 12/31/87 | 09/30/02 | 7.22% | $ 8,831.97 | $ 9,411.28 | $ 18,243.25 |
| 5 | 01/31/88 | 09/30/02 | 7.14% | $ 7,237.75 | $ 7,583.15 | $ 14,820.90 |
| 6 | 02/28/88 | 09/30/02 | 6.59% | $ 8,922.41 | $ 8,583.00 | $ 17,505.41 |
| 7 | 03/31/88 | 09/30/02 | 6.71% | $ 16,626.79 | $ 16,187.73 | $ 32,814.52 |
| 8 | 04/30/88 | 09/30/02 | 7.01% | $ 15,264.41 | $ 15,437.82 | $ 30,702.23 |
| 9 | 05/31/88 | 09/30/02 | 7.20% | $ 4,239.20 | $ 4,377.64 | $ 8,616.84 |
| 10 | 06/30/88 | 09/30/02 | 7.54% | $ 29,761.12 | $ 31,999.89 | $ 61,761.01 |
| 11 | 07/31/88 | 09/30/02 | 7.95% | $ 29,570.06 | $ 33,323.68 | $ 62,893.74 |
| 12 | 08/31/88 | 09/30/02 | 8.32% | $ 22,573.41 | $ 26,463.31 | $ 49,036.72 |
| 13 | 09/30/88 | 09/30/02 | 8.04% | $ 29,594.02 | $ 33,330.59 | $ 62,924.61 |
| 14 | 10/31/88 | 09/30/02 | 8.15% | $ 35,262.60 | $ 40,014.16 | $ 75,276.76 |
| 15 | 11/30/88 | 09/30/02 | 8.55% | $ 32,092.98 | $ 37,979.27 | $ 70,072.25 |
| 16 | 12/31/88 | 09/30/02 | 9.20% | $ 30,191.87 | $ 38,209.84 | $ 68,401.71 |
| 17 | 01/31/89 | 09/30/02 | 9.16% | $ 31,814.08 | $ 39,840.29 | $ 71,654.37 |
| 18 | 02/28/89 | 09/30/02 | 9.32% | $ 43,005.79 | $ 54,488.74 | $ 97,494.53 |
| 19 | 03/31/89 | 09/30/02 | 9.43% | $ 42,951.09 | $ 54,717.72 | $ 97,668.81 |
| 20 | 04/30/89 | 09/30/02 | 9.51% | $ 14,772.55 | $ 18,863.74 | $ 33,636.29 |
| 21 | 05/31/89 | 09/30/02 | 9.15% | $ 65,390.54 | $ 79,831.10 | $ 145,221.64 |
| 22 | 06/30/89 | 09/30/02 | 8.16% | $ 141,328.77 | $ 152,923.15 | $ 294,251.92 |
| 23 | 07/31/89 | 09/30/02 | 7.75% | $ 86,293.17 | $ 88,113.01 | $ 174,406.18 |
| 24 | 08/31/89 | 09/30/02 | 8.27% | $ 53,451.37 | $ 57,865.22 | $ 111,316.59 |
| 24 | 09/12/89 | 09/30/02 | 8.27% | $ 225,000.00 | $ 242,968.07 | $ 467,968.07 |
| 25 | 09/30/89 | 09/30/02 | 8.19% | $ 92,891.77 | $ 98,964.40 | $ 191,856.17 |
| 26 | 10/31/89 | 09/30/02 | 7.90% | $ 79,112.01 | $ 80,768.59 | $ 159,880.60 |
| 27 | 11/30/89 | 09/30/02 | 7.69% | $ 240,317.30 | $ 237,308.59 | $ 477,625.89 |
| 27 | 12/23/89 | 09/30/02 | 7.66% | $ 75,000.00 | $ 73,410.08 | $ 148,410.08 |
| 28 | 12/31/89 | 09/30/02 | 7.66% | $ 973,612.14 | $ 951,338.03 | $ 1,924,950.17 |
| 29 | 01/31/90 | 09/30/02 | 7.74% | $ 852,787.27 | $ 836,374.04 | $ 1,689,161.31 |
| 30 | 02/28/90 | 09/30/02 | 7.97% | $ 0.00 | $ 0.00 | $ 0.00 |
| 31 | 03/31/90 | 09/30/02 | 8.36% | $ 425,555.75 | $ 445,046.90 | $ 870,602.65 |
| 32 | 04/30/90 | 09/30/02 | 8.32% | $ 130,961.05 | $ 135,408.42 | $ 266,369.47 |
| 33 | 05/31/90 | 09/30/02 | 8.24% | $ 189,779.16 | $ 193,009.05 | $ 382,788.21 |
| 34 | 06/30/90 | 09/30/02 | 8.09% | $ 166,408.37 | $ 165,053.17 | $ 331,461.54 |
| 35 | 07/27/90 | 09/30/02 | 7.88% | $ 263,139.76 | $ 252,687.99 | $ 515,827.75 |
| 36 | 08/31/90 | 09/30/02 | 7.95% | $ 154,054.78 | $ 148,075.56 | $ 302,130.34 |
| 37 | 09/30/90 | 09/30/02 | 7.78% | $ 218,995.34 | $ 204,594.09 | $ 423,589.43 |
| 38 | 10/31/90 | 09/30/02 | 7.51% | $ 139,492.16 | $ 124,906.71 | $ 264,398.87 |
| CIC | 10/31/90 | 09/30/02 | 7.51% | $ 0.00 | $ 0.00 | $ 0.00 |
| 39 | 11/30/90 | 09/30/02 | 7.28% | $ 175,283.24 | $ 151,099.72 | $ 326,382.96 |
| 40 | 12/31/90 | 09/30/02 | 7.02% | $ 161,500.14 | $ 133,283.28 | $ 294,783.42 |
| 41 | 01/31/91 | 09/30/02 | 6.62% | $ 148,496.20 | $ 114,733.45 | $ 263,229.65 |
| CIC | 01/31/91 | 09/30/02 | 6.62% | $ 0.00 | $ 0.00 | $ 0.00 |
| 42 | 02/28/91 | 09/30/02 | 6.21% | $ 117,384.14 | $ 84,518.90 | $ 201,903.04 |
| 43 | 03/31/91 | 09/30/02 | 6.46% | $ 77,144.27 | $ 57,358.27 | $ 134,502.54 |
| 44 | 03/31/91 | 09/30/02 | 6.46% | $ 50,570.34 | $ 37,600.03 | $ 88,170.37 |
| 45 | 04/30/91 | 09/30/02 | 6.26% | $ 195,672.87 | $ 139,975.58 | $ 335,648.45 |
| 46 | 04/30/91 | 09/30/02 | 6.26% | $ 49,817.10 | $ 35,636.91 | $ 85,454.01 |
| 47 | 05/31/91 | 09/30/02 | 6.09% | $ 25,820.21 | $ 17,835.47 | $ 43,655.68 |
| 48 | 05/31/91 | 09/30/02 | 6.09% | $ 87,663.96 | $ 60,554.42 | $ 148,218.38 |
| 49 | 06/30/91 | 09/30/02 | 6.39% | $ 90,933.38 | $ 65,429.43 | $ 156,362.81 |
| 50 | 06/30/91 | 09/30/02 | 6.39% | $ 8,805.61 | $ 6,335.91 | $ 15,141.52 |
| 51 | 07/31/91 | 09/30/02 | 6.26% | $ 54,431.00 | $ 38,078.65 | $ 92,509.65 |
| | TOTAL | | | $ 6,247,920.07 | $ 6,012,540.36 | $ 12,260,460.43 |

**Prejudgment Community Improvement Fund Payments—Prejudgment Simple Interest (Flat Rate) Calculations**

This calculation includes each C.I.F. payment made by the Commission and the Post-judgment Interest Rate (the "Rate") under 28 U.S.C. Sec.1961(a), in effect at the time of payment assumed for these purposes to be the last day of the year for each of the 10 years. Simple interest is calculated as follows: The number of days between the payment date and

September 30, 2002, is totaled and divided by 365, down to four decimal points (the nearest one/ten thousandth of a year). This number is multiplied by the Rate in effect at the date of payment, and this result is multiplied by the amount of the payment resulting in a total interest amount. The total simple interest and the payment have been combined for the Balance for each payment. The historical post judgment interest rates may be found at any number of public sources, such as the web site for the United States District Court for the Northern District of Oklahoma, available at www.oknd.uscourts.gov.